UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

VERNON COPELAND,

Defendant.

21 Cr. 521 (KMK)

**THE GOVERNMENT'S SENTENCING MEMORANDUM**

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

Timothy Ly
Danielle Sassoon
Assistant United States Attorneys
Southern District of New York
          *- Of Counsel -*

# Table of Contents

I.    Preliminary Statement ........................................................................................... 1

II.   The Offense Conduct Proven at Trial ...................................................................... 2

    A.    Copeland Raped And Sexually Abused "Alyssa" For Years................................. 2

        1.    Copeland Began Sexually Abusing Alyssa When She Was Nine
             Years Old. ................................................................................................ 2

        2.    Copeland's Sexual Abuse of Alyssa Continued After She Moved
             Back to Bridgeport, Connecticut........................................................... 3

        3.    Alyssa Feared Copeland Because He Owned a Gun, Slapped
             Alyssa, and Was Physically Abusive Towards His Girlfriends................. 6

    B.    In March 2020, Alyssa Confided In a Friend That Copeland Had Raped
        Her.................................................................................................................... 6

    C.    At the Direction of the FBI, Alyssa Participated in Recorded Calls in
        Which Copeland Urged Alyssa to Induce a Miscarriage........................................ 7

    D.    Copeland Fled From New York After The April 1, 2020 Call And Was
        Arrested in August 2021 ..................................................................................... 8

    E.    Copeland's Cellphone Contained Webpages and Searches Related to
        ███████ Pornography and the Rape of Minors...................................................... 8

    F.    Dr. Dawn Hughes Testimony Provides Context for Understanding How
        Copeland Perpetrated the Sexual Abuse for So Long............................................. 9

    G.    Copeland Raped At Least Three Other Minors Since 2004 ................................ 11

        1.    Copeland Raped Two Minors on Thanksgiving Day 2004 ..................... 11

        2.    Copeland Raped His Then-Girlfriend's Sister in 2010............................ 13

III.  Copeland Obstructed The Legal Proceedings Throughout His Case............................... 15

IV.   The Applicable Guidelines Range ................................................................................ 20

V.    Probation and Defense Counsel's Recommended Sentences ........................................... 22

VI.   Discussion ................................................................................................................ 22

    A.    Applicable Law ................................................................................................ 22

B.  Copeland's Objections to the PSR .................................................................... 23

C.  The Court Should Impose a Guidelines Range Sentence of Life
Imprisonment .................................................................................................... 24

D.  Response to Copeland's Sentencing Submission. ................................................. 29

VII.  Conclusion ................................................................................................................ 32

The Government respectfully submits this memorandum in advance of Vernon Copeland's sentencing, which is currently scheduled for June 25, 2024, and in response to the defendant's sentencing memorandum dated April 22, 2024 ("Def. Mem."). For the reasons set forth below, the Court should sentence Copeland to the Guidelines range of life imprisonment for his heinous crimes. Such a sentence would be sufficient but not greater than necessary to serve the purposes of sentencing.

## I.    Preliminary Statement

On July 14, 2023, after a five-day trial, a jury convicted Copeland of three counts: coercion and enticement of a minor, in violation of 18 U.S.C. § 2422(b); aggravated sexual abuse of someone who was not yet 12 years of age, in violation of 18 U.S.C. § 2241(c); and transportation of a minor with the intent that the minor engage in sexual activity, in violation of 18 U.S.C. § 2423(a). Although the Court is familiar with the facts underlying those convictions, having presided over the trial, the defendant's criminal conduct is detailed below.

The facts proven at trial make clear that over approximately sixteen years, Copeland raped four minors, including ███████████████. During the rape of three of the minors, Copeland used his size and strength to physically overpower and frighten the girls. For the fourth minor, ██ ███████████, he also used psychologically and emotionally manipulative techniques that allowed him to rape and sexually abuse her over and over again when she was between the ages of nine and thirteen years old, and he only stopped because he was caught. The trial evidence proved that Copeland engaged in pervasive grooming by isolating █████████ psychologically and physically, desensitizing her to his sexual abuse, taking advantage of her lack of knowledge about sex to "normalize" the sexual abuse, and securing her silence by repeatedly telling her their relationship was a "miracle" or "blessing" and warning her of the terrible consequences if she disclosed the abuse. When under the mistaken belief that █████████ was pregnant, Copeland directed her to induce a

miscarriage and then fled to Florida, disconnected his phone, and used the name "Quentin." Since his arrest, Copeland has waged an ongoing campaign of feigning injuries and mental incapacity in the hopes of forestalling his eventual conviction and sentencing.

## II.    The Offense Conduct Proven at Trial

### A.    Copeland Raped And Sexually Abused "Alyssa" For Years

#### 1.    Copeland Began Sexually Abusing Alyssa When She Was Nine Years Old.

In 2015, Copeland's ███████ Alyssa was living in Bridgeport, Connecticut, with her mother and two siblings until around Christmas of that year, when Alyssa's mother was driving under the influence and got into a car accident with Alyssa in the car. (Tr. 65.) Shortly after, Copeland gained custody of Alyssa. (Tr. 65-66.) She was nine years old. (Tr. 64, 66-67.)

Alyssa moved in with Copeland and his then girlfriend "Elish" or "Lish" Ferara, at her house in Middleton, New York. (Tr. 66, 480.) Alyssa testified that in the beginning, she did "normal things" with Copeland and Ferara, like "make dinner together[,] go on little trips, go fishing, drive around." (Tr. 68.) She also enrolled in the third grade at a local elementary school. (Tr. 76; GX 104.) During this time, she felt that her relationship with Copeland "was good. I felt like I could trust him. He was like my closest ██████." (Tr. 68.)

About three weeks after moving in, things changed. Copeland began touching Alyssa sexually. (Tr. 68-69.) Almost every night, when Copeland came to tuck Alyssa in, he would caress her thighs, chest, and butt, and then touch her vagina. (Tr. 69.) Alyssa did not understand what was happening, but she knew that she felt "helpless" and "confused." (Tr. 69.) Copeland warned her not to tell anybody about the touching because he could get in trouble. (Tr. 69-70.) He told her their relationship was "a blessing and a miracle." (Tr. 103.)

In the months that followed the car accident, whenever one of Copeland's on-again-off-again girlfriends kicked him out of their residence, Alyssa and Copeland moved sporadically, staying at four other locations, including a shelter in Middletown, New York, and his other girlfriend Yeiana Smith's apartment in Poughkeepsie, New York. (Tr. 70.) At the shelter, Alyssa recalled that Copeland would push a set of bunk beds against the bedroom door at night to block anyone from entering; then, on the twin bed, he would touch Alyssa on her vagina, her chest, and her butt. (Tr. 70-71.) At Smith's residence, Alyssa slept on the couch, and at night, Copeland would join her there and touch her vagina. (Tr. 73-74.) At some point while she was in Copeland's custody, Copeland began performing oral sex on Alyssa, placing his mouth on her vagina and her chest, and touching her with his penis. (Tr. 74.)

### 2. Copeland's Sexual Abuse of Alyssa Continued After She Moved Back to Bridgeport, Connecticut

When Alyssa moved back to Bridgeport, Connecticut, in 2016 to live with her mother, Alyssa still saw Copeland every weekend when he picked her up in Bridgeport and took her back to New York. (Tr. 76-77, 80.) Copeland would communicate with Alyssa via Instagram or Snapchat while she was at her mother's house, with Copeland sometimes sending Alyssa emojis of a tongue or peach, which Alyssa understood to mean a "butt." (Tr. 78.) To arrange a pick-up of Alyssa from Bridgeport, Copeland and Alyssa's mother would talk over the phone, and occasionally, Alyssa's mother would hand her the phone so that she could talk to Copeland. (Tr. 77-78.)

On these drives from Bridgeport to New York, Copeland would touch Alyssa's chest and vagina. (Tr. 80.) Alyssa testified that on almost every drive drive from Bridgeport to New York, Copeland made Alyssa perform oral sex on him. (Tr. 74.) She recalled that he requested oral sex by asking her to "kiss" his penis and making a kissing gesture towards his lap. (Tr. 75.) Alyssa did not realize that what she was doing was oral sex until the time at Ferara's house, when Copeland

expressly asked Alyssa to "give him oral sex" and told her not to tell anyone that they were having sex. (Tr. 81.) It was only then she began to understand. (Tr. 81.)

The sexual abuse and rape continued when they arrived in New York. When Alyssa needed essentials like deodorant, lotion, or clothes, Copeland would make her perform sexual acts before he would buy those items for her. (Tr. 82.) Alyssa remembered one time when she asked Copeland for a pair of sneakers, and Copeland gestured towards his penis and demanded oral sex from her before he would buy her the sneakers. (Tr. 82.) Even then, Copeland did not buy her the sneakers until she also had vaginal sex with him. (Tr. 82.)

Alyssa's weekend visitations continued as she went through the fourth, fifth, sixth, and seventh grades in Bridgeport. (Tr. 81, 86, 88-92, 94, 415.) So too did Copeland's rape and sexual abuse of Alyssa. She testified about three separate instances when Copeland raped her. The first was at a studio apartment on Church Street in Poughkeepsie, New York. She testified that she had finished giving Copeland oral sex when he "turned [her] over and . . . put his penis in [her] vagina." (Tr. 92.)

The next happened in January 2020. Copeland parked his car on his friend's wooded property in Newburgh, New York, had vaginal sex with Alyssa in the front passenger seat, and then told Alyssa to get into the backseat. (Tr. 95-96.) After climbing over the armrest into the backseat, Copeland began having anal sex with Alyssa without saying anything. (Tr. 96.) Alyssa told Copeland that it was painful and asked him to stop, but he did not stop. (Tr. 96-97.) When Copeland's friend arrived, Copeland wiped the ejaculate off Alyssa, and they both quickly put on their clothes. (Tr. 97.) Corroborating Alyssa's testimony about her visitation with Copeland in January is cell-site location data showing that a cellphone attributed to Copeland traveled from

New York to Bridgeport and back on January 13, 2020, and repeated that travel on January 16, 2020. (Tr. 184, 361-65, 408; GX 109 at 6-7.)

Finally, Alyssa testified that the last time that Copeland took advantage of her was on the evening of February 8, 2020. (Tr. 100-101.) Copeland parked his car in the back of a residential complex called Barclay Manor in Newburgh, New York. (Tr. 99, 101.) Copeland climbed over into the passenger seat, placed Alyssa on top of him and had vaginal sex with her. (Tr. 101-02.) Corroborating Alyssa's testimony about her travel with Copeland in February is cell-site location data showing that a cellphone attributed to Copeland traveled from New York to Bridgeport and back on February 7, 2020, and repeated that travel on February 9, 2020. (Tr. 184, 401-06, 407-408; GX 109 at 8, 10.) Cell-site data from a Snapchat account used only by Alyssa corroborates her testimony that she had taken Snapchat photographs on the February 7th drive from Connecticut to New York. (Tr. 99-100, 405; GX 901 at 10; GX 552.) Cell-site data also shows that on February 8, 2020, after about 9:15 p.m.—roughly around the time that Alyssa testified that Copeland raped her—the cellphone attributed to Copeland was no longer active until the next day. (Tr. 184, 407-08; GX 901 at 9.)

In all, Alyssa recalled that Copeland made Alyssa perform oral sex on him in the car more than 10 times and raped her vaginally more than 10 times, ejaculating "on [her] face or [her] hair, around the area, or in [her] mouth." (Tr. 92, 143.) Onetime, when Copeland ejaculated inside of Alyssa, he obtained a morning-after emergency contraception pill, which he told Alyssa to take. (Tr. 92-93.) Alyssa felt confused at the time—she did not understand what Plan B was or what its purpose was. (Tr. 93.)

Over time, as she came to understand what Copeland done to her, Alyssa testified that the years-long sexual abuse "made [her] self-conscious . . . It's made [her] feel like [she] had no value,

like [she] was worth nothing, like [she] was just used and discarded like a piece of trash." (Tr. 147.)

### 3.    Alyssa Feared Copeland Would Hurt Her Because He Owned a Gun, Slapped Alyssa, and Was Physically Abusive Towards His Girlfriends

Copeland's behavior towards Alyssa included instances of violence and displays of violence. One time, Copeland got upset after he went through Alyssa's phone and found that she was texting a boy who lived in Bridgeport. (Tr. 83.) When Alyssa responded "whatever" or that she didn't care, Copeland slapped her across the face, which caused it to get swollen and red. (Tr. 83.) Alyssa also witnessed Copeland slap his girlfriend Ferara, as well as "put his hands" on another girlfriend's face. (Tr. 84; *see also* Tr. 472-74 (Smith testifying that Copeland physically abused her multiple times, including by striking her in the face with a closed fist and hitting her across the legs with a belt.); Tr. 498-99 (Ferara testifying that Copeland had been physically, mentally, and verbally abusive towards her, causing her to be afraid of Copeland and seek an order of protection).) Alyssa had come to understand that if she ever told anyone about the sexual abuse, that Copeland "would be angry with [her], possibly hurt [her]" by putting his hands on her or shooting her. (Tr. 84-85.) With respect to her fearing that she could be shot, Alyssa testified that Copeland owned a gun, that she had seen it in his car—the same car in which he repeatedly raped her—and heard him discuss with her grandfather's girlfriend how to hide the gun. (Tr. 85, 145-46.)

### B.    In March 2020, Alyssa Confided In a Friend That Copeland Had Raped Her

On or about March 4, 2020, Alyssa confided in her friend, Briah Lewis, that Copeland had been raping her. (Tr. 103-04, 415.) Lewis testified that she saw Alyssa come into the advisory period crying, and her face was red and puffy. (Tr. 110, 415.) Even after advisory had ended and the class had dispersed, Alyssa was still in her seat crying. (Tr. 415.) Lewis gave Alyssa a moment, then sat next to her and asked what was wrong. (Tr. 415.) Alyssa told Lewis that ███████ had

been raping her for years. (Tr. 416.) According to Alyssa, she spoke to Briah at this time because she was "overwhelmed"; she "couldn't stop thinking about [the sexual abuse], like in school, and my day-to-day life." (Tr. 110.) Copeland's sexual abuse had gone from "bad to worse" (*i.e.*, from "touching" to "actually having sex") and she "couldn't take it anymore." (Tr. 110.) Up until the moment she spoke to Briah, she had not told anyone because she was scared "[o]f what would happen to [her], of how people would react[,] if anyone would believe [her]." (Tr. 110-11, 144.) Nor did Alyssa feel that the people that she had immediate access to—*e.g.*, Ferara, Smith, her grandfather—were people she could confide in. (Tr. 143-44.) Alyssa also feared that if she told a social worker of the rape, she and her siblings would be split up or put in foster care. (Tr. 144-45.)

### C.    At the Direction of the FBI, Alyssa Participated in Recorded Calls in Which Copeland Urged Alyssa to Induce a Miscarriage

Shortly after speaking with Briah, Alyssa spoke to the police, who asked her to make recorded phone calls to Copeland on March 23, 2020. (Tr. 104, 137, 183.) On the first recorded phone call, the FBI told Alyssa to make Copeland believe that she was pregnant. (Tr. 104.) Within a few days of that phone call, Copeland showed up unannounced at Alyssa's house in Bridgeport, Connecticut. (Tr. 104.) He told Alyssa that she should "look up [online] how to have a miscarriage" and specifically told her to take Vitamin C. (Tr. 104-05.) Copeland also asked Alyssa if "he was in trouble, because if so, he'd get a passport and leave the country." (Tr. 105.) Corroborating Alyssa's testimony that Copeland made the unannounced visit is cell-site data indicating that on March 26, 2020—just a few days after the March 23, 2020 controlled call—a cellphone attributed to Copeland traveled from Middleburg, New York, to Bridgeport, Connecticut, and back.  (Tr. 184, 408-10; GX 901 at 11.)

A few days later, Alyssa spoke to Copeland on a second recorded phone call that occurred on April 1, 2020 (Tr. 106, 135; GX 502, 502-T.) On that call, Copeland urged Alyssa "to make it

happen," and "that's what you gotta do and you'll have a miscarriage," and "you need to cause yourself to have that," all of which Alyssa understood to mean she should find a way to have a miscarriage. (Tr. 107-09.)

### D.    Copeland Fled From New York After The April 1, 2020 Call And Was Arrested in August 2021

In April 2020, shortly after learning about Alyssa's "pregnancy," Copeland fled from New York with the help of Smith, who drove with Copeland down to Jacksonville, Florida. (Tr. 411-12, 464-67.) By April 12, 2020, he had arrived at a Holiday Inn Express in Spring Hill, Florida. (Tr. 475; GX 103.) In June 2020, he disconnected his phone number. (GX 309.)

It was in Florida that Officer Samuel Logan of the Tampa Police Department found and arrested Copeland in Tampa, Florida, on August 3, 2021, pursuant to a fugitive warrant. (Tr. 36-42.) Logan observed that although Copeland told officers that his name was "Quentin," tattooed on his neck was the word "Chips." (Tr. 42.) Additionally, a cellphone was seized from Copeland's person incident to arrest. (Tr. 40, 42.)

### E.    Copeland's Cellphone Contained Webpages and Searches Related to ███ Pornography and the Rape of Minors

FBI Digital Forensic Examiner Samantha Slattery extracted the data from Copeland's cell-phone. (Tr. 44, 150-51.) Slattery testified that the following titles of webpages were found on Copeland's cellphone for the time period spanning July 5, 2021 through August 2, 2021: "█ Dick Before SCHOOL"; "████, Please ████, fuck me"; "fit youngster SCREAMING FUCK ME tougher ████████"; "████ but I don't want to fuck you! DON'T MAKE ME DO IT"; "Fucking my neighbor's ████"; "████'s Cum is Everything"; "JAY'S POV – ████████ Gem has Vice Grip Super Tight Pussy and Makes ████ Cum Twice"; "Narrow teen pussy"; and "Gape my pussy ████." (Tr. 155-157; GX 601.)

F.    **Dr. Dawn Hughes Testimony Provides Context for Understanding How Copeland Perpetrated the Sexual Abuse for So Long**

To help the jury better understand the dynamics of Copeland's sexual abuse of Alyssa, the Government offered the testimony of Dr. Dawn Hughes, an expert on childhood sexual abuse. Dr. Hughes explained that the typical perpetrator of childhood sexual abuse is someone who is often "trusted and known to the child," such as a "█████████████████████ █████████." (Tr. 223, 224.) This is in part because the trust engendered through a pre-existing relationship (i) allows the perpetrator to use certain "coercive and manipulative tactics"; (ii) gives the perpetrator access to children; and (iii) gives the perpetrator the opportunity to isolate the child—"take them on a car ride, take them for ice cream . . . bring them to a movie, where they can have opportunities for abuse." (Tr. 225). Due to her lack of maturity and youth, a child sexual abuse victim often succumbs to the adult perpetrator's sexual abuse—particularly in a ███████████ relationship, where the child is ███████████████████████████"—even if the victim "feels kind of icky and gross" about the sexual abuse. (Tr. 226, 235-36.) Furthermore, young children "don't know what sex is, so they don't know what is happening to them." (Tr. 226.) This makes it harder for a child sexual abuse victim to fight against the abuse. (Tr. 226.)

In a sexual abuse relationship between a ███████████████, these factors are exacerbated—the trust and attachment to the sexually abusive ██████ can be incredibly strong, and the access and opportunity are readily available. (Tr. 236.) According to Dr. Hughes, as a result, "sometimes we see, in the ██████████ abuse, that there's a frequency of abusive acts and a longer duration, because it takes a longer time to [be] detected." (Tr. 236.)

Dr. Hughes went on to describe "grooming," a term that refers to manipulative techniques that a perpetrator uses "to get compliance from [a] child," "endure sexual abuse," and "maintain nondisclosure of [the sexual] abuse." (Tr. 227, 237.) This includes "the gradual

desensitization of sex" by, for example, starting with "talking about sex as if it's normal," then moving to touching "the thigh, inner thigh," then moving to increasingly violative sexual acts, (Tr. 228); isolating a child physically and psychologically from support systems, including other family members, (Tr. 229-30); using the victim's dependency on the perpetrator for basic necessities (like food and shelter), but also love and affection, which creates a confusing sense of love for the perpetrator, even as the perpetrator sexually abuses the victim, (Tr. 231); and securing secrecy through "positive" reinforcement, such as the perpetrator telling victim that "You can't talk about this . . . It's our special thing. No one will understand," and through subtle or implicit threats, such as a perpetrator telling the victim that "something bad . . . can happen to you [or me, or your mom] if you tell." (Tr. 232-33.)

Dr. Hughes also explained that for children, witnessing domestic violence can be psychologically harmful, and they quickly make the association that "even though I may not be . . . threatened directly . . . if I don't keep the pact, the secret . . . that [violence] could happen to me." (Tr. 234.) In other words, being exposed to domestic violence "has the effect of instilling fear and conditioning fear . . . ." (Tr. 234.) Dr. Hughes also explained that the stressors of poverty and housing insecurity can create a "chaotic environment where nobody is watching the child" and heighten the child's desire for love and guidance. (Tr. 236-37.)

Finally, Dr. Hughes explained the potential long-term effects of childhood sexual abuse:

[D]epressive disorders, anxiety-based disorders, substance use disorders, posttraumatic stress disorder, trauma-based disorders[,] . . . eating disorders[,] . . . cutting and self-harm[,] . . . higher rates of suicidality[,] . . . trust difficulties, relational difficulties[,] . . . difficulties in sexual intimacy[,] . . . difficulties in interpersonal relationships. They feel they can't trust. They don't know who to trust. And a lot of sort of what we call affect dysregulation, where your feelings feel like they're all over the place. And . . . getting triggered and having a lot of high affect emotions at some point and then very low ones at other points. . . . And then we have a lot of, you know, humiliation and shame and guilt and feelings of helplessness and

feelings of dirty and gross and disgusting, . . . which cause a lot of stress for the individual in just going about their lives.

[S]hame is probably the number one thing that I see, and it's also the one that's the hardest for . . . me to help to get rid of. You know, certainly, we know that sexual abuse is a profound violation of someone's body. It's you know, a profound violation of power and control, where someone is exerting their control over you. You know, we're supposed to have agency over our body, who touches us, where, when, what context; and when someone violates that, we call that abuse. So, because of that sort of most intimate violation, victims feel, as I said, this helpless feeling, this dirty feeling, this disgusting feeling. And then they feel that they're somehow to blame, that they should have stopped it sooner, they should have fought back, they should have told sooner, they should have screamed out. And it's this sort of internalized blame, which . . . I see so often, is . . . one of the worst characteristics and consequences of child sex abuse, that the perpetrator and the grooming makes the victim think they're complicit in their own abuse, makes them think that they're responsible for their own abuse, and they're not.

### G.    Copeland Raped At Least Three Other Minors Since 2004

Alyssa was not Copeland's first rape victim. The Government presented victim testimony and DNA evidence that Copeland raped at least three other minors prior to Alyssa.

### 1.    Copeland Raped Two Minors on Thanksgiving Day 2004

In 2004, Shannon and her friend Nicole were celebrating Thanksgiving at Nicole's house in Wappinger Falls, New York, when Shannon received a phone call from someone named "Chip."[1] (Tr. 47, 323-25.) She had met Chip for the first time about a week earlier, when he approached her at a Chinese restaurant. (Tr. 47.) After the phone call, Shannon and Nicole got into Nicole's car, picked up Chip and Chip's friend "D," and drove to a motel. (Tr. 325.) Before they went into a motel room, Shannon and Nicole were drinking and using drugs with Chip and D. (Tr. 326.) Chip offered cocaine to her, which was the first time that she had used cocaine. (Tr. 49.)

---

[1] During the trial, Shannon referred to her rapist as "Chip," and Nicole referred to the same person as "Chips." As described in this sentencing memorandum, the trial testimony establishes that the person known as "Chip" is the same as the person known as "Chips" (*i.e.*, Vernon Copeland).

Shannon testified that after some dancing in the motel room, Chip grabbed Shannon by the arm, pulled her into the bathroom, and told her, "We're going to do the nasty." (Tr. 49-50.) He pushed Shannon onto the floor with both of his hands, took off her pants and underwear, got on top of her, and forced his penis into her vagina. (Tr. 50.) Shannon was scared and tried to push Chip off, but Chip continued and ejaculated inside of her. (Tr. 51.) After finishing with Shannon, Chip left the bathroom and reentered the motel room. (Tr. 51, 326-27.)

Nicole testified that it was there that Chips raped her, forcing her to perform oral sex on him and vaginally penetrating her despite Nicole telling him "no" and that she wanted him to stop. (Tr. 327-28.) As part of her testimony, she read aloud a portion of the written statement she had given to law enforcement approximately a week after she was raped:

> Chips came up to me and sat next to me on the bed. I was laying down. Chips told me to get up, but I didn't. Then Chips took his penis out of his pants and told me to put my mouth on it. I said, "no," and then he kept trying to push my head toward his penis. Then I got scared and put my mouth on his penis. After that Chips pulled me up and told me to take my shirt off, but I didn't and that's when he took it off himself. Then Chips unstrapped my bra and [I] turned my body away from him. Then I laid down on the bed like sideways and he pushed me over and started to take my pants off. Once he had my pants off, he pulled my underwear down, got behind me and put his penis inside my vagina. Chips was pushing his penis into my vagina. I tried to pull away. I told him to stop but he kept putting his penis back in. Then I was finally able to pull away and got under the covers. Chips walked away and then he kept looking at himself in the mirror. Then Chips came back over to the bed and told me to put my mouth on his penis again, but I didn't. Then Chips started to say . . . I ruined everything and it was supposed to be fun.

(Tr. 334-37.) At the time Chips committed the rapes, Nicole was seventeen years old (Tr. 323) and Shannon was fifteen (Tr. 46).

Nicole and Shannon met with Detective Ted Brucato of the Town of Newburgh Police Department several days afterwards to report the rapes. (Tr. 52, 328, 340.) As part of the investigation, Detective Brucato took photographs of a small black and blue mark on Shannon's back, a mark that Chips caused when he pushed Shannon down in the motel bathroom. (Tr. 51, 340.)

Detective Brucato was already familiar with the name "Chips" and knew that it referred to Copeland and his father, who both went by "Chips." (Tr. 341-42.) Based on Shannon and Nicole's description, Detective Brucato's investigation focused on Copeland. (Tr. 342.) When Brucato interviewed him, Copeland acknowledged that he hung out with Shannon and Nicole at a motel on Thanksgiving night, but denied having any sexual contact with either of them. (Tr. 343.)

In addition to speaking with Detective Brucato, Shannon and Nicole gave him the unwashed jeans and underwear that each of them wore on the night of the rape. (Tr. 52, 328, 340-41, 318-319; GX 1001.) Detective Brucato also obtained a buccal swab from Copeland's gum and cheeks. (Tr. 319-20, 343.) The unwashed jeans and underwear and Copeland's buccal swab were all delivered to the New York State Police Crime Laboratory ("NYSP Crime Lab") for DNA testing. (Tr. 319-320; GX 1001.) According to the lab report, the DNA from the sperm found on Nicole's jeans, Nicole's underwear, Shannon's jeans, and Shannon's underwear all matched the DNA from Copeland's buccal swab, and the probability of selecting "an unrelated individual with an STR DNA profile matching these items is less than 1 in 300 billion." (GX 704 at 6.)

At the time, Copeland faced no legal consequences for his actions. (*See generally* Presentence Investigation Report ("PSR") ¶¶ 44-50 (no criminal convictions or arrests stemming from the rapes).) Nicole did not pursue charges because, in her words, "I, I was embarrassed. I didn't want nobody to know. It's a lot for a young girl to go through." (Tr. 338.)

### 2.    Copeland Raped His Then-Girlfriend's Sister in 2010

In 2010, Nickeyta had come to know Copeland (who she also knew as "Chip") because her older sister Nichole had been dating Copeland for several years. Nickeyta testified that on the evening of January 10, 2010, after she fell asleep in Nichole's bedroom watching TV with Nichole, Copeland woke her up in the middle of the night and told her to get on the couch. (Tr. 169.) After Nickeyta complied, Copeland began touching her vagina with his hand. (Tr. 169-70.) Nickeyta

moved his hand away and told him to stop, but he didn't. (Tr. 170.) Copeland then told Nickeyta

to go to the bathroom, and she complied because "he's bigger than me and I was 16 and smaller

than I am now." (Tr. 170-71.) In the bathroom, Copeland told her to "pull [her] pants down and

bend over the toilet," which she did because she was scared of a confrontation with Copeland. (Tr.

171.) Copeland then inserted his penis into Nickeyta's vagina for several minutes, during which

time Nickeyta told Copeland to stop. (Tr. 172.) Copeland did not stop. (Tr. 172.) Nickeyta was

finally able to get him to stop by lying to him and telling him that they could finish the next day.

(Tr. 172.) Nickeyta then went back to the couch while Copeland went to Nichole's bedroom where

Nichole was. (Tr. 172.)

In the morning, Nickeyta awoke to Copeland coming into the apartment. (Tr. 173.)

Copeland told Nickeyta to go to the bedroom, where she took her pants off again and Copeland

again put his penis into her vagina. (Tr. 173.) Nickeyta again told Copeland to stop, but Copeland

continued without saying a word. (Tr. 173-74.) After he finished, Copeland drove Nickeyta home

and told her not to tell anybody about what happened because he could get in trouble. (Tr. 174.)

Approximately one week later, Nickeyta reported the rape to the City of Newburgh Police Depart-

ment and provided them with the boxer shorts and underwear she wore on the night and morning

of the rape, and the clothing was in turn handed over to the NYSP Crime Lab for testing. (Tr. 175,

179-80; GX 1002.) Serology testing confirmed that both the boxer shorts and the underwear were

positive for sperm. (Tr. 277-78; GX 804.)

In November 2021, law enforcement collected DNA from Copeland using a cheek swab

from an evidence collection kit. (Tr. 287-88; GX 1003.) NYSP Forensic Examiner Brittany Anto-

nucci testified that testing confirmed that the DNA from Copeland's cheek swab matched the DNA

from the sperm found in Nickeyta's underwear and boxers, and that the probability of selecting

"an unrelated individual with an STR DNA profile matching these three evidence items [*i.e.*, Copeland's cheek swab, the sperm found in the boxers, and the sperm found in the underwear] is less than one in 320 billion." (Tr. 289, 295-96; GX 806.)

## III.    Copeland Obstructed The Legal Proceedings Throughout His Case

Before and throughout the trial, Copeland waged a calculated campaign of obstructing and delaying proceedings.

At prior status conferences in this case, Copeland failed to appear and participate, forcing the Court to reschedule. See Ex. A (Sept. 22, 2022 Tr. 2) Furthermore, due to his behavior, the Court ordered a competency evaluation, the results of which were that both the Government and defense experts agreed that Copeland was a malingerer and fully competent. See Ex. A (Sept 22, 2022 Tr. 4, 6, 12). By that time (September 22, 2022), Copeland's malingering had delayed proceedings for almost six months. See Ex. A (Sept 22, 2022 Tr. 11.) Because defense counsel argued that their expert's assessment needed updating, the court allowed defense counsel time to do a further evaluation, and scheduled another status conference that took place on November 3, 2022. At that conference, the defense's evaluator found that the defendant was not competent. (Def. Mem., Ex. F, PID # 2-5.) After yet further analysis, at the December 9, 2022 status conference, the parties' experts once again agreed that at that time, Copeland was competent to proceed to trial. Ex. B (December 9, 2022 Tr. 3-5, 14.) By this time, the case had been delayed another three months on account of Copeland's malingering.

Copeland's malingering continued at trial. Before coming to court for the second day of trial on July 11, 2023, Copeland tried to delay the start of witness testimony by "pitch[ing] a screaming fit" and "caus[ing] a flood in his bathroom in his room at the [correctional] facility" (Tr. 202.) During Alyssa's testimony that same day, "Copeland repeatedly push[ed] back from the

table in a way that caused the marshals some concern about whether he might be considering getting up and making some sort of gesture or interruption of the testimony." (Tr. 202.)

On the morning of July 12, 2023—the third day of trial—Copeland took medication and sat before this Court "pretending that he [was] asleep." (Tr. 201.) The Court noted that based on what a nurse at the correctional facility had said, the medication that Copeland took "doesn't have the effect he's pretending to be suffering from. . . . He went boneless with the marshals when they tried to bring him [into the courtroom], and the medication[,] even taken to the extreme[,] doesn't cause that."  (Tr. 301.) The Court further observed that pretending to be comatose was "just part of the shenanigans that [Copeland has] pulled . . . to try to avoid . . . being held to answer to the charges that [were] brought against him. . . . Mr. Copeland has played one move after another to try to avoid coming to court." (Tr. 201-02.)

On the afternoon of July 12, 2023, after returning from the lunch break but before the jury came out, Copeland began "screaming [gibberish] at the top of his lungs" in the holding cell outside the courtroom. (Tr. 299-300.) The Court made clear that Copeland's screaming was part of "Mr. Copeland's . . . history of contumacious conduct specifically designed to delay this case. He has pretended to be catatonic. . . . He has pretended to have injuries from supposed falls in the shower. He's the unluckiest shower-taker in the history of American jurisprudence, because it seems every time he has to come to court, whoops, he falls in the shower. . . . And, then, the doctors [at the correctional] facility . . . say that he doesn't have an injury" that would prevent him from coming to court. (Tr. 300-01.) The Court emphasized that "[t]his is a [d]efendant who doesn't like how the trial is going, who has for two years tried to avoid this day, and it is third and long and this is he conduct he has decided to engage in." (Tr. 301.) The Government reminded the Court that in the fall of 2021, a Bureau of Prisons evaluator, Dr. Restrepo, had previously determined

that Copeland was "malingering and feigning symptoms, such as muteness and an inability to participate in activities of daily living." (Tr. 302-03.)

After Copeland's yelling had stopped, the Court brought him back into the courtroom and warned him that "[i]f you yell while sitting in that chair[,] even once, I will have you removed from this courtroom and you will be participating in this trial back in the holding cell where there is a speaker and you'll be able to hear from there." (Tr. 306-07.) When asked if he understood, Copeland remained silent with his eyes closed, not reacting to the Court's questions. (Tr. 306-07.) The Court made a finding on the record that Copeland could hear the Court, and that he "had been advised of the consequences if he tried to disrupt the trial. (Tr. 307.)

Not more than five minutes or so into resuming the trial, Copeland began wailing and screaming in front of the jury. (Tr. 310-11.) After dismissing the jury and moving the Copeland to the holding pen, where he continued to scream and yell so loud that it could be heard in the courtroom, the Court made the following finding on the record:

> I am not going to delay this trial one minute and reward Mr. Copeland for his obvious attempt to disrupt this trial by engaging in contumacious and disruptive behavior. What he did just now was a deliberate move. He was told he'll be let back in if he can remain quiet. He remained quiet for five minutes and then he began with his outburst, and there is zero reason to think this is anything other than a deliberate attempt to disrupt this trial. . . .

> Indeed, what I'm told is that, when he took the medication . . . this morning and supposedly . . . paralyzed his body, that the medical professional at the facility said, "okay, if you're gonna do that, then it's time for you to go to jail," and he literally got up and walked out the room. . .

> I also want to repeat for the record, when I was reading into the record what the case law allowed me to do, Mr. Copeland went silent in the holding pen, he heard it, and then he knew he was going to be brought . . . back in and be told he can stay here if he behaved himself, and so that was the decision he made . . . [I]t's pretty obvious given that sequence of events what's going on here.

(Tr. 311-12, 314.)

17

Because Copeland was still yelling and screaming in the holding cell as the Court made its findings on the record, the Court ordered that Copeland be moved downstairs so as not to disturb the trial. (Tr. 314, 316.) When the marshals went to the holding cell to move Copeland, they found him "lying naked on the floor." (Tr. 316.) The next day, the Court made a further finding that

> what we learned after he was removed from the courtroom and sent to the pen . . . [was that] he had taken his clothes off and was on the floor[,] and presumably somebody who can't move can't do that. So I think it really undercuts any claim that the medication that he chose to take, not that was prescribed to him . . . even put him in the condition he was sort of pretending to be suffering from yesterday."

(Tr. 389.) The Government further added that it had learned that "upon his return to the facility yesterday evening, [Copeland] was able on his own volition to rise form his wheelchair, walk himself into his room and consume food without any apparent physical impediment." (Tr. 390.)

On July 13, 2023—the fourth day of trial—the Court allowed Copeland back into the Courtroom and warned him again not to disrupt the proceedings, or else he would be removed. (Tr. 390-91.) Copeland sat through the Government's remaining witness testimony and the presentation of his defense case without incident, but when the Court attempted to allocute him on his right to testify, Copeland launched into a tirade about his lack of opportunity to review discovery and feeling rushed and unprepared for trial (Tr. 508-15.) After the Government laid out how it had timely met its discovery obligations and worked as speedily as possible to ensure that Copeland had access to his discovery, the Court added the following:

> Mr. Copeland's credibility . . . is seriously in doubt because it's the same individual who on four separate times [has] been found by medical professionals to be malingering when making claims of mental health challenges. And even his conduct here today in the courtroom, he was alert as alert can be when the witnesses on his behalf were testifying. He was sitting there in rapt attention. And the minute I turn to him to ask him if he understood his rights with respect to his right to choose to testify or not, he closed on his eyes, and then went on this rant. I couldn't even get him to answer my question.

[E]verything he said was meant to not answer the question and, frankly to disrupt the process. . . . Mr. Copeland has played this game to the very end here[,] and I'm not going to let him delay this trial. . . .

[U]nlike when a lot of the [G]overnment's witnesses were testifying, where he would close his eyes, his eyes were wide open [during the testimony of the defense witnesses.] He was paying attention. There were times he was even smirking. . . . [But] the minute I started to ask him the questions and the colloquy about whether or not he understood about his right to testify and his choice, he closed his eyes, and he went back to the same faux, drowsy look that he's been trying to wear through most of this trial. . . .

That is a conscious choice, and it reflects exactly what he has done not only throughout this trial, but throughout the history of this case . . . . [Mr. Copeland] is an operator and he's trying to play the system the best he can. . . . [A]s the trial has progressed, as the government's witnesses have testified . . . he's feeling the walls cave in. And so he's playing the last few cards in his deck, which is volume, and putting on a show, and that this display he engaged in . . . or his rant when I was trying to help him understand his rights and . . . by the way, the rant wasn't the gibberish he did yesterday. The rant was a sequence of actually logical sentences, where someone wants to complain about not having enough time to prepare his case, not having enough time to see discovery, not having enough time to think about whether or not he wants to testify. These were arguments he was making. These were not . . . an incoherent string of sentences. . . .

I think he's genuinely trying to create a mistrial. I think he's genuinely trying to have it so that we have to do this thing over again, and that's a conscious choice. That's a deliberate strategy that he's engaged in. And I don't say that lightly. I say that based on everything I've seen, everything he's done, and the record speaks for itself on that.

(Tr. 516, 518 528.)

On the fifth and final day of trial, July 14, 2023, the Court explained to Copeland his right to testify, but also that his right to testify didn't give him the right to "take the witness stand and give a speech, or take the witness stand and rant, or take the witness stand and given nonresponsive answers. . . ." (Tr. 559.) The Court then asked Copeland "the question to you, and I know you can hear me even though you're pretending to shut your eyes, is do you want to testify; yes or no?" From that point forward, Copeland engaged in a game of repeating back to the Court what the

Court had asked of him, followed by repeatedly saying the word "Zion." (Tr. 559-63.) After the Court removed him to the holding cell, he continued to yell. (Tr. 568-69.)

The Court reiterated its previous findings that Copeland's medical conditions were fabricated, and that as "Copeland listened to the testimony that directly implicated him in the rape of ███████ . . . [a]nd as he's gotten closer to the end of the trial, he has escalated his efforts to disrupt this trial." (Tr. 564.) The Court also emphasized that "[Copeland] knows full well that the victims in this case found it extremely difficult to testify, and his goal, clearly, has been to try to . . create a mistrial and force these women to testify again. . . . [T]his is not irrational behavior in the sense that he is doing things that have no explanation. There is a clear explanation." (Tr. 564; *see also* Tr. 567-68 ("[T]his is a strategy to disrupt this trial, to get a mistrial, to do whatever it is he could to avoid being held accountable for the charges in the indictment.").)

## IV.    The Applicable Guidelines Range

The Probation Office calculated the applicable offense level as 51—base offense level of 38 because Copeland was convicted of 18 U.S.C. § 2241(c); plus 4 levels because the victim was placed in fear of death or serious bodily injury; plus 2 levels because the victim was in the care or custody of the defendant; plus 2 levels because the defendant used the internet to converse directly with the victim in his attempts to entice or coerce the victim to engage in prohibited sexual contact; and plus 5 levels because the offense of conviction was a covered sex crime and the defendant engaged in a pattern of activity involving prohibited sexual conduct—which is reduced to a total offense level of 43 pursuant to Chapter 5, Part A, comment n.2, since the total offense level is in excess of level 43. (PSR ¶¶ 30-43.) The Government agrees with the Probation Office's conclusion that the total offense level is ultimately 43, but submits that the applicable offense level fails to account for the two-level obstruction enhancement under U.S.S.G. § 3C1.1 that applies.

Because the defendant willfully obstructed or impeded, or attempted to obstruct or impede the administration of justice with respect to the investigation and prosecution of the instant offense of conviction and the obstructive conduct related to the defendant's offense of conviction and any relevant conduct, a two-level increase applies pursuant to U.S.S.G. § 3C1.1. Although the Second Circuit has not addressed the issue, multiple other circuits are clear that malingering and feigning incompetency in order to delay or obstruct proceedings are adequate bases for applying the obstruction enhancement. *United States v. Nygren*, 933 F.3d 76, 82-88 (1st Cir. 2019) (holding that malingering and feigning incompetency are sufficient bases for applying the obstruction enhancement); *United States v. Batista*, 483 F.3d 193, 197-98 (3d Cir. 2007) (holding that feigning mental incompetence is a sufficient ground for applying the obstruction enhancement); *United States v. Bangura*, 765 F. App'x 928, 933 (4th Cir. 2019) (unpublished) (holding that the obstruction enhancement was applicable where the defendant malingered symptoms of mental illness during the sentencing phase); *United States v. Greer*, 158 F.3d 228, 234-41 (5th Cir. 1998) (holding that the obstruction enhancement was applicable to "the act of feigning competence in order to avoid trial, conviction, or sentencing");  *United States v. Wilbourn*, 778 F.3d 682, 682-685 (7th Cir. 2015) (holding that the obstruction enhancement was applicable where a defendant deliberately exaggerated his symptoms at a competence hearing (including faking a catatonic state) and delayed his trial by months); *United States v. Binion*, 132 F. App'x 89, 92–93 (8th Cir. 2005) (per curiam) (holding that obstruction enhancement applied where the defendant "fak[ed] a mental illness in order to be found unable to assist in his one defense"); *United States v. Bonnett*, 872 F.3d 1045, 1047 (9th Cir. 2017) (per curiam) ("We join the other Circuits in holding that malingering may support an obstruction of justice enhancement pursuant to U.S.S.G. § 3C1.1.") *United States v.*

*Patti*, 337 F.3d 1317, 1324-25 (11th Cir. 2003) (holding that the obstruction enhancement was applicable to a defendant, who "feigned amnesia" and delayed trial for a year).[2]

Here, even before trial started, Copeland faked injuries from falls in the shower and mental illness (which led to repeated competency evaluations), all of which delayed the start of trial by at least nine months. During trial, he attempted to delay trial and create a mistrial on four of the five days of trial through frequent outbursts of gibberish alternating with pretending that he was in a catatonic state. On this record, Copeland's deliberate obstructive actions warrant application of the two-level obstruction enhancement.

## V.   Probation and Defense Counsel's Recommended Sentences

Probation recommends a Guidelines range sentence of life imprisonment followed by a term of life supervised release based on the "horrific nature of the defendant's . . . predatory abuse," his continued "assert[ion] of his innocence," and the multiple minor victims. (PSR at 31-32.)

Defense counsel seeks the minimum sentence of 30 years imprisonment based on the "positive qualities" that are described in the letters of support for Copeland, his troubled upbringing, his mental health, drug addiction, the need to avoid sentencing disparities, and the conditions of Copeland's confinement. (Def. Mem. at 5-11.)

## VI.   Discussion

### A.   Applicable Law

The Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*,

---

[2] The Government is not aware of any circuit court decision holding to the contrary.

552 U.S. 38, 46 (2007), and district courts are required to treat them as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 49.

After calculating the Guidelines, the Court must consider seven factors: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant," (2) the purposes of sentencing discussed in the next paragraph, (3) "the kinds of sentences available," (4) the Guidelines range itself, (5) any relevant policy statements by the Sentencing Commission, (6) "the need to avoid unwarranted sentence disparities among defendants," and (7) "the need to provide restitution to any victims." 18 U.S.C. § 3553(a)(1)-(7); *see also Gall*, 552 U.S. at 49-50 & n.6.

In determining the appropriate sentence, Section 3553(a) directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)   to afford adequate deterrence for criminal conduct;

(C)   to protect the public from further crimes of the defendant; and

(D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

### B.    Copeland's Objections to the PSR

Copeland raises one objection to the PSR: he argues that the 4-level enhancement pursuant to U.S.S.G. § 2A3.1(b)(1) for offense "conduct described in 18 U.S.C. § 2241(a), namely that the victim was placed in fear of death or serious bodily injury" is not applicable because there was no evidence of "a knowing and intentional threat or placing in fear by the defendant, [rather than] simply a subjective claim by the victim that the victim was in fear." (Def. Mem. 5.) Copeland cites

two places Alyssa testified that her awareness of the gun made her feel "unreal" and "no way in particular." (*Id.*)

Copeland's objection overlooks Alyssa's testimony about the actions that Copeland took that placed her in fear of death or serious bodily injury. Alyssa understood that if she ever told anyone about the sexual abuse, Copeland "would be angry with [her], possibly hurt [her]" by putting his hands on her or shooting her. (Tr. 84-85.) She came to this understanding based on seeing Copeland's black gun in his car—the same car where he had repeatedly raped her—and hearing Copeland discuss with her grandfather's girlfriend how to hide the gun. She also described Copeland slapping her after he found out she was texting with a boy, and witnessing him slapping one of his girlfriends and put his hands on the face of another girlfriend. (Tr. 83-85, 145-46); *see United States v. Castillo*, 140 F.3d 874, 885 (10th Cir. 1998) ("The [fear] element is satisfied when the defendant's actions implicitly place the victim in fear of some bodily harm."). Based on the full record described, there is more than sufficient evidence to support the two-level enhancement under U.S.S.G. § 2A3.1(b)(1).

### C.   The Court Should Impose a Guidelines Range Sentence of Life Imprisonment

A Guidelines range sentence of life imprisonment is sufficient but not greater than necessary to satisfy the purposes of sentencing. *See* 18 U.S.C. § 3553(a).

**Nature and Seriousness of the Offense:** The seriousness of Copeland's crimes alone justify a Guidelines sentence. Over approximately 16 years, Copeland raped four victims ranging in age from just nine years old to 17. One of those victims was ███████████ Sexual abuse of a minor is always serious. Raping a child in grade school preys on one of society's most vulnerable and trusting victims. Sexual abuse, particularly against a child, may inflict lifelong trauma and

shame, and destroy self-worth and the ability to form trusting, loving, and healthy attachments. Such abuse brutally robs children of their innocence, childhood, and agency over their bodies.

Copeland committed the most heinous form of such abuse by habitually raping and abusing ████████████ beginning when she was only nine-years-old. A ████████ relationship is meant to be one of love, trust, and security. Copeland exploited a ████████'s inherent desire for love and security to gratify his own depraved sexual desires. In so doing, he inflicted great physical pain on ████████ And he also inflicted grave emotional abuse that involved isolation, shame, and fear—emotions that Alyssa will likely have to work through as she continues to mature. As Alyssa's ████, Copeland was duty-bound to protect her and provide for her. Instead, he pleasured and protected himself at her expense over the course of years, in the form of sexual abuse, secrecy, and telling her to induce a dangerous at-home abortion.

Copeland's criminal conduct involved the use and threat of physical violence. In perpetrating each of the rapes, Copeland used his physical size, strength, and fear to overpower them. With Shannon, he shoved her to the ground, bruising her back, and despite her efforts to push him away, she could not get him off of her. (Tr. 50-51) With Nicole, she tried to pull away, but Copeland stripped her clothes off, pushed her head towards his penis to make her give him oral sex and forced himself onto her. (Tr. 334-37.) With Nickeyta, she testified that she was afraid of a confrontation with Copeland on the night he raped her, noting his physical size compared to her. (Tr. 170-71.) With Alyssa, she described the fear she felt of being shot or physically harmed after Copeland slapped her, she saw him physically abuse his girlfriends, and she saw a gun in the car where Copeland repeatedly raped her. (Tr. 83-85.)

Copeland's crimes against Alyssa also involved pervasive emotional and psychological manipulation over the course of approximately four years. Copeland used many of the grooming

techniques that Dr. Hughes described—taking advantage of the hardwired love and trust built into a ▓▓▓▓▓▓▓ relationship and a child's general tendency to obey an adult's direction, (Tr. 68, 223, 224, 226, 235-36); desensitization to sex by gradually escalating from touching Alyssa to oral sex to vaginal and anal sex, (Tr. 68-69, 74-75, 95-96, 228); isolating Alyssa from her siblings and mother, (Tr. 65-66, 229-30); telling Alyssa that their relationship was a "miracle" and a "blessing," while also reinforcing that if she told anyone about the sexual abuse, Copeland would get in trouble, (Tr. 69-70, 103, 232-33); conditioning the purchase essentials (like sneakers) for Alyssa on oral and vaginal sex, (Tr. 82, 231); and taking advantage of the Alyssa's still-maturing mind and unawareness about sex to "normalize" his sexual abuse of her. (Tr. 92-93, 226.)

The trauma, physical and emotional pain, and shame he caused was evident in the voices and gut-wrenching testimony of each victim. Almost all the victims broke down on the stand as they recounted and relived the horrific details of what Copeland did to them. Nickeyta's letter described how she was "called a liar, . . . punished, harassed, and had to stay quite about the situation. That alone led me down a long road of depression, drug abuse, and homelessness." Ex. C. For Shannon and Nicole, they never got justice for what Copeland did to them. As Nicole explained, she didn't press charges because she "was embarrassed. [She] didn't want nobody to know. It's a lot for a young girl to go through." (Tr. 338.) For Alyssa, she described the helplessness and confusion she felt when Copeland first began his sexual abuse, how she couldn't bear the burden anymore as the sexual abuse went from bad to worse, and how, as she came to a fuller understanding of what Copeland did to her, she struggled with feeling "self-conscious," like "[she] had no value, like [she] was worth nothing, like [she] was just used and discarded like a piece of trash." (Tr. 69, 110, 147.)

Copeland has done everything in his power to avoid responsibility. When he fell for the FBI's ruse and thought Alyssa was pregnant, he tried to manipulate her into having a miscarriage. (Tr. 104-06.) When he apparently felt the pressure of law enforcement, he went on the lam, disconnected his phone, and took up the identity of "Quentin." (Tr. 411-12, 464-7, 36-42; GX 309.)

**Copeland's History and Characteristics:** Copeland's history and characteristics support the need for a substantial sentence. He has been raping minors for his entire adult life, culminating in the years-long abuse of ███████████. Copeland has demonstrated time and again that he will rape and abuse to gratify his perverse and unlawful sexual desires, regardless of the devastating and enduring consequences for others. This was demonstrated by his rape of the four minors, but also by the webpages involving ████ and rape of minors found on his cellphone, webpages that were visited while he did not have access to Alyssa. (Tr. 155-57; GX 601.)

His actions also display a callousness towards his victims and a mentality of selfishly protecting himself at all costs. For example, after he finished raping Nicole, he told her that she had "ruined everything and it was supposed to be fun." (Tr. 337.) When he thought that Alyssa was pregnant because of him, he focused largely on protecting himself by convincing Alyssa to get rid of the fetus covertly, not on ensuring that Alyssa would receive proper support and medical care. (Tr. 104-105; GX 502, 502-T.) Indeed, despite the overwhelming evidence, Copeland forced his victims to come before him and strangers (*i.e.*, the jury) to publicly recount the traumatizing events.

Finally, Copeland has not shown a shred of remorse and continues to peddle a false narrative of innocence. (Tr. 512.) According to his narrative, he is the victim of his sister Ashley planting the idea in Alyssa's mind to fabricate the facts underlying charges for which he was ultimately convicted. (PSR ¶ 68.)

**Respect for the Law and Deterrence:** Deterrence likewise supports the need for a Guidelines sentence. Not only has Copeland persisted in raping minors his entire adult life, but he has also shown a flagrant disregard for the law and lack of remorse. After getting away with the rapes of Nicole and Shannon, Copeland proceeded to rape Nickeyta. Emboldened by the lack of meaningful consequences, he went on to groom and rape ███████████ At the first sign of trouble, he directed ███████████ to induce an at-home abortion and fled to Florida. Even once facing federal charges, Copeland feigned ailments and mental incompetence to stall this case over the course of approximately two years.

A significant sentence is also warranted for general deterrence. Cases like this are difficult to detect and to prosecute. Copeland successfully kept Alyssa silent for years. At the outset of the investigation, it was her word and her word alone. It took substantial investigative efforts to corroborate Alyssa, and to locate Nicole, Shannon, and Nickeyta, who were at times understandably reluctant to testify about their traumatic experiences. As Dr. Hughes testified, ███████ and child sex abuse is more common than widely understood because of the shame and confusion that keeps victims from coming forward. ███████ sexual abuse in particular is difficult to detect and prosecute given the amount of access, control, and trust possessed by the abuser. A substantial sentence is therefore warranted to advance general deterrence of such crimes.

**Protecting the Public:** Copeland is unquestionably a danger to the public. As described above, Copeland has no regard for the safety or wellbeing of minors and no remorse for his actions. He has been willing to hurt ███████████ for his own sexual gratification, sexually assaulted the sister of his then-girlfriend twice, and plied two minors he barely knew with cocaine and alcohol prior to raping them. His persistent need for sexual gratification, his refusal to acknowledge

that he has done anything wrong, and his willingness to do whatever it takes to obtain and cover up his sexual gratification all are indicative of someone who must be kept away from minors.

### D.    Response to Copeland's Sentencing Submission.

Copeland makes several arguments in hopes of obtaining a sentence at the mandatory minimum of 30 years. *First*, Copeland details his rough upbringing as a potential mitigating factor, explains how that upbringing and drug addiction contributed to certain mental issues, and highlights some of the positive qualities described in his letters of support. (Def. Mem. 1-3, 5-7.) On balance however, when weighed against the nature and seriousness of the offense, the need for deterrence, protecting the public, the troubling aspects of Copeland's history and characteristics, and promoting respect for the law, the mitigating factors do not warrant a sentence below the Guidelines range.

*Second*, Copeland broadly argues that the JSIN data indicates other defendants with similar Guidelines calculations most often receive 360 months in prison. (Def. Mem. 9.) But as Copeland's sentencing submission partially acknowledge, the weakness of JSIN data is that it does not differentiate between different violations under 18 U.S.C. § 2241, nor does it provide details about the differentiating factors that led to the differing or similar sentences.

*Finally*, Copeland argues that the Court should take into account the conditions at the Metropolitan Detention Center. (Def. Mem. 9-10.) He specifically cites finding bugs in food, the amount of time on lockdown, the slow response to medical and mental health needs, and physical conditions such as water damage, mold, and power outages. (*Id.*)

As an initial matter, in the analogous context of downward departures, the Second Circuit has recognized that "pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures." *United States v. Carty*, 264 F.3d 191, 196 (2d Cir. 2001). However, the Circuit has suggested that such departures are applicable only where the conditions

of pre-sentence confinement were so severe as to take a particular case outside the heartland of the applicable Guideline. *Id.*; *see also United States v. Mateo*, 299 F. Supp. 2d 201, 208 (S.D.N.Y. 2004) ("[C]ourts have granted relief generally where the conditions in question are extreme to an exceptional degree and their severity falls upon the defendant in some highly unique or disproportionate manner."). In *Carty*, the defendant was detained for approximately eight months in a Dominican prison, where he claimed he was held in a four-foot by eight-foot cell with three or four other inmates, there was no light in his cell, he received ten to fifteen minutes per day outside of his cell to bathe, his only toilet was a hole in the ground, and he lost forty pounds during that time as a result. *Carty*, 264 F.3d at 193. In *Mateo*, the defendant was subject to sexual abuse by a prison guard and then had to give birth without medical care. *Mateo*, 299 F. Supp. 2d at 211. As a result, the district court found in *Mateo* that the trauma suffered by the defendant was extraordinary and inflicted upon her to a disproportionate degree and applied a downward departure. *Id.* at 212.

Here, although Copeland notes the general issues at MDC, Copeland does not offer facts suggesting that he was particularly vulnerable or disproportionally affected by the conditions at MDC. Nor was he subjected to conditions at the MDC that are "extreme to an exceptional degree," *Mateo*, 299 F. Supp. 2d at 208.

Moreover, as of the first week of June 2024, DOJ personnel involved in MDC-related matters have confirmed that many of Copeland's general complaints are being addressed by the MDC as follows:

- <u>Medical Care:</u>  On May 15, 2024, the MDC implemented a new telehealth program to facilitate contact between inmate patients and medical providers in the community. This program makes use of newly installed telehealth equipment. To expand its reach of medical providers to those with guaranteed remote accessibility, the MDC entered into a new formal agreement with a local hospital not previously part of the BOP medical network. By allowing remote patient care, employees who would otherwise escort and supervise detainees during medical visits in the community are freed

to focus on in-facility work and maintain a better staff to inmate ratio within the MDC's walls.

- Immediate Staffing Levels:  The BOP has taken unprecedented steps to improve staffing at the MDC.  In early 2024, all BOP employees (more than 37,000 people in total) received a message offering significant financial incentives for temporary duty assignments at the MDC, to address immediate staffing concerns.  These financial incentives are being offered *in addition* to housing, food, and other incidental expenses that BOP pays for temporarily assigned personnel.  Participation is open to BOP employees, including attorneys, doctors, counselors, chaplains, and correctional officers, with correctional officers receiving even greater financial incentives.  No other BOP facility has benefitted from a temporary assignment call of this scale, and this exceptional effort has led to a surge in the number of the employees at the MDC.

- Long-Term Staffing Levels:  The BOP has also undertaken measures to ensure staffing challenges at the MDC are addressed in the months and years ahead, not only through temporary assignments.  To retain qualified employees, the MDC implemented a 35% retention pay incentive for most incumbent employees.  Large hiring events are also being held in the community on a regular basis, including on May 15, 2024. During that event, MDC Brooklyn was able to make more than 35 conditional offers using Direct Hire Authority, which OPM approved for MDC earlier this year.  A 25% relocation and recruitment incentive has also been put into effect to increase interest in MDC vacancies.  Between October 1, 2023, and May 31, 2024, MDC has hired 48 new staff members which includes 33 correctional officers, seven medical personnel (including one Paramedic, one Mid-Level Practitioner, three registered nurses, a psychologist, and a pharmacist), two attorneys, one legal assistant, one accounting technician, one case manager, two time & leave clerks, and one unit secretary.  As of May 31, 2024, there are currently 66 active tentative offers which have been extended to interested and qualified Correctional Officer and Medical applicants.  With its mid-May 2024 inmate population of approximately 1,375 persons and permanent staff total of approximately 457, the staff to inmate ratio is 2.9 inmates per employee.  An additional 173 positions are authorized and funded, pending selection of qualified applications.  Assuming a consistent inmate population, this will bring the staff to inmate ratio to 2.1 inmates per employee.

- Building Infrastructure:  The MDC has made significant structural repairs in recent months as well.  Hundreds of outstanding building issues were addressed when teams of specialized staff were temporarily deployed to the facility.  These projects included construction of 20 private phone booths for direct attorney-client access, an energy-efficient system for water conservation, security lightning installed along the front perimeter, new security camera monitors, and various in-cell repairs (*e.g.*, plumbing, electrical, temperature control).

- Food Services:  The BOP is in the process of replacing two ovens in MDC's Food Services area of the facility.  As of mid-May 2024, installation is pending.  In addition, MDC responded swiftly to claims of contaminants in inmate food by identifying that

31

one specific item (a particular type of beans) had weevils in it.  Since that time, MDC personnel have routinely inspected sample food trays and responded directly to units in which inmates have complained of food contaminants to ensure that no widespread problem exists.  MDC is also reviewing its menu and ingredients, in conjunction with a discussion of the national BOP menu—to mitigate the risk of contamination in the future.

Given the above improvements and the lack of proof that Copeland has been directly affected by the specific complained-about conditions, Copeland's request for any mitigation in light of these complaints he described should be denied. [3]

## VII.   Conclusion

For the reasons set forth above, the Court should sentence Vernon Copeland to life imprisonment.

Dated:      White Plains, New York
            June 18, 2024

                              Respectfully submitted,

                              DAMIAN WILLIAMS
                              United States Attorney

        By:      _____
                 Timothy Ly
                 Danielle Sassoon
                 Assistant United States Attorneys
                 (212) 637-1062

---

[3] In light of recent Second Circuit decisions, the Government respectfully requests that, for each special condition of supervised release that the Court imposes, the Court briefly state its reasons for concluding that each such special condition is "reasonably related" to at least one of the factors set forth in U.S.S.G. § 5D1.3(b). *See, e.g.*, *United States v. Sims*, 92 F.4th 115 (2d Cir. 2024) (vacating special condition and remanding for district court to provide sufficient explanation for imposition of condition); *United States v. Oliveras*, 96 F.4th 298 (2d Cir. 2024) (same); *United States v. Jimenez*, No. 22-1022, 2024 WL 1152535 (2d Cir. Mar. 18, 2024) (summary order) (same).