1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK

2  ------------------------------------x

3  UNITED STATES of AMERICA,

4       -against-           21 CR 521 (KMK)
                            TRIAL

5  VERNON E. COPELAND III,

6

7                Defendant.

   ------------------------------------x

8

9                         United States Courthouse
                         White Plains, New York

10                        July 14, 2023

11

12  B e f o r e:  THE HONORABLE KENNETH M. KARAS,
                           District Judge

13

14

   DAMIAN WILLIAMS

15      United States Attorney for
      the Southern District of New York

16  LINDSEY KEENAN
   TIMOTHY LY

17  DANIELLE SASSOON
         Assistant United States Attorneys

18

19

   GREEN & WILLSTATTER

20        Attorneys for Vernon E. Copeland III
   THEODORE GREEN

21

22

23

24

25

1

2          (In open court; jury not present)

3          THE LAW CLERK:  The Honorable Kenneth M. Karas

4    presiding.  Case Number 21CR521, United States of America v

5    Vernon E. Copeland, III.

6          Counsel, please state your appearances for the

7    record.

8          MS. KEENAN:  Good morning, your Honor.

9          Lindsey Keenan, Danielle Sassoon, and Timothy Ly for

10   the government.  We're joined by Paralegal Specialist William

11   Sirmon and the Detective Michael Sisia from the Town of

12   Newburgh Police Department.

13         THE COURT:  Good morning to you all.

14         THE LAW CLERK:  And for the defense.

15         MR. GREEN:  Yes, your Honor.

16         Good morning, your Honor.  Theodore Green for

17   Mr. Copeland.  With me at the table is Vernon Copeland.

18         THE COURT:  All right.  Good morning to you both.

19         Good morning, Angela.

20         Please be seated everybody.

21         All right.  Mr. Green, what's your client going to do

22   today; testify or not testify?

23         MR. GREEN:  Yes, your Honor.  I saw my client briefly

24   in the pen right outside the courtroom this morning and I did

25   speak to him and ask him some questions, but I did not get a

1   meaningful response.  So I can't state what his intentions are.

2          THE COURT:  Well, I mean, I'm about to bring in the

3   jury and I'm going to ask you do you have anymore witnesses.

4   So what are you going say?

5          MR. GREEN:  No, I have an exhibit to offer.

6          THE COURT:  Okay.

7          MR. GREEN:  I mean, I am asking that the Court

8   question Mr. Copeland on the record about what his intentions

9   are.

10          THE COURT:  Okay.  So let me say a couple of things.

11          Mr. Copeland has the right to testify and what

12  testifying means is that he answers the questions, the

13  questions that are properly asked of him, and he answers the

14  questions and he only answers the questions.  If he were to do

15  anything other than answer the questions, either give

16  nonresponsive answers, I will strike those answers.  If he were

17  to engage in any kind of an outburst of the likes of which has

18  had done twice so far, well, actually, more than twice, but at

19  least twice so far, I will give him one warning.  If he

20  continues with any outbursts, he will be deemed to have

21  forfeited, waived his right to testify.

22          He has a right to testify.  It is not absolute.  What

23  I mean by that is he absolutely has a right to testify.  What

24  he doesn't have a right to do is take the witness stand and

25  give a speech, or take the witness stand and rant, or take the

1  witness stand and give nonresponsive answers.  That he does not

2  have a right to do.  If that's what he's going to do, then he's

3  going to waive his right to testify.

4         I've read the cases, Mr. Green, that you provided,

5  even the Ninth Circuit case that you provided faulted the trial

6  court for not warning the defendant about the consequences of

7  engaging in disruptive behavior.

8         Mr. Copeland, who is here and is listening, has now

9  been warned.  And the Eight Circuit case that I think the

10  government cites is on point, and I think the Second Circuit

11  case that the government cites, I think the government's right,

12  is distinguished based on the record that's just been made and

13  the record to date.

14         So Mr. Copeland, the question to you, and I know you

15  can hear me even though you're pretending to shut your eyes, is

16  do you want to testify; yes or no?

17         THE DEFENDANT:  Say no, yes or no, yes or no, do you

18  want to testify?

19         THE COURT:  So, yes, you want to testify?  Or no you

20  do not want to testify; which is it?

21         THE DEFENDANT:  So yes you want to testify or no you

22  do not want to testify; what is it?

23         THE COURT:  Unless Mr. Copeland affirmatively says he

24  wants to testify --

25         THE DEFENDANT:  Unless Mr. Copeland affirmatively

1   says.

2         THE COURT: -- then he's got not going testifying,

3   Mr. Green.

4         THE DEFENDANT: He's not going to be testifying.

5         THE COURT: Okay. Mr. Copeland, if you're going to

6   engage in this charade of repeating what I'm saying in front of

7   the jury, then you're going to be excused from the courtroom,

8   because you will have waived your right to be present. You

9   don't get a chance to disrupt the proceedings of this case.

10   Okay?

11         THE DEFENDANT: This case.

12         THE COURT: All right, so one last time,

13   Mr. Copeland, do you want to testify?

14         THE DEFENDANT: Do you want to testify?

15         THE COURT: Okay. So that the new form here of

16   disruption is to repeat what I'm saying, and since he hasn't

17   said yes, I'm going to deem you to have indicated,

18   Mr. Copeland, you do not want to testify. But once Mr. Green

19   rests, the government is going to give its closing statement.

20   Mr. Green is going to give his closing statement. You can't

21   change your mind and then say, no, I want to testify.

22         Do you understand that?

23         THE DEFENDANT: Do you understand?

24         THE COURT: Okay.

25         All right. Anything else that the government would

1  like me to do in terms of the allocution of --

2           THE DEFENDANT:  Zion.

3           THE COURT:  -- Mr. Copeland?

4           THE DEFENDANT:  -- Zion.

5           MR. LY:  No, your Honor.

6           THE DEFENDANT:  Zion.  Zion.

7           THE COURT:  Mr. Copeland, if you could please be

8  quiet.  Please be quiet.

9           THE DEFENDANT:  Zion.

10           THE COURT:  Mr. Copeland, I really do want you to be

11  here and have an opportunity to assist in your defense.

12           THE DEFENDANT:  Zion.

13           THE COURT:  But if you're going to engage in these

14  kinds of antics --

15           THE DEFENDANT:  Zion.

16           THE COURT:  -- then you're going to just waive your

17  right to be present.

18           THE DEFENDANT:  Zion.

19           (Reporter clarification)

20           THE COURT:  He's not trying to say anything that's

21  meant to be heard.  This is all part of his game.

22           Go ahead, Mr. Ly.

23           THE DEFENDANT:  Zion.

24           MR. LY:  Your Honor is correct, he'd have to claim

25  his right to testify.

1          THE DEFENDANT:  Zion.  Zion.

2          MR. LY:  He can't just be silent.

3          THE DEFENDANT:  Zion.

4          THE COURT:  Okay.

5          THE DEFENDANT:  Zion.

6          THE COURT:  All right.

7          THE DEFENDANT:  Zion.

8          THE COURT:  All right, so if you're going --

9          THE DEFENDANT:  Zion.

10          THE COURT:  -- to persist in that, Mr. Copeland

11    then --

12          THE DEFENDANT:  Zion.  Zion.  Zion.

13          THE COURT:  All right, marshals, if you could

14    please --

15          THE DEFENDANT:  Zion.

16          THE COURT:  -- remove Mr. Copeland.

17          THE DEFENDANT:  Zion.

18          THE COURT:  And if he's repeating this conduct --

19          THE DEFENDANT:  Zion.

20          THE COURT:  -- inside this pen, we're going to have

21    to move him downstairs so that the jury can't hear him.

22          THE MARSHAL:  Does your Honor just prefer to leave

23    him in this pen?

24          THE COURT:  For now.  If he can be heard in here,

25    then I'm going to ask to move him.

1          THE DEFENDANT:  Zion.

2          THE COURT:  I'm trying to do the least restrictive --

3          THE DEFENDANT:  Zion.

4          THE COURT:  -- alternative.  At least he can hear

5    things in the pen.

6          THE DEFENDANT:  Zion.  Zion.  Zion.  Zion.  Zion.

7          (Defendant escorted from courtroom)

8          THE COURT:  Mr. Green.

9          MR. GREEN:  May I make a record, your Honor?

10          THE COURT:  Of course.

11          MR. GREEN:  I just want to renew previous

12    applications I've made to have some type of a psychiatric

13    examination of Mr. Copeland prior to any determination that

14    he's deliberately disrupting the proceedings, or that he's

15    knowingly and voluntarily and intelligently waiving his right

16    to testify at this proceeding.

17          THE COURT:  Yes.

18          MR. GREEN:  So accordingly, I object on the Court's

19    finding.

20          THE COURT:  Again, Mr. Green, let me say two things.

21          One is, I don't blame you for making that record or

22    objecting; and two, I have profound respect for how you have

23    comported yourself during this trial.  I don't envy your

24    situation and you have zealously represented Mr. Copeland

25    throughout these proceedings but particularly at this trial.

1          The reason I am not going to grant your request --

2     there's several reasons.  One is, he's been evaluated four

3     times, most recently in December of 2022, and the unanimous

4     conclusion of the medical professionals is that he is making

5     this stuff up.  He is a malingerer.  And nothing he has done

6     during this trial is inconsistent with that.  His outbursts did

7     not start at the beginning of this trial.  His outbursts began

8     after he listened to the testimony that directly implicated him

9     in the rape of his daughter.

10          Now the jury will decide whether the government has

11     met its burden of proving guilt beyond a reasonable doubt, but

12     to the extent that the jury believes the witnesses, from

13     Mr. Copeland's perspective, he has concerns, obviously, about a

14     guilty verdict.  And as he's gotten closer to the end of the

15     trial, he has escalated his efforts to disrupt this trial.

16          He knows full well that the victims in this case

17     found it extremely difficult to testify, and his goal, clearly

18     has been, to try to create a disruption, to create a mistrial

19     and force these women to testify again.  And it is a strategy.

20     And this is not irrational behavior in the sense that he is

21     doing things that have no explanation.  There is a clear

22     explanation.

23          His little speech yesterday when I was trying to do

24     the inquiry about whether he understood his right to testify

25     was a complaint about he hasn't had enough time to prepare, he

1  hasn't seen the discovery, he hasn't had a chance to

2  participate in his defense, et cetera.  Those were cogent

3  arguments.  They were untrue, but they were not incoherent.

4       So what he's trying to do now is he's trying to

5  actually look like he needs to have a psych eval because he

6  knows that will be the end of this trial, and it is so

7  transparent in terms of how he's actually comported himself.

8  The sort of games he's played in terms of how he wants to look.

9  Today he came in with the eyes droopy again.  The eyes have

10  been droopy except when the witnesses you called testified.

11  Then he was sitting at the edge of his seat, eyes wide open,

12  fully attentive as to what was going on.  Because this was his

13  Hail Mary, was the witnesses you called.

14       And now he's doing what he's doing now, which is

15  screaming, and not because he's having a psychotic episode but

16  because he's trying to deliberately disrupt this trial.

17       So in addition to all the findings I made before,

18  nothing about today is anything different.  This is just

19  consistent with how he's behaved in the last 48 hours.

20       Ms. Keenan.

21       MS. KEENAN:  Just two notes, your Honor.

22       First, that Mr. Copeland's rant at the close of

23  yesterday's proceedings demonstrated that he has in fact been

24  incredibly well-attuned to the statements of your Honor and to

25  the government during the course of this trial.  He made

1　reference to several remarks that your Honor made to the jury,

2　including about the length of some criminal trials.  He

3　repeated verbatim a statement made by the government about

4　considering his opportunity to testify and confirming that he

5　would not be given a weekend's worth of time to consider that.

6　He repeated things that have happened in this courtroom over

7　several days in a very cognizant fashion that demonstrated the

8　absolute farcity of this behavior.

9　　　　And second, your Honor referenced the many

10　psychological evaluations Mr. Copeland has received because of

11　this behavior, and I would just note that he also has received

12　repeated medical attention, and when doctors have examined him

13　for his purported physical ailments, they have noted that his

14　purported physical conditions also have no basis in medical

15　etiology.  So this purported psychological behavior is just a

16　consistent pattern that has persisted for years.

17　　　　MR. GREEN:  Can I just add one more thing?

18　　　　THE COURT:  Please, Mr. Green.  Yes, go ahead.

19　　　　MR. GREEN:  Your Honor, the Court had pointed out, I

20　think yesterday, that the last psychiatric evaluation was done

21　in December of 2022.

22　　　　THE COURT:  That's the day of the report.

23　　　　MR. GREEN:  The date of the report.

24　　　　THE COURT:  Yes.

25　　　　MR. GREEN:  Actually, I'm not sure, the evaluation

1  might have been earlier, probably was.

2              THE COURT:  Yes.

3              MR. GREEN:  So that's at least seven months or more.

4              THE COURT:  Right.

5              MR. GREEN:  A lot can happen with a person's mental

6  state in seven months, and I think that's particularly so when

7  the person is under a highly stressful situation.  Could

8  trigger decompensation or psychotic episodes of some other

9  kind.  From --

10             THE COURT:  Right, but the problem is --

11             MR. GREEN:  -- a medical professional.

12             THE COURT:  Of course, of course that's true.  But

13 medical professionals since then have opined, for example, when

14 Mr. Copeland, at the conference we had when we set the trial

15 date, he didn't show up because he supposedly fell in the

16 shower and he was too injured to come to court.

17             A medical professional examined him and said he's

18 fine.  There's no injury.  There's no reason why he can't come

19 to court.  He is a liar.  He's an actor.  This is a charade.

20             And I am not a medical professional, but I've been in

21 the criminal justice system for three decades, and I've seen

22 people who have serious psychosis issues, okay?  And I wouldn't

23 know the medical term necessarily to call it, but this is an

24 act.  This is somebody who in the military would be going for a

25 Section 8.

1          This is all a charade.  It's a poorly executed

2   charade, but it is a charade nonetheless.  His efforts to not

3   come to court that have all been based on lies, his efforts to

4   pretend like he's having, oh, a psychotic episode by yelling

5   gibberish, is all an act.  And that's my finding.  It's based

6   on my observations of him during the course of this trial as

7   the evidence is piled on top of him, as he's gotten closer to a

8   verdict in this case.

9          And as I said, it is clear to me that this is a

10  strategy to disrupt this trial, to get a mistrial, to do

11  whatever it is he could to avoid being held accountable for the

12  charges in the indictment.  And it frankly cannot be tolerated.

13         And if I had the slightest doubt, Mr. Green, I

14  promise you, I have no agenda, if I actually thought your

15  client needed medical help, whether it was psychiatric help or

16  some kind of physical ailment he was suffering from, I would

17  not hesitate to get him that.  But that's not what's going on

18  here.  Not even close.

19         So I don't blame you for making the record, I don't

20  blame you for lodging your objection at all, but this is not

21  even a close call, in my view.  So I think we've spent enough

22  time on this issue.  I think the record is what it is.

23         I can still hear Mr. Copeland yelling.  So as much as

24  I would like to keep him in the cell up here where he can

25  listen to the proceedings, his yelling is going to disrupt

1   these proceedings, and so I'm going to ask the marshals to have

2   Mr. Copeland brought downstairs so that we can't hear him doing

3   his continued charade of trying to disrupt this trial.

4           And I once again want to thank the marshals for their

5   professionalism in this case.

6           Ms. Keenan.

7           MS. KEENAN:  Your Honor, the government would request

8   that when the jury comes out they be provided another

9   instruction about the appropriateness of proceeding in

10  Mr. Copeland's absence.

11          THE COURT:  Okay.

12          I take you don't object to that, Mr. Green?

13          MR. GREEN:  No.  No.

14          THE COURT:  Okay.  All right.  So you're going to put

15  in another exhibit?

16          MR. GREEN:  Yes.

17          THE COURT:  Okay.  And then you're going to rest?

18          MR. GREEN:  Yes.

19          THE COURT:  Government, you going to have a rebuttal

20  case?

21          MS. KEENAN:  No, rebuttal case, your Honor.

22          THE COURT:  Okay.  So you want to got straight to

23  summations then?

24          MS. KEENAN:  Yes, your Honor.

25          THE COURT:  Okay.  So what we will do, you want to

1  set up the podium before we bring the jury in then?

2          Thank you, Marshals.

3          MR. GREEN:  Your Honor, is it your practice to

4  entertain the motions after I rest?

5          THE COURT:  We can do the motions now.

6          MR. GREEN:  Okay.  Well, okay.  I'm just moving for a

7  judgment of acquittal pursuant to Rule 29 grounded upon

8  insufficiency of the evidence.

9          THE COURT:  All right.

10         Who wants to respond?

11         MS. KEENAN:  Your Honor, there's been ample evidence

12  in this case to prove the defendant guilty beyond a reasonable

13  doubt of the crimes charged.  That evidence has included the

14  testimony of Alyssa, which was credible, detailed, specific,

15  and corroborated by, for example, the defendant's cell site

16  records, his repeated contacts to a phone number that Alyssa --

17  identified as belonging to her mother, the search terms in his

18  cellphone which was seized from him at the time of his arrest,

19  the evidence related to the defendant's flight from New York,

20  including his use of an alias at the time of his arrest, and of

21  course it's also been supported by the testimony of three other

22  women who were subjected to the defendant's forcible sex acts

23  between the date of Thanksgiving 2004 and the date of

24  January 10th, 2010.

25         It's the government's position that there is

1  sufficient evidence to find the defendant guilty of the crimes

2  charged.

3          THE COURT:  All right.

4          Anything else, Mr. Green?

5          MR. GREEN:  No, your Honor.

6          THE COURT:  Okay.  So I'm going to deny the motion.

7  I think, to the extent that there's any credibility questions,

8  that's for the jury to decide.  The government gets the

9  inferences here, so to the extent that the jury believes

10  Alyssa's testimony and the testimony of the other witnesses

11  here, that testimony, combined with Mr. Copeland's flight, the

12  evidence regarding the cellphones, which I think establishes

13  all the interstate nexus components, there is sufficient

14  evidence for the jury conclude that the government can meet its

15  burden of proving, it has met its burden of proving guilt

16  beyond a reasonable doubt of all three charges.  So the

17  motion's denied.

18          Without prejudice, obviously, Mr. Green.

19          MR. GREEN:  Yes, your Honor.

20          THE COURT:  All right, any other motions you want to

21  make, Mr. Green?

22          MR. GREEN:  No.

23          THE COURT:  All right.  So you want to finish

24  rearranging the furniture, Ms. Keenan, before we get the jury?

25          MS. SASSOON:  I'm not familiar with your Honor's

1    practice, but I would request a brief bathroom break before the

2    rebuttal.

3              THE COURT:  That's fine.  My practice is let lawyers

4    try their case, so if you need a bathroom break, you get a

5    bathroom break.

6              All right.  Is that where you want the podium?

7              MS. KEENAN:  Yes, it's fine.

8              THE COURT:  You sure?

9              MS. KEENAN:  Yes.

10             THE COURT:  You don't want to use this thing?

11             MS. KEENAN:  The problem with that thing, your Honor,

12   is there's no monitor.  So I won't be able to review the slides

13   as I go.

14             THE COURT:  Okay.

15             MS. KEENAN:  And because I was making the slides in

16   the middle of the night, I'd like to have a close eye on them.

17             THE COURT:  Fair enough.  It's your summation.

18             Mr. Green, what are you going to want in terms of

19   podium, you going to want to big podium?

20             MR. GREEN:  I'm fine with that.

21             THE COURT:  Okay.

22             And Ms. Sassoon, where you going to go, you going to

23   go with the big podium, too?

24             MS. SASSOON:  No, I'm going to go in the middle,

25   possibly no mic, if your Honor will permit that.

1        THE COURT:  You have to take that up with Angela.

2        MS. SASSOON:  Okay, with a mic.

3        THE COURT:  You know what you could try to do, maybe

4   you have that podium there, but you don't use it, but you have

5   it to just prop up the mic.

6        I think as long as you stay near the court reporters.

7   Your voice carries enough where --

8        MS. SASSOON:  And if you're having trouble, just tell

9   me and then I'll --

10       THE COURT:  Look, I was too clumsy with notes, so I

11  didn't use a podium, and I used to get in trouble.  I also used

12  to go too fast.  I know that shocks you.

13       So are we good for the jury?

14       MS. KEENAN:  Yes, your Honor.

15       THE COURT:  Okay.  So it's just one exhibit you're

16  going to put in?

17       MR. GREEN:  Yes.

18       THE COURT:  All right.  Are we good with the flash

19  drive?

20       MS. KEENAN:  Mr. Green has reviewed the flash drive

21  and it was delivered to the clerk's office so that it could be

22  scanned to ensure we're not introducing viruses.  And I believe

23  that Matt will bring it up when that's complete.

24       THE COURT:  All right.  We'll check with Matt.

25       MS. KEENAN:  The only thing I would note, and I'm not

1   sure, Ms. Spivack, about your facility with Acrobat Pro, but

2   Defense Exhibit B says the word "victim" on it --

3            MR. GREEN:  D, D.

4            MS. KEENAN:  D.  So I don't know if you could redact

5   the word "victim" from Defense Exhibit D before it goes back.

6            THE COURT:  We'll give it a go.  We'll talk to Matt.

7            MS. KEENAN:  I can certainly do it on your computer

8   for you.

9            THE COURT:  All right.  We'll talk to Matt.

10            Ms. Spivack is going to get the lunch menus for the

11   jury, because we didn't know what Mr. Copeland was going to do

12   so we're going to get the lunch orders going.

13            While she does that, did you all get the revised

14   verdict sheet from last night?

15            MS. KEENAN:  We did, your Honor.

16            THE COURT:  All right.  Any objections to the --

17            MS. KEENAN:  No, your Honor.

18            THE COURT:  Mr. Green?

19            MR. GREEN:  No, your Honor.

20            THE COURT:  All right.  Well, that was my only effort

21   to stall.

22            MS. KEENAN:  I can make a further strenuous

23   objection --

24            THE COURT:  Did you look up the reference?

25            MS. KEENAN:  -- to the special verdict form.

1    THE COURT:  Did you look up the reference?

2    MS. KEENAN:  If your Honor can believe it, I didn't

3 have time to do that last night.

4    THE COURT:  Get your priorities straight.

5    MS. KEENAN:  I certainly will do it this weekend.

6    THE COURT:  They're almost done with the menus and

7 we'll bring them in.

8    (Pause)

9    (In open court; jury present)

10    THE COURT:  All right.  Please be seated.

11    Good morning, ladies and gentlemen.

12    JURORS:  Good morning.

13    THE COURT:  So once again, as we get to the end, I

14 think the last letter we got from the lawyers, I don't know,

15 9:00, 10:00 o'clock last night, we've been here arguing over

16 all kinds of legal issues.  We're done.

17    Mr. Green is going to put in one more exhibit, and

18 then we're going to go right into closing statements for the

19 lawyers.  Okay?

20    You may notice again today that Mr. Copeland is not

21 here.  Once again, as I mentioned to you before, please don't

22 speculate as to why he's absent.  Under the law, under these

23 circumstances, we can proceed in his absence, and that's what

24 we're going to do.  And I once again instruct you not to draw

25 any inference as to his guilt or innocence just from his

1  absence and otherwise not to hold it against him for any reason

2  in any way whatsoever.  Okay?

3      Mr. Green, what's next?

4      MR. GREEN:  Yes, your Honor.

5      Your Honor, at this time I offer into evidence

6  Defendant's Exhibit D for identification, and this is a

7  biological science serology case report from the New York State

8  Police Forensic Investigation Center prepared by Richard T.

9  Brunt, and I'm offering that as a record kept in the regular

10  course of business of the New York State Police Forensic

11  Investigation Center.

12      THE COURT:  Any objection?

13      MS. KEENAN:  No objection.

14      THE COURT:  Okay, received.

15      MR. GREEN:  Thank you, your Honor.

16      (Defendant's Exhibit D received in evidence)

17      THE COURT:  With that?

18      MR. GREEN:  Your Honor, the defense rests.

19      THE COURT:  Okay.

20      Government, is there a rebuttal case?

21      MS. KEENAN:  There is no rebuttal case, your Honor.

22      THE COURT:  All right.  Ladies and gentlemen, now all

23  the evidence is in, and so what's next is the closing

24  statements of the lawyers.

25      A couple of things.  Number one is remember what I

1  said at the beginning, what the lawyers say is not evidence,

2  but the closing statements are still very important because

3  this is the chance the lawyers have to argue to you what the

4  evidence does or does not show.  You can take notes, but again,

5  their statements are not evidence.  They don't, obviously,

6  replace the evidence.

7        The order is the government has the burden of proof

8  so the government goes first and gives a main summation.

9  Again, Mr. Green doesn't have to give a closing statement

10  because Mr. Copeland is presumed innocent, and it's the

11  government's burden throughout this case to prove guilt beyond

12  a reasonable doubt.  But Mr. Green has advised me he will be

13  giving a closing statement.  And because the government does

14  have the burden of proof, the government gets to give a

15  rebuttal summation.

16        And so I think what we'll do is we'll probably do the

17  first two closing statements.  We'll take a very short break

18  and then we'll do the rebuttal summation, and then we'll take

19  another short break, and I'll give you the legal instructions

20  and you'll be able to begin your deliberations in the case.

21  All right.

22        So with that, Ms. Keenan.

23        MS. KEENAN:  At this trial you have seen overwhelming

24  evidence of the defendant's 19-year history of predatory sexual

25  conduct culminating in his years long abuse of his own

1    daughter, Alyssa.

2           In 2004, the defendant met Shannon at a Chinese food

3    restaurant, invited her to hang out for the evening on

4    Thanksgiving, and then dragged her into a bathroom, threw her

5    to the ground and forcibly raped her.  Then he left her on the

6    floor of the bathroom, approached her friend Nicole, demanded

7    oral sex, removed Nicole's clothes and raped her, too.

8           In 2010, the defendant found his girlfriend's little

9    sister asleep in bed, woke her up, followed her to the

10   bathroom, bent her over a toilet and forced himself inside her.

11   When he came home the next morning to an empty apartment and

12   found her there by herself, he did it again.

13          Earlier this week you heard from Dr. Dawn Hughes that

14   sex abuse crimes are crimes of access and opportunity.  You

15   have learned at this trial that when the defendant has an

16   opportunity, he takes it and engages in forcible sex with

17   teenaged girls.

18          And in 2016, when the defendant gained access to

19   Alyssa, his daughter, who was just nine years old, he took that

20   opportunity, too, for years over weekends and school holidays

21   and summer breaks, the defendant abused Alyssa and left her

22   feeling helpless, ashamed, and afraid.

23          In 2020, Alyssa was 13 years old and she told you in

24   her own words the defendant's actions were going from bad to

25   worse.  She couldn't take it anymore.  She disclosed the

Closing Statement - Keenan

1   defendant's abuse.  And when confronted with a police ruse in

2   which Alyssa told the defendant that she missed her period,

3   what did he do?  He assumed she was pregnant.  He knew how.  He

4   knew why.  He directed his daughter to induce an at-home

5   miscarriage and he fled.

6          In Florida the defendant disconnected his phone

7   service, he assumed a new name, he tried to stay off the radar.

8   But the defendant could not hide forever.

9          In August of 2021, when he was arrested by the Tampa

10  Police Department, he gave a fake name.  But he was brought

11  back to New York to face the consequences of his actions, and

12  he sits in this courthouse.

13         Overwhelming evidence of the defendant's guilt has

14  been presented to you here and the time has come to hold him

15  accountable for his horrific crimes.

16         This has not been a long trial, but you have seen and

17  heard from a number of witnesses and you have seen and heard a

18  lot of evidence.  This summation is the government's

19  opportunity to explain to you how that evidence fits together

20  and proves that the defendant, Vernon Copeland, is guilty as

21  charged.

22         Later today Judge Karas will instruct you on the law.

23  And what Judge Karas tells you governs your deliberations.  But

24  to give you some context as I discuss the evidence, I'll

25  provide a brief overview of the charges.

Closing Statement - Keenan

1    What I expect Judge Karas to tell you is that the

2  defendant is charged with three separate crimes, each of those

3  crimes pertains to the defendant's abuse of Alyssa:

4    First, he's charged with a crime of using a facility

5  of interstate commerce to persuade, induce, entice, or coerce

6  Alyssa to engage in illegal sexual activity;

7    Second, he is charged with the crime of the

8  aggravated sexual abuse of a minor under 12 years old; and

9    Third, he's charged with transporting a minor in

10  interstate commerce.  Again, for the purpose of illegal sexual

11  activity.

12    As I said, I expect Judge Karas' instructions will

13  tell you that each of these crimes is focused on the sexual

14  abuse of Alyssa, so I'm going to draw your attention there in

15  this summation.  And during this trial, the government has

16  proved beyond a reasonable doubt that the defendant sexually

17  abused Alyssa for years.

18    Let's start with Alyssa's own testimony.  You learned

19  that in 2015 Alyssa was just nine years old.  Government

20  Exhibit 101 is her birth certificate.  She told you that her

21  mom got into a drunk-driving accident on Christmas day, that

22  she was in the car and that she was injured in that accident.

23    After that, Alyssa went to live with the defendant,

24  her dad.  Alyssa's siblings went to live with an uncle, and

25  Alyssa bounced from place to place, sleeping on sofas in

1  strangers' apartments, a twin bed in a shelter, and the living

2  room of her grandfather's house.

3         Ladies and gentlemen, make no mistake, separated from

4  her mother and her siblings, surrounded by people she did not

5  know well, Alyssa was isolated.

6         Remember the testimony of Dr. Dawn Hughes?  There are

7  certain risk factors that can make a child particularly

8  susceptible to sexual abuse; poverty, housing insecurity,

9  substance abuse in the household.  All of these factors

10  collided in Alyssa's life all at the same time, and she found

11  herself sleeping on the sofa at the defendant's girlfriend's

12  apartment.

13         Ms. Ferara, or Lish, as she was known to Alyssa,

14  testified for the defendant yesterday, and she confirmed that

15  just weeks after she met the defendant, he was staying at her

16  apartment with Alyssa in tow.  And you know what happened in

17  that house.  Alyssa said that when her dad, the defendant,

18  tucked her in at night, he caressed her butt, her thighs, her

19  chest, and her vagina.

20         Remember how Dr. Hughes defined childhood sex abuse?

21  She defined it as the imposition of sexual activity on a child

22  who lacks the maturational, cognitive, or developmental

23  capacity to understand or consent to those sexual acts.

24         Once again, that is exactly what was happening to

25  Alyssa at that time.  She told you that she didn't understand

1    what was happening at all.

2    "Question:  At that time what did you understand was happening

3    to you?

4    "Answer:  I didn't understand what was happening at all."

5            She said there came a time at Ms. Ferara's house when

6    the defendant asked her for oral sex and told her "don't tell

7    anybody because we're having sex."  Alyssa said I never knew

8    that what was happening to me was sex.

9            After the caressing at bedtime, the defendant

10   advanced to performing and demanding oral sex from his

11   daughter.  Alyssa told you that while she was staying with the

12   defendant at a shelter in New York, he would push the bunk bed

13   up against the wall so that a manager at the facility could not

14   come into the room and see what was happening.

15       She described that at Yeiana Smith's house the defendant

16   began touching her vagina and her chest with his mouth, and he

17   asked Alyssa to perform oral sex by saying, "kiss it," or

18   making a gesture toward his lap.

19           Ladies and gentlemen, Alyssa was in the third grade.

20           By the time that summer break ended, Alyssa told you

21   she was back at her mom's house and going to school in

22   Bridgeport, Connecticut.  You have her school records.  Those

23   are Government Exhibit 104 and Government Exhibit 106.

24           But after Alyssa returned to Connecticut, the

25   defendant wanted weekend visitation.  He wanted more.

Closing Statement - Keenan

1    Dr. Hughes told you that childhood sex abuse involves

2   the imposition of sexual acts perpetrated for the sole benefit

3   of the perpetrator.  The defendant had access, he had

4   opportunity, and he was not going to give that up.

5    Alyssa told you that in the summer of 2018 the

6   defendant had a studio apartment on Church Street in

7   Poughkeepsie where she stayed with him in a single, twin bed.

8   There, he began having full penetrative sex with his

9   11-year-old daughter.  Not once, not twice, as Alyssa told you,

10  more than ten times.  And some of the places that that happened

11  to her?  In the defendant's car.  In his apartment on Church

12  Street.  At Yeiana Smith's house.  Over and over and over

13  again.

14   Dr. Hughes described a process to you that she called

15  grooming, which she described as the gradual desensitization of

16  sex; the continual introduction of touch and boundary violation

17  in a gradual process.  As she said, when it comes time for the

18  ultimate act, the child is used to this aberrant behavior.

19   Over a period of weeks and months and years, the

20  defendant groomed his daughter, a child in his care, who was

21  dependent on him to meet her basic needs, to accept his

22  increasingly severe sexual contact, from caressing her thigh to

23  touching her vagina to performing oral sex to vaginal sex.

24   As Dr. Hughes described, the defendant duped this

25  prepubescent child into thinking that this was normal.  This is

1 just what we do.  This is what happens in our house.  The

2 defendant also took deliberate steps to keep his grooming and

3 abuse a secret.

4          From the start she told Alyssa that she could not

5 tell anyone because he would get in trouble.  He instilled fear

6 in Alyssa, fear that she could lose her family and also fear

7 that the defendant could hurt her if she told.  She witnessed

8 domestic violence.  She saw the defendant's gun, including in

9 the very car where he raped her.  She told you that she thought

10 he could hurt her or even shoot her if she told.

11          The defendant also tried to make Alyssa feel special.

12 He told her that their relationship was a blessing and a

13 miracle.  Dr. Hughes told you that this combination of negative

14 and positive techniques works together to secure a child

15 victim's silence.

16          But in January 2020, the defendant crossed another

17 line.  He forced Alyssa to submit to painful anal sex.  She

18 asked him to stop and he didn't.  It was weeks later that

19 Alyssa couldn't bear it anymore.  She broke down at school and

20 finally confided in her friend Briah Lewis.

21          Alyssa's testimony was incredibly powerful evidence,

22 and if you believe her, the defendant is guilty.

23          So defense counsel focused his own questioning of

24 Alyssa on discrediting her.  Primarily on why she did not

25 disclose the abuse sooner.  You will remember that he asked her

1    about why she did not tell various people that this was

2    happening, why didn't she tell the defendant's girlfriend?  Why

3    didn't she tell the defendant's girlfriend's daughter?  Why

4    didn't she tell the defendant's other girlfriend, or maybe that

5    girlfriend's mother, or maybe her grandfather, or her

6    grandfather's girlfriend?  Maybe one of the various social

7    workers that walked in and out of her mother's apartment over a

8    period of years in response to her siblings' complaints of

9    physical abuse.

10        Ladies and gentlemen, you know that there are many

11   reasons why Alyssa suffered years of abuse before she reported.

12        First of all, you heard from the defendant's own

13   expert, Dr. Blechman, yesterday, that victims of sexual assault

14   rarely report because they feel guilt and shame.  They feel

15   complicit in their own abuse.

16        You also heard from Dr. Hughes that the majority of

17   children don't report.  She told you you're more likely to not

18   report the abuse than to report the abuse.  And many victims of

19   childhood sex abuse wait until adulthood to talk about the

20   abuse.

21        She told you that they fear the abuser.  They fear

22   the threats.  They feel they won't be believed and they fear

23   they'll be blamed.  She described to you a subtle or an

24   implicit threat that something bad kind of can happen to you if

25   you tell.  Something bad might happen to me.  She described the

1    very threat that the defendant used against his own daughter.

2           And you heard from Alyssa.  She told you she was

3    scared.

4           What were you scared of?  Of what would happen to me,

5    of how people would react.  If anyone would believe me.  She

6    told you the defendant told her not to tell anybody because he

7    could get in trouble.

8           She also told you she's scared of disclosing the

9    abuse to a social worker because she could be split up with her

10    siblings.  She said, I felt like they could possibly split us

11    up or put us in foster care because at that time my mom wasn't

12    doing so well with us herself.

13           She also told you about the defendant's explicit

14    threat, that if she told, he would be in trouble.  That threat

15    to her dad, the person who she described as making sure she was

16    fed and had a roof over her head loomed large in her child's

17    mind.

18           These are textbook reasons for a child, ages 9 to 13,

19    to keep a parent's sexual abuse inside.  But Alyssa had even

20    more reason.  She described to you that she witnessed the

21    defendant's physical abuse of his girlfriends, that she saw him

22    hit the other women in his life.  She told you about the gun

23    she saw in the car.  She told the Poughkeepsie Police that she

24    was scared that if she told, she didn't know what the defendant

25    would do because he had a gun.  Of course Alyssa kept the

1   defendant's secret.

2           Another way defense counsel tried to discredit Alyssa

3   is by bringing in an expert to testify that her backpack and

4   her sneakers did not have semen on them.  This is a distraction

5   that you should give no attention.

6           First of all, you heard from serologist Allyson Goble

7   that environmental factors, which include moisture, humidity,

8   heat, and light, all can influence the success of DNA testing

9   by degrading the quality of a sample, making DNA undetectable,

10  even eliminating it from a piece of evidence.

11          You also heard from the defendant's own expert,

12  Richard Brunt, that semen is most commonly found on intimate

13  articles of clothing, on underpants.  A child's shoes and

14  backpack are not intimate articles of clothing.  They are

15  routinely exposed to the elements.

16          But putting that aside, Alyssa told you that the

17  defendant ejaculated on her hair and on her face and inside of

18  her or around the area.  She told you that when she had sex

19  with the defendant in the car, she took off her pants.  It goes

20  without saying that she took off her shoes and that if the

21  defendant ejaculated on her body, it is very unlikely his semen

22  landed on her sneakers.

23          How do you know you can believe Alyssa?  First of

24  all, you saw her.  You watched her as she sat on the witness

25  stand for hours and recounted years of devastating sexual

Closing Statement - Keenan

1   abuse.  You watched her take a moment to collect herself when

2   she was asked to describe the living arrangement in Lish's

3   apartment.  You watched her tear up when she thought about how

4   she felt at school that day before she talked to her friend,

5   Briah Lewis.

6           Her testimony was detailed, it was specific, and it

7   was credible.  But her testimony also is corroborated by other

8   evidence in this case.  For example, the cell site analysis

9   that you heard about yesterday from Andrew Petersohn.  In the

10  months before Alyssa's disclosure, she told you the defendant's

11  behavior was getting from bad to worse.  She was talking about

12  that incident in the car in January 2020, in which the

13  defendant tried to have anal sex with her.

14          There is, of course, a window of time in mid-January

15  2020 when the defendant's phone traveled from where he lived in

16  Beacon to where Alyssa lived in Bridgeport and back again.

17          Then he returns.  Alyssa spent a few days with the

18  defendant.  He goes from New York, Connecticut, and back again.

19          Alyssa told you that a few weeks after the defendant

20  tried to have anal sex with her, the defendant again had sex

21  with her in his car.  She described it as a weekend visit and

22  she told you that on the way from Connecticut to New York she

23  took a picture of herself on Snapchat, because she was wearing

24  a new sweatshirt that her mom had just purchased.  Alyssa's

25  Snapchat photo, the one where she's wearing that sweatshirt, is

Closing Statement - Keenan

1    Government Exhibit 552.  You can see at the top that she's

2    traveling north from Bridgeport to Trumbull, Connecticut.  You

3    can see the date and time of these photos.  There's the

4    defendant's phone in that black call-out box on the bottom

5    traveling right along with Alyssa's Snapchat pins.

6         Alyssa also told you that on the Saturday of that

7    weekend, while she was staying with the defendant at her

8    grandfather's house, the defendant took her to an apartment

9    complex that she remembered was called Barclay Manor.  He

10   parked in the parking lot around 9 or 10 p.m. and tried -- and

11   had sex with his daughter in the car.  There's the defendant's

12   phone just above Barclay Manor at 9:15 p.m. on February 8,

13   2020.

14        Remember what Andrew Petersohn told you?  He told you

15   that after that 9:15 voice record, there was no active use of

16   the defendant's phone.  You know why.  He was in his car raping

17   his daughter just like she told you.  Alyssa told you after

18   that weekend she didn't see the defendant for any further

19   weekend visits and the cell site data shows that he drove her

20   home on Sunday and didn't return to Bridgeport for weeks.

21        Ladies and gentlemen, by now you know well what

22   happened in the interim.  Briah Lewis told you that when Alyssa

23   got to school on March 4 of 2020, her face was red and wet and

24   puffy.  She spent the morning with her head down and then she

25   disclosed the defendant's awful secret to her school friend and

1    confidant.  The police got involved, and as Detective Ellingson

2    told you, on March 23, 2020, Alyssa made a controlled call in

3    the presence of law enforcement where she told the defendant

4    that she had missed her period.

5         Alyssa described to you that a few days after that

6    call the defendant, in her words, popped up at her house in

7    Bridgeport and directed her to look up on line how to cause a

8    miscarriage, to look up on line to find the things to help her

9    do that.  And sure enough, a few days after that call,

10   March 26, 2020, the defendant's phone makes a quick trip down

11   Route 25 to Bridgeport before he heads back to New York.

12        Detective Ellingson told you that within a week of

13   that March 26 trip to Bridgeport, the defendant spoke to

14   Alyssa, using his phone number ending in 0246.  You heard that

15   recording, ladies and gentlemen.  It is Government Exhibit 502.

16   You can listen to it as you deliberate.  I'd like to just play

17   a few seconds of that call for you right now.

18        Mr. Sirmon, if you could play from 25 to 33 seconds.

19        (Audiotape played)

20        MS. KEENAN:  Exactly as Alyssa described.  The

21   defendant's own words; you need to do what I told you.  He

22   already told her, ladies and gentlemen.  He visited her just

23   days before.  He was at her house in Bridgeport just as she

24   said.

25        And what did he tell her?  About looking it up, about

1    making it happen.  He said to her, you understand, that's what

2    you got to do.  You'll have a miscarriage.

3         No parent, when confronted with information about

4    their teenaged daughter's missed period, says get on the

5    internet and figure it out.  Get rid of it.  Cause a

6    miscarriage.  Not go to a doctor.  Not I'll take you to Planned

7    Parenthood.  Not even find a clinic.  Do it at home in secret

8    because this is our secret.

9         Ladies and gentlemen, if you listen to that call

10   again, you'll realize the defendant is cagey.  And after this

11   trial, you know why.  This was not the first time.  This was

12   not the first accusation.  Alyssa was not the first victim.

13        I told you earlier that Judge Karas will instruct you

14   on the law and what he says controls, but what I expect he will

15   tell you is that you may consider evidence of the defendant's

16   other rapes for its bearing on whether the defendant committed

17   the crimes charged here.  In other words, you can consider

18   whether the defendant's rapes of other teenage girls makes it

19   more likely that he also raped Alyssa.

20        So let's talk about those other rapes because of

21   course this evidence bears on that question.  Common sense

22   tells you that if he has done it before, he is more likely to

23   do it again; first Shannon, then Nicole, then Nickeyta, then

24   Alyssa.  Opportunity and access.

25        In 2004 the defendant met Shannon, and on

Closing Statement - Keenan

1  Thanksgiving night, she and her high school best friend Nicole,

2  went to meet the man they knew as Chip.  That night took a

3  devastating turn with the defendant's sexual violence and both

4  girls were forcibly raped.

5          You watched Shannon walk into this courtroom crying.

6  You listened as Nicole read her statement to the police in

7  tears.  You heard Detective Brucato.  He saw the bruise on

8  Shannon's back that she got when the defendant shoved her to

9  the floor of a motel bathroom.

10          You also learned that Detective Brucato interviewed

11  the defendant and that the defendant admitted he hung out with

12  those girls on Thanksgiving night and denied any sexual

13  contact.  Ladies and gentlemen, you know he was lying because

14  his DNA was in both girls' underwear.  That report is

15  Government Exhibit 704.  And the chance that it was someone

16  else's DNA, less than 1 in 300 billion.

17          In 2010, another opportunity presented itself in the

18  form of Nickeyta.  You watched Nickeyta testify.  You observed

19  her matter-of-fact demeanor.  She told you at that time she was

20  a junior at Newburgh Free Academy.  Her much older sister

21  Nicole, 11 years older, was dating Vernon Copeland whose

22  nickname Nickeyta knew to be Chip.  You know from Alyssa and

23  from the defendant's own witnesses, Ms. Smith and Ms. Ferara,

24  that the defendant had spent years bouncing around different

25  women's apartments in Orange County and Dutchess County,

Closing Statement - Keenan

1 New York.  Nickeyta's sister Nicole was no different.

2          Nickeyta told you he was always there and one night

3 he came home, he followed Nickeyta to the sofa.  He began to

4 sexually touching on her as she said, and then he directed her

5 to the bathroom where he forcibly inserted his penis in her

6 vagina, even though she told him to stop.

7          The defendant told Alyssa to keep it a secret.  Told

8 Nickeyta to keep it a secret because he could get in trouble,

9 just like he told Alyssa.  But you know that Nickeyta reported

10 the sexual assault and that she provided her underwear to the

11 police.

12          Years later, in connection with this case, the New

13 York State Police compared the defendant's underwear to the

14 evidence recovered from Nickeyta's underwear back in 2010, and

15 they came up with another match.  Serologist Allyson Goble

16 described to you the process by which she cut away samples of

17 Nickeyta's purple underpants in 2010, extracted the DNA, and

18 preserved it for later analysis.

19          Then forensic scientist Brittany Antonucci described

20 the process she undertook in 2020 of comparing the alleles

21 present at 15 separate locations from the defendant's DNA to

22 the alleles present at 15 separate locations from the DNA in

23 Nickeyta's purple underpants.  She found that it was exactly

24 the same at every location she tested.  That chart is

25 Government Exhibit 806.

1        And the chance that it was someone else's DNA,

2   Examiner Antonucci told you again, less than 1 in 320 billion.

3   When you are considering the defendant's pattern of behavior

4   with respect to Alyssa, his intent toward his daughter, think

5   about his lengthy history of forcible sex with teenage girls.

6        You also know that the defendant is guilty because

7   when he thought his daughter might be pregnant, he fled.  He

8   had been living in New York with Nicole and Ms. Ferara and Ms.

9   Smith and his father and other women for years.  He lives here.

10  His family lives here.  But when he thought he got his daughter

11  pregnant, he picked up and ran.  He hitched a ride to Florida

12  with Ms. Smith and he did not look back.

13       Government Exhibit 502, that recorded call that we

14  just listened to a few seconds of, took place on April 1 of

15  2020.  They drove to Florida, and by April 12th of 2020, he was

16  at the Holiday Inn Express in Spring Hill.  That's Government

17  Exhibit 103.

18       His own witness, Ms. Smith, told you she drove him

19  down.  She didn't drive him back.  Then he disconnected his

20  cell service, he picked out a new name, and he took up a life

21  in Florida as Quentin.

22       You'll recall Officer Sam Logan from the Tampa Police

23  Department testified that he arrested the defendant in Tampa on

24  August 3 of 2021.  And upon that arrest, the defendant provided

25  an alias, Quentin.  You can watch that body-worn camera footage

Closing Statement - Keenan

1  again as you deliberate, ladies and gentlemen.  It is

2  Government Exhibits 201 and 202.

3          You'll also recall that when the defendant was

4  arrested, he was holding a cellphone, a black, LG cellphone,

5  with a silver disk on the back.  Government Exhibit 3 is the

6  cellphone that Officer Logan seized.  It was later vouchered by

7  the FBI as evidence item number 1-B-1 and forensically examined

8  by a CART examiner, who you heard from, FBI Analyst Samantha

9  Slattery.  Another thing that you can and should consider when

10 you're evaluating the evidence is the content of that phone.

11 Website after website related to daddy-daughter porn, teenage

12 girls, incest, and forcible sex.

13         Ladies and gentlemen, this is chilling proof of the

14 defendant's state of mind with respect to his own daughter.

15         I mentioned earlier Judge Karas will instruct you on

16 the law and the central element of each of the three crimes

17 with which the defendant is charged is his sexual abuse of

18 Alyssa.

19         Judge Karas' instructions on the law will govern your

20 deliberations.  But before I sit down, I will briefly review

21 the elements of each crime.

22         I expect Judge Karas will tell you that Count One,

23 which charges the defendant with using a facility of interstate

24 commerce to persuade, induce, entice, or coerce Alyssa to

25 engage in illegal sexual activity has four separate elements.

Closing Statement - Keenan

1          First, the defendant used a facility of interstate

2     commerce.  I expect Judge Karas will tell you that the use of a

3     telephone or the internet constitutes the use of an interstate

4     facility.  So the defendant's use of a phone to contact Alyssa

5     or Alyssa's mother to arrange those weekend visits, or ask for

6     more time with her over the summer, the emojis, and Snapchat

7     messages of peaches and tongues that Alyssa told you she

8     received from the defendant, those things are enough.

9          You can find all the phone records at Government

10    Exhibits 302 to 309, 311 and 313 to 326, and you can find

11    Alyssa's Snapchat subscriber records and her location records

12    from those Snapchat memories at 556 and 557.

13         Government Exhibit 901 is the cell site report that

14    summarizes for you a lot of that phone usage, the dates on

15    which calls were made and the days of the week where the

16    defendant primarily called Alyssa's mother, which I'm sure you

17    remember was Friday.

18         Second, the defendant knowingly persuaded or induced

19    or enticed Alyssa to engage in sexual activity, and I expect

20    Judge Karas will tell you that those words just carry their

21    ordinary plain English meanings.

22         Third, the sexual activity would violate New York

23    law.

24         Judge Karas will instruct you on the specific

25    provisions of New York law, but you know that it's a crime for

Closing Statement - Keenan

1  an adult to perform oral sex on a child, or to request and

2  receive oral sex from a child, or to insert his penis into a

3  child's vagina or anus.

4  Fourth, that Alyssa was less than 18. Ladies and

5  gentlemen, you know she was in the third grade when this

6  started and in middle school when she reported the abuse.

7  I expect Judge Karas will tell you that Count Two

8  charges the defendant with the aggravated sexual abuse of a

9  minor under 12.

10  I anticipate he will say that this crime also has

11  four elements.

12  First, the defendant caused Alyssa to engage in a

13  sexual act, and he will define that term for you, but it

14  includes the digital, oral, vaginal, and anal sex that Alyssa

15  described to you.

16  Second, the defendant knowingly caused Alyssa to

17  perform a sex act. And that just means that it was

18  intentional. This was not a mere accidental brush of her

19  vagina while he was helping her put on her clothes.

20  Third, Alyssa was under the age of 12. You have her

21  birth certificate. You know the timeline. But between 2015

22  and 2017, she was under the age of 12.

23  Fourth, that the defendant crossed a state line with

24  the intent to engage in a sexual act. Ladies and gentlemen, he

25  crossed that state line again and again.

Closing Statement - Green

1      Lastly, I will expect Judge Karas will tell that you

2  Count Three has three elements.

3      First, the defendant transported Alyssa interstate.

4      Second, it was with the intent that she would engage

5  in illegal sexual activity.

6      And third, that she was less than 18 at the time of

7  the acts charged in the indictment.

8      Ladies and gentlemen, you know what the defendant

9  did.  You know what he wanted.  You know when you did it --

10  when he did it, you know how often, and you know how it harmed

11  her.  She sat in front of you and she told you it's made me

12  self-conscious of myself, my body image.  It's made me feel

13  like I had no value.  Like I was nothing.  Like I was just used

14  and discarded like a piece of trash.

15      The time has finally come to hold the defendant

16  accountable.  When you review the evidence, when you assess the

17  testimony of the witnesses, you use your common sense, you will

18  come to the only verdict that is consistent with the evidence,

19  that the defendant, Vernon Copeland, is guilty as charged.

20      THE COURT:  All right.  Thank you, Ms. Keenan.

21      On behalf of Mr. Copeland, Mr. Green.

22      MR. GREEN:  Yes, your Honor.

23      When Alyssa decided that she did not want to visit

24  her father anymore, it had nothing to do with sexual abuse,

25  because there was no sexual abuse.  It had to do with anger.

Closing Statement - Green

1  It had to do with her father's anger and it had to do with her

2  anger.

3        Her father would get upset with her over

4  inappropriate content on her phone.  During questioning by the

5  government she was asked, did the defendant ever become mad at

6  you?  She answered yes.  Then Alyssa explained.

7        Before, he took my phone and went through it and seen

8  that I was texting a boy that lived in Bridgeport around my

9  area, and he got upset.  And I was saying whatever, and I

10 didn't care and stuff like that, and he slapped me in my face.

11       And she testified to seeing her father get mad at

12 other people.  It all culminated in February of 2020 when her

13 father, once more, got upset with her over content on her phone

14 that he found inappropriate.  He took the phone and confiscated

15 it.  He brought Alyssa home to Bridgeport to drop her off and

16 he took the phone with him back to New York.

17       As she acknowledged at this trial, she was fed up

18 about this, and she did not want to -- she never visited her

19 father after that on visits to New York and she did not want to

20 visit him.

21       Alyssa claimed at trial that she was worried that no

22 one would believe her if she reported that her father

23 was sexually -- had sexually abused her.  But by 2020, she knew

24 better.  Alyssa was very familiar with the work of the Child

25 Protective Services agency in Bridgeport, Connecticut, where

Closing Statement - Green

1  she lived with her mother and her siblings.

2       She knew that any report of abuse would be
3  investigated, that a social worker would come to the house and
4  interview her.  In 2016, she did just that.  She made a report
5  to her school that her mother had struck her causing a bruise
6  to her leg.  That relatively minor incident triggered a
7  response by the agency which promptly came out to investigate.

8       Alyssa knew that similar investigations occurred in
9  2017, and again in 2018, when social workers were investigating
10 other reports of hitting of the children in the household by
11 the mother.  And yet at trial, she claimed that she could not
12 make a report against her father because I felt like nobody
13 would believe me.

14      This is not credible.  If she had made a report of
15 abuse by her father, the social workers who came out for
16 bruises on the leg or hitting a child, they would be out there
17 in a heartbeat and they would be all over this investigating
18 it.

19      What is credible is that Alyssa understood that if
20 all she reported was that her father was disciplining her by
21 taking her phone away and getting angry at her because of stuff
22 on her phone, that would not stop the visitation with her
23 father.  That's what -- that's what would not be taken
24 seriously as a reason for depriving the father of his
25 visitation rights, and she wanted the visitation to stop

Closing Statement - Green

1   because she was fed up.  It's not that no one would take her

2   seriously if she reported sexual abuse, it's that nobody would

3   believe that the father should lose his visitation just because

4   the father was getting angry over the child having

5   inappropriate content on the phone.

6          This is not just a dispute between a child and a

7   parent over a phone.  It was not just the phone.  It was the

8   anger, the father's anger at her.  The father intervening in

9   her social life when she was trying to text and message her

10  peers.  Alyssa, being angry and upset back at her father.

11  That's what she wanted to end.

12         So when she reported, when she made a report of

13  sexual abuse, it did end.  It also started an investigative and

14  law enforcement machinery that she had little choice but to go

15  along with.  The FBI gave Alyssa a script to follow.  She made

16  a phone call to her father, told him she was supposed to have

17  an appointment with a doctor, and that she had missed her

18  period.

19         Mr. Copeland, on hearing this, did nothing to

20  discourage her from seeing the doctor.  She says that

21  Mr. Copeland came to visit her in Bridgeport a few days later

22  and they spoke.  No such conversation is recorded, so she could

23  have told him anything.

24         She claims that Mr. Copeland spoke to her in person

25  and he gave her this bizarre advice that you heard on how to

1   terminate the pregnancy by taking vitamin C.  She doesn't claim

2   that Mr. Copeland showed up with a giant bottle of vitamin C.

3   She doesn't explain how she would be able to obtain that on her

4   own, but if an innocent person, an innocent person, is falsely

5   accused by their child, having sex with them, and that this

6   caused her to miss her period, and father, of course, doesn't

7   realize that this is something that the child is telling them

8   because it's been scripted for her by the FBI, he's just

9   hearing this bizarre, outrageous allegation coming from his own

10  child, that's something that could cause someone to panic,

11  apparently, and could cause them panic enough to come up with

12  some crazy idea about taking vitamin C.

13          He obviously didn't go there with any plan to say any

14  such thing.  An innocent person, in that situation, in a

15  father-child situation, would also have to be worried that even

16  if any DNA paternity tests were conducted, a good portion of

17  his DNA would be found, for the simple reason that he is

18  Alyssa's father.  This wasn't the reaction of a guilty person.

19  It was the reaction of an innocent person confronted by an

20  outrageously false accusation.

21          Again, there's no recording of that meeting that

22  Alyssa claims happened in Bridgeport.  You remember there was

23  one phone call which the government said was in March 23.  We

24  don't have a recording.  We don't know what Alyssa told him.

25  But I submit that what she told him was enough to make an

Closing Statement - Green

1  innocent person panic.

2       Alyssa's trial testimony differs from prior

3  statements that she made in important ways.  She claims that

4  the last incident of abuse occurred in February of 2020.

5  That's significant because she first reported the abuse in

6  early March 2020.  This is not a situation where her memory

7  would fade by the passage of time.

8       Now, as to that February 2020 alleged incident, she

9  claimed at trial that the only sex act, this is where she

10  claimed it happened in the parking lot of the apartment

11  complex, she claimed at trial the only sex act during that

12  event occurred in the front passenger seat.  But when she was

13  interviewed in March 2020, she claimed that they also went in

14  the back seat where they were lying down.

15       A car in an apartment complex, two people getting out

16  of the front of the car in a state of undress in February, and

17  going into the back seat.  It's not a credible story.

18       She told the police that the sexual intercourse at

19  the Church Street location occurred in the summer of 2018.  But

20  again, at the March 2020 interview, she claimed it happened

21  only about seven or eight months earlier in the summer of 2019,

22  the same summer that she returned from her trip to England.

23  This was the questioning about that.

24  "Question:  And you told them, you had mentioned that there was

25  vaginal sex, sexual intercourse, going on at the place in the

Closing Statement - Green

1  Poughkeepsie the summer, correct?

2  "Answer:  Yes.

3  "Question:  You told the Poughkeepsie Police that that happened

4  in the summer of 2018, correct?

5  "Answer:  Yes.

6  "Question:  When you were -- and that's when you say it did

7  happen?

8  "Answer:  Can you please --

9  "Question:  Is that when you say it did happen?

10  "Answer:  When?

11  "Question:  Is that when you say it happened in the summer of

12  2018?

13  "Answer:  Yes

14  "Question:  When you were interviewed by the woman in

15  March 2020, the interview that was recorded, you remember that?

16  "Answer:  Yes.

17  "Question:  All right.  That was in 2020, correct?

18  "Answer:  Yes.

19  "Question:  And you told that person that the sexual

20  intercourse in the apartment in Poughkeepsie on Church Street

21  happened earlier that summer.  In other words, the summer of

22  2019, after you had gotten back from England; is that right?

23  "Answer:  Yes."

24          So she tells the Poughkeepsie Police 2018, and at

25  this interview she says it happened -- this is an interview in

Closing Statement - Green

1    March 2020, now she's saying it happened the immediate previous

2    summer after a memorable occasion in her life coming back from

3    a trip to England.

4           She was inconsistent about -- she testified about

5    threatening behavior at this trial.  In the March 2020

6    interview, she testified inconsistently.  She was questioned

7    about this topic.

8    "Question:  All right.  The interviewer in March 2020 asked

9    again whether your father ever had done anything to scare you

10   correct?  She wanted to know

11   "Answer:  Yes.

12   "Question:  And you told her, not really, right?

13   "Answer:  Yes.

14   "Question:  And you told her that you never really seen him in

15   a fight with anybody?

16   "Answer:  Yes.

17   "Question:  That you've just seen him yell and get ready mad,

18   correct?

19   "Answer:  Yes."

20          Alyssa claimed that her father's seminal fluid had

21   gotten on to a backpack, a pair of boots, and a pair of

22   sneakers.  The government keeps trying to minimize this.  But

23   there's a reason why all of those items were collected and

24   tested for the presence of any serological evidence.  It's

25   because Alyssa told them that seminal fluid had gotten on those

1  items.  It wasn't some speculation.  They weren't gathering up

2  every single possession or item of clothing that Alyssa had.

3  They focused on those three specific items because, as Alyssa

4  acknowledged at this trial, she had said that there was seminal

5  fluid on those items.  The forensic evidence does not

6  corroborate this.

7          There were five separate items; two shoes, two boots,

8  and a backpack.  All were tested for the presence of seminal

9  fluid.  With four of the items, a forensic light was used to

10  try to detect the luminescence emitted by seminal fluid.  None

11  was detected.

12          There were a follow-up test by all five items; the

13  backpack, two sneakers, the two boots were wiped with filter

14  paper.  A chemical test was applied to detect the presence of

15  seminal fluid.  None was found.  Of course, that means there

16  was no seminal fluid that could be used to create a DNA profile

17  or do a DNA comparison.

18          And she claimed that there was additional seminal

19  fluid deposited in the Nissan Pathfinder, yet no evidence has

20  been produced of any such thing.

21          Alyssa was brought to St. Vincent's Hospital in

22  Bridgeport on March 4, 2020, when she was examined by

23  Dr. Yaakov-Blechman who testified at this trial.  This included

24  a genitourinary exam where the doctor examined the vagina.

25          There were no injuries reported, no lesions, no

1   tenderness, no discharge, no abnormalities of the hymen or the

2   labia or any other anatomical structure during this pelvic

3   examination.

4           Alyssa claimed that abuse occurred in the households

5   of Yeiana Smith and in the household of Elisha Ferara.  She

6   claimed that this case it happened in Ms. Smith's small

7   apartment in Poughkeepsie, and in Ms. Ferara's case it happened

8   in that open-plan apartment that she had in the Middletown

9   area, the one with one big room and a loft above.

10          She claimed that it happened almost literally right

11  under the noses of Ms. Smith and Ms. Ferara.  Neither Ms. Smith

12  nor Ms. Ferara saw any such thing.  Now both Ms. Smith and

13  Ms. Ferara were in relationships with Mr. Copeland that at

14  times involved fighting or yelling.

15          In Ms. Ferara's case, there were cross family court

16  petitions filed by Mr. Copeland and Ms. Ferara against each

17  other.  But even with that going on, neither one of them saw

18  Mr. Copeland abuse Alyssa, much less sexually abuse her.

19          And the fighting, and to the extent that there was

20  this fighting and yelling going on, it corroborates another

21  thing.  What bothered Alyssa was Mr. Copeland's anger, not of

22  sexual abuse.  As she acknowledged at trial, he would yell and

23  get ready mad, and along with that, he interfered in the

24  virtual life that she had through her cellphone, her text with

25  peers, her experimenting with content that the father found

1    inappropriate.

2         These things are critically important in the life of

3    a young person, and what Alyssa wanted to bring an end to was

4    this interference in her social life and the anger that went

5    along with it.  It had nothing to do with sexual abuse.

6         Now, to try to shore up this case, the government has

7    introduced evidence of other acts.  In other words, not acts

8    that you need to decide whether are proven in this case.  In

9    this case, your role is to determine whether all of the

10   elements of the charges, the three charges in the indictment,

11   have been proven beyond a reasonable doubt.

12        So they have -- and you will be instructed, I

13   believe, that you cannot convict Mr. Copeland simply on the

14   basis of the prior acts that were alleged here, and

15   specifically, including the 2004 incident, and the 2010 case

16   involving Nickeyta, and the evidence about the internet

17   searches that occurred in July and August of 2021.

18        Now, as to the 2004 matter -- well, you have

19   Mr. Copeland's date of birth in evidence, 2004 he was 20 years

20   old.  He was not much older than Shannon and Nicole.  The case

21   was never prosecuted.

22        After 20 years, memories fade and they become harder

23   to testify about and they become harder to defend against.  And

24   it is remote in time and it is, I say not of minimal relevance

25   here, and is not a basis that you could rely on to convict in

Closing Statement - Green

1  this case.  You must find that the charges that are alleged in

2  this indictment are credible and sufficient, and you must find

3  that the government has met its burden of proof beyond a

4  reasonable doubt as to every element of the charges in the

5  indictment.

6         It's not a trial of events that happened in 2004 or

7  in 2010.  And similarly, in 2010, that occurred at a time when

8  Mr. Copeland was 25 years old and Nickeyta was 16.

9         As to the internet searches, these occurred -- these

10  are documented to have occurred about a year and a half after

11  the events that Alyssa testified to at this trial ended.  And

12  it's extremely thin evidence of intent, and it's not something

13  that you can consider as evidence of a propensity to commit

14  this crime.

15         So we have reasonable doubt here.  And as you've been

16  told multiple times, Mr.-- there is a presumption of innocence

17  as to Mr. Copeland.  He is presumed innocent.  And there is

18  reasonable doubt for the multiple reasons that I've gone

19  through; lack of any physical corroboration, no injury, no DNA,

20  inconsistencies in the testimony, lack of credibility as to why

21  Alyssa believes she couldn't report this, and there's motive.

22  There's motive to make a false report.

23         Now when Dr. Hughes testified, one thing she was

24  asked about was what an early disclosure, what a disclosure,

25  first, or early disclosure usually looks like.  And Dr. Hughes

1  said that disclosure is piecemeal, comes out slowly over time.

2  She says it's a process that unfolds over time.  She compared

3  it to an iceberg, you know, one-ninth is above the water and

4  eight-ninths is below the water and we're not going to get it

5  all at once.

6          And what happened here is these allegations of abuse

7  by Alyssa against her father just kind of popped out all at

8  once in March of 2020.

9          When the witness, Briah Lewis, came in here she said

10  that what Alyssa had told her is that her father had been

11  raping her and he had been doing it for years.  That's not a

12  gradual, piecemeal disclosure.  She's popping out all of major

13  talking points of the accusation all at once.

14          And Briah Lewis said another thing.  She made clear

15  that Alyssa was a quite well-adjusted child.  She was bright

16  and bubbly.  She was upbeat and positive.  She was not a

17  traumatized child.

18          So given all of the lack of evidence, the lack of

19  corroboration, the inconsistencies, motives, there's reasonable

20  doubt for multiple reasons, and I submit that you should find

21  Mr. Copeland not guilty.

22          THE COURT:  All right.  Thank you, Mr. Green.

23          All right.  Ladies and gentlemen, I think what makes

24  sense is to take a break now.  We still have one more closing

25  statement, we have the government's rebuttal, and then we'll go

1    right from that to the legal instructions, but I just need to

2    get the papers in order, I am actually going to give you the

3    instruction.

4           So let's take our break now, and that should be time

5    so that, by the time we get to the rebuttal summation and

6    instructions, hopefully your lunch will be here.  Hopefully,

7    you'll get what you ordered this time with the order form.

8           So please continue keep an open mind.  We have not

9    heard the rebuttal summation.  You have not heard the

10    instructions yet.  Please do not discuss the case yet.

11           See you in 20.

12           All rise.

13           (In open court; jury not present)

14           THE COURT:  All right.  Please be seated.

15           Any issues, Mr. Green?

16           MR. GREEN:  No, your Honor.

17           THE COURT:  Okay.  Any issues, government?

18           MS. KEENAN:  No, your Honor.

19           THE COURT:  Okay.  See you in 20.

20           (Recess taken)

21           (Continued on next page)

22

23

24

25

1          THE DEPUTY CLERK:  All rise.

2          THE COURT:  All right, please be seated.

3          A couple quick things.  I know you want to get going,

4     but just a couple quick things.

5          So the thumb drive that's going to go in, both sides

6     have signed off on it?  This is all the exhibits, right?

7          MS. KEENAN:  Yes, your Honor.

8          THE COURT:  Mr. Green?

9          MR. GREEN:  I've reviewed them previously and...

10         THE COURT:  Okay.

11         MR. GREEN:  No issues.

12         THE COURT:  So the thumb drive contains the exhibits

13    from both sides and nothing else, right?

14         MS. KEENAN:  It also contains the exhibit list, which

15    Mr. Green has reviewed.

16         THE COURT:  Okay, so exhibit list, exhibits, and

17    nothing else on here, right?

18         MS. KEENAN:  Yes, your Honor.

19         THE COURT:  Mr. Green.

20         MR. GREEN:  Correct?

21         THE COURT:  Okay, all right.

22         On the charge, I know that Ms. Spivack was talking to

23    you about the "if completed" language that's on page 7 and 14,

24    and you all are both good with that language staying.  Is that

25    right?

1          MS. KEENAN:  Yes, your Honor.

2          THE COURT:  Mr. Green?

3          MR. GREEN:  Yes, your Honor.

4          THE COURT:   Okay.  And then I know that Ms. Spivack

5     also talked to you about the change to the verdict sheet with

6     respect to Count Three where it's -- instead of "violated,"

7     it's 'intended to violate,' because it's slightly different.

8          MS. KEENAN:  Yes, your Honor, we spoke to --

9          THE COURT:   Okay, right, Mr. Green?

10          MR. GREEN:  I agree.

11          THE COURT:   Okay, and so I've made one change to the

12     charge that reflects that, so the last sentence now, page 14,

13     the paragraph that begins with "Count Three of the Indictment,"

14     which is the second full paragraph on 14, the last sentence

15     that begins "to clarify," reads "to clarify, a finding that the

16     Defendant intended to violate a particular section," and that

17     now matches the language that's in the verdict sheet.  As

18     opposed to "violated."

19          MS. KEENAN:  Understood, your Honor, and we agree.

20          THE COURT:   Okay.

21          All right, Mr. Green, you got that.

22          MR. GREEN:  Yes, Judge.

23          THE COURT:  All right, so fresh copies are on their

24     way and I won't be stalling anymore with movie lists.

25          Are you ready to go?

1          MS. SASSOON:  Yeah, ready to go.

2          THE COURT:  How long do you think?

3          MS. SASSOON:  Twenty?  Minutes?

4          THE COURT:  All right, so we'll bring in the jury.

5          (Discussion off the record)

6          THE COURT:  And then the indictment that's going to

7    go in, I took out the attempt language, right?

8          MS. KEENAN:  It did, your Honor.

9          THE COURT:  All right.  You got that, Mr. Green?

10         MR. GREEN:  Yes.

11         THE COURT:  Okay.  All rise.

12         (In open court; jury present)

13         THE COURT:  All right, please be seated, ladies and

14   gentlemen.

15         All right, so on behalf of the Government, Ms.

16   Sassoon.

17         MS. SASSOON:  The Defendant is not the unluckiest man

18   in the world, with a 13-year-old daughter so mad about losing

19   her cell phone that her first instinct is to make up an

20   elaborate and graphic story about vaginal and anal rape by her

21   father.  He's guilty.

22         Now, the Defendant has no burden in this case.  Judge

23   Karas will tell you that.  It's the Government's burden to

24   prove this case beyond a reasonable doubt.  We embrace that

25   burden and we have met that burden, but when the Defense makes

1   arguments in the form of cross-examination or closing

2   statement, it is your duty to scrutinize those arguments, to

3   see if they hold up against the evidence and against your

4   common sense.  They don't.  I'm not going to address everything

5   Mr. Green said here today.  I don't have to.  I've seen you

6   paying close attention to the witness and the evidence, and I

7   know that you're capable of rejecting many of those arguments

8   out of hand.

9        For example, you don't need to spend much time on

10   this argument that there were no physical signs of abuse when

11   Alyssa was examined a month after she had last seen her father.

12   The Defense's own witness, Dr. Blechman, their expert witness,

13   told you that she would not expect to see those physical signs

14   of abuse a month after the last rape and especially here, when

15   the Defendant had been raping his daughter for years without

16   the use of physical violence beyond the rape, but through these

17   other coercive tactics of grooming.

18        And this other argument that there was no DNA on the

19   backpack or the boots.  Take a look at Defense Exhibit B, which

20   is a stipulation, which says that Alyssa gave these items to

21   the police in September of 2020, seven months after she had

22   last seen the Defendant.  Alyssa's not a serologist.  She

23   didn't know that wearing that backpack and her boots every day,

24   day in, day out, in the aftermath of her father's abuse could

25   degrade any physical evidence; that moisture, rain, humidity,

1  tossing your backpack on the ground, walking to school would

2  remove any traces of semen, if they were even there.  And you

3  can use your common sense to conclude that the odds of semen

4  being there in the first place is highly unlikely, but the

5  Defendant's own expert, Dr. Brunt, told you that, too.  He said

6  that where he finds semen is commonly on undergarments, not on

7  backpacks and winter boots.

8          So let's get to the heart of this case, which is the

9  Defendant's effort to discredit Alyssa, and you know why that's

10  where Mr. Green focused his argument, because if you believe

11  her, the Defendant is guilty.  And you know that she told you

12  the truth.  You know that she did not have a motive to make up

13  this elaborate story about vaginal and anal rape.  The best Mr.

14  Green could come up with was that she was mad about a cell

15  phone.

16          Think about your own experience.  When kids get mad

17  about an unfair punishment, what do they do?  They might throw

18  a tantrum or give you the silent treatment or lock themselves

19  in their room or complain to their other parent.  They don't

20  come forward saying "I was raped by my dad."  That's

21  ridiculous.  What child would take on the humiliation and shame

22  and gravity of accusing a parent falsely of sexual abuse, of

23  spending time in forensic examinations, having their body

24  examined, and meeting with police and missing out on time with

25  their friends for a cell phone?  And getting up on that stand

1  in front of a room of adults and strangers and talking about

2  those graphic and humiliating things if they didn't happen?

3  That's ridiculous.

4          And I want you to think about what it would really

5  mean to accept Defense Counsel's argument.  You would have to

6  believe that not only did Alyssa come forward and say "my Dad

7  raped me," but that she also made up every single one of those

8  vivid and graphic details of where and when and how and in the

9  car and in the shelter and in the bed and at bedtime.  Each of

10  those details would have had to be invented out of thin air by

11  Alyssa.  And not only that, somehow, magically, she would have

12  had to come up with this idea that her father raped her in the

13  car in February of 2020 and it just happens to match up with

14  the cell site evidence from that night and from the other

15  nights where you saw the cell site evidence.

16          And on top of that, her story just happens to match

17  up with what Dr. Hughes described to you as the classic pattern

18  of child sex abuse, the escalation of abuse to touching, to

19  touching private areas, to oral sex, to vaginal sex, to anal

20  sex, the secrecy, the threats.  Somehow, Alyssa was so smart

21  that she made up a story that tracks exactly the behavioral

22  patterns of child sex abuse.  Now, either that's the craziest

23  coincidence I ever heard or this 13-year-old, according to Mr.

24  Green, from a couple visits from Social Services for a bruise

25  on her brother's leg learned the patterns of child sex abuse

1  that it took Dr. Dawn Hughes decades of experience and clinical

2  practice to understand.

3  Oh, and on top of all that, if you accept what Mr.

4  Green is saying, it's just the craziest  coincidence that what

5  Alyssa did when she got mad at her dad was make up this story

6  and he also just happens to have raped three other girls when

7  they were teenagers and, oh, and he just also happens to have

8  this interest in incest porn and, oh, and he fled to Florida?

9  That wasn't because he knew he was about to be caught; he just

10  had this sudden urge to cut trees under the name Quentin.  It's

11  ridiculous.  That is not reasonable doubt; that is a conspiracy

12  theory that has no support in the evidence.

13  Alyssa's not a cunning mastermind or a pathological

14  liar.  She was a 13-year-old girl when she disclosed her abuse

15  and she was a 16-year-old girl when she took that stand just a

16  few days ago.  You saw her on that stand and you heard how she

17  has been consistent since the day she came forward to Briah

18  Lewis that her dad had been raping her for years, and you saw

19  how painful it was for her to describe to you, in graphic

20  detail, what no child should ever have to talk about, let alone

21  endure.  You know she was telling you the truth.

22  Now, Mr. Green talked about the iceberg that you

23  heard about from Dr. Hughes, and he said,  well, Dr. Hughes

24  said that there's this iceberg and she came out and said that

25  her dad was raping her and that doesn't match with what Dr.

1 Hughes said. That misunderstands and misstates Dr. Hughes's

2 testimony.

3      Dr. Hughes explained that while a victim might

4 disclose the abuse, it might take time for them to gain the

5 comfort for them to describe all the details and the incidents

6 and the where and the when, and that's what happened here.

7 Briah Lewis didn't testify "I sat with Alyssa for five hours

8 while she walked through every instance of abuse." Alyssa told

9 her that tip of the iceberg; "my dad's raping me." And then

10 she went to the police and then she was interviewed and

11 ultimately she took that stand. And the Defense can't have it

12 both ways saying, oh, she disclosed everything, but there's all

13 these inconsistencies. Well, which is it? The reality is that

14 Alyssa has been consistent from day one of her disclosure that

15 her father is raping her, and I'll point you to a couple places

16 in the record for your reference and to assist in your

17 deliberations.

18      First of all, this notion from Mr. Green that her

19 description of where they were in the car doesn't make sense

20 because they would have to get out naked in a parking lot, that

21 wasn't her testimony. She said that when she moved to the back

22 seat of the car, they climbed through the car, and that's at

23 page 101 of the transcript. And if you look at page 145 of the

24 transcript, that's where Alyssa described how she disclosed the

25 details of the abuse to the Poughkeepsie police.

1          And this idea that Alyssa was somehow inconsistent

2     about whether she was afraid of the Defendant or saw people

3     fighting, the Defense's own witnesses described to you how

4     these households were full of altercations and verbal and

5     physical abuse.  Of course she was afraid.  And the Defense

6     can't have it both ways.  Mr. Green wants you to believe that

7     she wasn't afraid of the Defendant, but that she was so mad

8     about his anger that she made up this fake story.  You can't

9     have it both ways.

10          And I want to remind you what Dr. Hughes said about

11    the memory of trauma and abuse.  She said that when abuse is

12    ongoing for weeks or months or years, some of the incidents can

13    blend because of the trauma, but that victims have the most

14    salient memories of the bookends, the beginning and the end,

15    and Alyssa described to you the grooming that took place at Ms.

16    Ferrara's apartment and those final incidents of abuse in

17    February of 2020 that match up perfectly with the cell site.

18          The Defendant is not the unluckiest dad in the world

19    with a daughter so mad about a cell phone that she would send

20    him to prison for rape or with four women who do not all know

21    each other coming forward to say he raped them.  He's someone

22    who raped Shannon and Nicole in 2004 and Nickeyta in 2010 and

23    his own daughter when she came into his care.

24          Throughout this trial, the Defense has suggested to

25    you that you shouldn't believe Alyssa because she didn't tell

anyone sooner and because a couple girlfriends didn't witness

the abuse themselves.  You should reject that.  Abuse obviously

doesn't happen at the dinner table or when everyone is up and

about in a house.  It happens in the dark, at night, when

others are asleep or upstairs or can't hear.  Ms. Ferrara

herself acknowledged that she would not hear molestation  and

touching happening in her own house if she were not asleep or

if she were in the upstairs part of this supposed open floor

plan.

And there was no social fabric, I believe those were

Mr. Green's words in his opening, or inter generational support

system for Alyssa just waiting for her to cry out about her

abuser.  Alyssa was the vulnerable and at-risk girl that Dr.

Hughes described to you as most at risk for exploitation and

abuse.  She was separated from her mom and her brothers.  She

went to live with a woman that she had met days before.  There

was domestic violence, there was a gun, she was moving from

home to home to shelter.  She didn't have a support system.

Is Defense Counsel really asking you to believe that

if Alyssa had been abused, she would have run into the arms of

Elisha Ferrara?  You saw her testify.  She met Alyssa days

before she moved into her house.  You saw her demeanor.  You

saw how she couldn't even give a straight answer about whether

the Defendant used her car because she was covering for him.

Give me a break.  No one's confiding in Ms. Ferrara.

1           Some of the Defense arguments boil down to this:

2   don't believe these women and especially don't believe Alyssa

3   because she didn't behave the way you would expect a rape

4   victim to behave.

5           In the Defense's world, there's a perfect rape

6   victim.  She cries out when she's being assaulted if there are

7   other people in the house, even if she's a scared little girl.

8   The perfect rape victim fights back and she doesn't comply out

9   of fear.  The perfect victim comes forward right away and she

10  presses charges, and the perfect rape victim doesn't drink or

11  go to a hotel to have fun with her friends.  The perfect rape

12  victim preserves her underwear for testing, and the perfect

13  rape victim doesn't compartmentalize her abuse and have  days

14  where she can be happy at school with her friends.  And the

15  perfect rape victim in the Defense's world remembers every

16  detail of her abuse, whether it was twenty years ago or

17  something that took place over the course of weeks, months, and

18  years, even if it's the very thing that you would try your

19  hardest to forget.

20          You jurors know there is no such thing as a perfect

21  rape victim.  We know that a child victim can be confused, can

22  be driven to secrecy by a trusted adult from threats,

23  confusion, fear, shame, and guilt.

24          The most important point is this.  Dr. Hughes told

25  you how the biggest road block for an abuse victim in coming

1  forward can be the fear that they won't be believed, and Alyssa

2  told you that herself.  Who will believe me.  What if I share

3  this horrible secret and I'm taken from my family and no one

4  believes that this horrible thing happened to me.

5         In just a moment, you will have the case.  You have

6  Alyssa's word, but you have so much more than that.  You have

7  the cell site, the expert testimony, the three other women who

8  were raped, the graphic search history of incest porn, the

9  Defendant's flight, and the testimony of the many witnesses in

10  this courtroom.  You know what happened.  It's time to

11  deliberate without fear or favor to reach the only conclusion

12  consistent with the evidence and the law, that the Defendant is

13  guilty.

14         THE COURT:  All right, thank you, Ms. Sassoon.

15         All right, ladies and gentlemen, we're going to start

16  with the instructions.  Some folks -- we're going to give you

17  the instructions, so you don't have to worry about memorizing

18  them.  And you can take notes.  We're going to give each one of

19  you a copy of the instructions, we're going to give each one of

20  you a copy of the verdict sheet, that's how you're going to

21  report your verdict, and I'll go over this a little bit more in

22  a minute.

23         When we're done, you'll go back -- Ms. Spivack will

24  take you back to the jury room.  You'll begin your

25  deliberations.  As I said, we'll find your lunch and we'll

1    bring it to you.

2           We're also going to send two other things back.

3    We're going to send a thumb drive that has all the exhibits, as

4    well as an exhibit list, and we're going to give you an ability

5    to access that thumb drive, so if you need to see the exhibits,

6    you can do that.  We're also going to give you a copy of the

7    Indictment so you know exactly what the Indictment alleges.

8    Remember, the indictment's not evidence, it's not an exhibit,

9    but it's so you know exactly what the charges are and it can

10   help you navigate the instructions and the verdict sheet that

11   we're going to give you.

12          So we're going to start off now by handing out the

13   jury charge and the verdict sheet.

14          (Brief pause)

15          THE COURT:  Is there anybody among the jurors who

16   does not have a copy of the charge and the verdict sheet?

17   Okay.  Because, as I said, you're welcome to follow along,

18   you're welcome to take notes, you're welcome just to listen,

19   whatever it is that you want to do, it's entirely up to you,

20   but you can keep those copies that you've been given.

21          All right, members of the jury, we have now reached

22   that point where you are about to begin your final function as

23   jurors: your deliberations.  As I have said before, your

24   service here is one of the most important duties of citizenship

25   in this country.

1    I'm now going to give you a set of instructions on
2  the law that you should apply during your deliberations.  My
3  instructions will be in six parts.  First, I will describe the
4  role of the Court and of the jury.  Second, I will describe the
5  parties.  Third, I will instruct you about the presumption of
6  innocence and the standards under which you will decide whether
7  the Government has met its burden of proof.  Fourth, I will
8  summarize the charges against the Defendant and I will describe
9  the law to be applied to the facts as you find them to be
10  established by the proof.  Fifth, I will give you instructions
11  concerning the evaluation of evidence.  The sixth and final
12  section of these instructions will relate to your
13  deliberations.

14    So starting off with the role of the Court and the
15  jury, I will now describe my role as the judge and yours as the
16  jury.

17    You, the members of the jury, are the sole and
18  exclusive judges of the facts in this case.  It is my job to
19  instruct you as to the law, and it is your duty to accept those
20  instructions and then apply them to the facts as you determine
21  them.

22    On legal matters, you must take the law as I give it
23  to you.  If an attorney has stated a legal principle different
24  than any I state to you during my instructions, it is my
25  instructions you must follow.  You should not single out any

1   instruction alone as stating the law.  Rather, you should

2   consider my instructions as a whole when you go back to the

3   jury room to deliberate.

4           I have said that the purpose of your deliberations is

5   to determine the facts of this case.  Let me remind you now

6   about some general points regarding what you should consider in

7   your deliberations.

8           You must rely upon your own recollection of the

9   evidence.  The evidence consists of the answers given by

10  witnesses, the stipulations agreed to by the parties, and the

11  exhibits that were received into evidence.  You may not

12  consider any testimony that I have told you to disregard or

13  that was stricken from the record.  What the lawyers said in

14  their opening statements, their closing arguments, their

15  objections, or their questions is not evidence.  Nothing that I

16  say is evidence.  The rulings that I have made during the trial

17  are not any indication of my views of what your decision should

18  be.

19          Now the parties.  The parties to this case are the

20  Government of the United States of America and the Defendant,

21  Vernon E. Copeland, III.

22          You are to perform your duty without bias or

23  prejudice as to any party of any kind.  The fact that the

24  prosecution is brought in the name of the United States of

25  America entitles the Government to no greater consideration

1 than that of any other party to a case. By the same token, the
2 Government is entitled to no less consideration.

3 Next, the presumption of innocence and the burden of
4 proof.

5 The Defendant has pleaded not guilty to the charges
6 alleged in the Indictment. As a result of a plea of not
7 guilty, the burden is on the Government to prove the
8 Defendant's guilt beyond a reasonable doubt. The burden never
9 shifts to the Defendant for the simple reason that the law
10 never requires any defendant to prove his or her innocence, no
11 defendant in a criminal case ever has the burden or duty of
12 testifying, calling any witness, or locating or producing any
13 evidence.

14 The law presumes the Defendant to be innocent of each
15 charge. This presumption of innocence alone is sufficient to
16 acquit the Defendant. The Defendant was presumed innocent when
17 the trial began and this presumption remains with the Defendant
18 unless and until you are convinced that the Government has
19 proved the Defendant guilty beyond a reasonable doubt.

20 Let me explain to you what "reasonable doubt" is.
21 The words almost define themselves. It is a doubt based on
22 reason and common sense. It is a doubt that a reasonable
23 person has after carefully weighing all of the evidence. Proof
24 beyond a reasonable doubt must be proof of a convincing
25 character that a reasonable person would not hesitate to rely

upon in making an important decision in his or her own affairs.

A reasonable doubt is not a caprice or whim and it is not

speculation or suspicion.  It is not an excuse to avoid the

performance of an unpleasant duty and it is not sympathy.

In a criminal case, the burden is at all times on the

Government to prove guilt beyond a reasonable doubt.  The

Government does not have to prove guilt beyond all possible

doubt.  Proof beyond a reasonable doubt is sufficient for you

to convict.  On the other hand, if you believe that the

Defendant probably committed the crimes with which he is

charged, that is not sufficient.  That the Defendant introduced

evidence in this case does not shift the burden of proof to him

at all.

If, after fair and impartial consideration of all the

evidence, or lack of evidence, you are satisfied beyond a

reasonable doubt of the guilt of the Defendant, you should vote

to convict the Defendant of the count you are considering.  If,

on the other hand, after fair and impartial consideration of

all of the evidence, or lack of evidence, you have a reasonable

doubt about the guilt of the Defendant, it is your obligation

to acquit the Defendant of the count you are considering.

Next up is the Indictment, and I'll start with a

summary of the charges.

The Defendant, Vernon E. Copeland, III, is formally

charged in an Indictment.  As I instructed you at the outset of

this case, the Indictment is a charge or accusation.  It is not
evidence.  Before you begin your deliberations, you will be
provided with a copy of the Indictment.  I will not read the
Indictment to you at this time.  Rather, I will first summarize
the offenses charged in the Indictment and then explain in
detail the elements of each charged offense.  I will provide
you with all relevant definitions and all relevant legal
principles.  In other words, I will provide you with all the
instructions you need to decide whether the Government has
proved beyond a reasonable doubt each of the necessary elements
of each charge in the Indictment.

Count One of the Indictment charges that Vernon E.
Copeland, III knowingly, using a facility and means of
interstate commerce, persuaded, induced, enticed, or coerced a
minor to engage in sexual activity for which a person can be
charged with a criminal offense from at least in or about 2016
through at least in or about 2020.

Count Two of the Indictment charges that Vernon E.
Copeland, III crossed a state line with the intent to engage in
a sexual act with someone who had not yet attained the age of
12 years, between in or about September 2016 through in or
about September 2018.

Count Three of the Indictment charges that on or
about February 7, 2020, Vernon E. Copeland, III transported a
minor in interstate commerce with the intent that the minor

engage in sexual activity for which a person can be charged
with a criminal offense.

As I noted, the Defendant is charged in three counts,
also called charges. Each count charges the Defendant with
different criminal conduct. You must consider each count
separately and you must return a verdict of guilty or not
guilty for each count. Whether you find the Defendant guilty
or not guilty as to one offense should not affect your verdict
as to any other offense charged.

Now, generally applicable legal principles, so we're
going to talk about the definitions of 'unlawfully,'
'intentionally,' and 'knowingly.'

As I instruct you on the specific charges, I will
define several terms. At the outset, though, let me define the
terms 'unlawfully,' 'intentionally,' and 'knowingly.'

Unlawfully simply means contrary to law. The
Defendant need not have known that he was breaking any
particular law or any particular rule for you to find that he
acted unlawfully. Rather, the Defendant need only have been
aware of the generally unlawful nature of his acts.

An act is done intentionally and knowingly if it is
done deliberately and purposefully, that is, the Defendant's
acts must have been the product of the Defendant's conscious
objective rather than the product of a mistake or accident or
mere negligence or some other innocent reason.

1          Now, in terms of the individual charges, Count One,

2   which is Enticement to Engage in Illegal Sexual Activity, I

3   will now give you detailed instructions on the crime charged in

4   Count One of the Indictment.

5          Count One of the Indictment charges the Defendant

6   with using a facility of interstate commerce to persuade,

7   induce, entice, or coerce an individual to engage in illegal

8   sexual activity, in violation of  2422(b) of Title 18 of the

9   United States Code.  The relevant statute for Count One, Title

10  18, United States Code,  2422, provides that "whoever, using

11  the mail or any facility or means of interstate commerce,

12  knowingly persuades, induces, entices, or coerces any

13  individual who has not attained the age of 18 years to engage

14  in any sexual activity for which any person can be charged with

15  a criminal offense" is guilty of a federal crime.  Count One

16  charges the Defendant with incitement to engage in illegal

17  sexual activity from at least in or about 2016 through at least

18  in or about 2020.

19         Now, in terms of the elements, in order to satisfy

20  its burden of proof, the Government must establish each of the

21  four following essential elements beyond a reasonable doubt:

22         First, that the Defendant used a facility of

23  interstate commerce as alleged in the Indictment; second, that

24  the Defendant knowingly persuaded or induced or enticed or

25  coerced Alyssa to engage in sexual activity; third, that this

1    sexual activity would violate New York law; and fourth, that

2    Alyssa was less than 18 years old at the time of the acts

3    alleged in the Indictment.

4    So now, let's separately consider the four elements,

5    starting with the first element, use of mails or internet.

6    The first element of Count One which the Government

7    must prove beyond a reasonable doubt is that the Defendant used

8    a facility of interstate commerce as alleged in the Indictment.

9    Transmission of communications by means of the

10   telephone or internet constitutes the use of a facility of

11   interstate commerce regardless of whether the communication

12   actually crossed a state line.  However, you must find beyond a

13   reasonable doubt that the specific communication in question

14   was actually transmitted by means of the telephone or internet.

15   Now, the second element, persuasion to engage in

16   sexual activity, the second element which the Government must

17   prove beyond a reasonable doubt is that the Defendant knowingly

18   persuaded or induced or enticed or coerced Alyssa to engage in

19   sexual activity.  The words 'persuade,' 'induce,' 'entice,' and

20   'coerce' should be given their ordinary meanings.

21   The Defendant must have knowingly persuaded or

22   induced or enticed or coerced Alyssa to engage in sexual

23   activity.  I have previously defined the term 'knowingly' for

24   you and you should apply those instructions here.

25   The third element, illegal sexual activity, the third

1   element that the Government must prove beyond a reasonable

2   doubt, is that this sexual activity, if completed, would

3   violate New York law.

4           The Indictment alleges that the Defendant persuaded

5   Alyssa to engage in sexual activity in violation of three

6   sections of New York Penal Law: (i),  130.30, Rape in the

7   Second Degree; (ii)  130.45, Criminal Sexual Conduct in the

8   Second Degree; and (iii),  130.60, Sexual Abuse in the Second

9   Degree.  You need only find that the sexual activity, if

10  completed, would violate one of these crimes under New York

11  law.  However, you must be unanimous, that is, all 12 jurors

12  must agree, that the Government has proven beyond a reasonable

13  doubt that the sexual activity, if completed, would violate at

14  least one of the three New York State crimes.  To clarify, a

15  finding that the Defendant violated a particular section of New

16  York Penal Law must be unanimous as to the particular section

17  of New York Penal Law.

18          I instruct you as a matter of law that each of the

19  three crimes I have just listed was a violation of New York

20  Penal Law at the time the acts in Count One are alleged to have

21  been committed, that is, during the period from at least in or

22  about 2016 through at least in or about 2020.

23          Under New York law, for a sexual act to be criminal,

24  it must be committed without the consent of the victim.  A

25  person is deemed incapable of consent under New York law when

1    he or she is less than 17 years old.  That means a person who

2    is 16 years old or younger cannot consent to a sexual act under

3    New York law.  This instruction regarding consent under New

4    York law applies to each of the alleged violations of New York

5    law that I am about to discuss for Count One.

6            So now I'm going to set out the elements of each of

7    these New York Penal Law crimes.

8            So starting with New York Penal Law  130.30, Rape in

9    the Second Degree, a person violates New York Penal Law

10    130.30, Rape in the Second Degree, when, being 18 years old or

11   more, he engages in sexual intercourse with another person less

12   than 15 years old.

13           Under New York law, "sexual intercourse" means any

14   penetration, however slight, of the penis into the vaginal

15   opening.  In other words, any penetration of the penis into the

16   vaginal opening, regardless of the distance of penetration,

17   constitutes an act of sexual intercourse.  Sexual intercourse

18   does not necessarily require erection of the penis, emission,

19   or orgasm.

20           Next, New York Penal Law  130.45, which is Criminal

21   Sexual Conduct in the Second Degree, a person violates New York

22   Penal Law  130.45, that is, criminal sexual act in the second

23   degree, when, being 18 years old or more, he engages in oral

24   sexual conduct or anal sexual conduct with another person less

25   than 15 years old.

1    Under New York law, "oral sexual conduct" means

2 conduct between persons consisting of contact between the mouth

3 and the penis, the mouth and the anus, or the mouth and the

4 vulva or vagina.

5    Under New York law, "anal sexual conduct" means

6 conduct between persons consisting of contact between the penis

7 and the anus.

8    Finally, under New York Penal Law  130.60, Sexual

9 Abuse in the Second Degree, a person violates New York State

10 Penal Law  130.60, that is, sexual abuse in the second degree,

11 when he subjects another person to sexual contact and when such

12 other person is less than 14 years old.

13    Under New York law, "sexual contact" means any

14 touching of the sexual or other intimate parts of a person for

15 the purpose of gratifying the sexual desire of either party.

16 It includes the touching of the victim by the actor, whether

17 directly or through clothing, as well as the emission of

18 ejaculate by the actor upon any part of the victim, clothed or

19 unclothed.

20    The fourth element of the fourth count is age of the

21 victim, so the fourth element of Count One which the Government

22 must prove beyond a reasonable doubt is that Alyssa was less

23 than 18 years old at the time of the acts alleged in Count One.

24    The Government must prove that the Defendant knew

25 that Alyssa was less than 18 years old at the time of the acts

1    alleged in Count One.

2         Now, Count Two, Aggravated Sexual Abuse of a Minor

3    Under 12, I will now give you detailed instructions on the

4    crime charged in Count Two of the Indictment.

5         The Indictment charges the Defendant with aggravated

6    sexual abuse of a minor under 12, in violation of  2241(c) of

7    Title 18 of the United States Code.  That section provides in

8    relevant part: "whoever crosses a state line with intent to

9    engage in a sexual act with a person who has not attained the

10   age of 12 years...knowingly engages in a sexual act with

11   another person who has not attained the age of 12 years [shall

12   be guilty of a federal crime]."

13        Now, Count Two charges the Defendant with aggravated

14   sexual abuse of a minor under 12 years of age between in or

15   about September 2016 through in or about September 2018.

16        Now, in terms of the elements, in order to prove the

17   Defendant guilty of aggravated sexual abuse of a minor under

18   12, the Government must prove each of the following elements

19   beyond a reasonable doubt: first, that the Defendant caused

20   Alyssa to engage in a sexual act as I will define that term for

21   you; second, that the Defendant acted knowingly in causing

22   Alyssa to engage in that sexual act; third, that Alyssa was

23   less than 12 years old at the time of the acts alleged in Count

24   Two; fourth, that the Defendant crossed a state line with

25   intent to engage in a sexual act with a child under 12.

1    So now let's separately consider the four elements,

2 starting with first element, sexual act.

3    The first element that the Government must prove

4 beyond a reasonable doubt is that the Defendant caused Alyssa

5 to engage in a sexual act.

6    The term "sexual act" means (1) penetration, however

7 slight, of the vulva or anus by the penis; (2), contact between

8 the mouth and the penis, the mouth and the vulva, or the mouth

9 and the anus; (3), penetration, however slight, of the anal or

10 genital opening of another by hand, a finger, or by any other

11 object, with an intent to abuse, humiliate, harass, degrade, or

12 arouse or gratify  the sexual desire of any person; or (4) the

13 intentional touching, not through the clothing, of the

14 genitalia of another person who has not attained the age of 16

15 years with an intent to abuse, humiliate, harass, degrade, or

16 arouse or gratify the sexual desires of any person.

17    The second element that the Government must prove

18 beyond a reasonable doubt is that the Defendant acted knowingly

19 in causing Alyssa to engage in a sexual act.  I have already

20 instructed you as to what it means to act knowingly.  Please

21 apply the instructions previously provided to you.

22    The third element that the Government must prove

23 beyond a reasonable doubt is that Alyssa was less than 12 years

24 old at the time of the acts alleged in Count Two.  The

25 Government does not have to prove that the Defendant knew that

1   Alyssa was less than 12 years old.

2           The fourth  element that the Government must prove

3   beyond a reasonable doubt is that the Defendant crossed a state

4   line with intent to engage in a sexual act with a child under

5   12.

6           In order to establish this element, it is not

7   necessary for the Government to prove that the illegal sexual

8   activity was the sole purpose for crossing the state line.  A

9   person may have several different purposes or motives for such

10  travel and each may prompt in varying degrees the act of making

11  the journey.  The Government must prove beyond a reasonable

12  doubt, however, that a significant or motivating purpose of the

13  travel across a state line was to engage in a sexual act with a

14  child under 12 years old.  In other words, the illegal sexual

15  activity must not have been merely incidental to the trip.

16          Finally, Count Three, Transportation of a Minor to

17  Engage in Illegal Sexual Activity.

18          All right, I'm now going to give you the detailed

19  instructions on the crime charged in Count Three of the

20  Indictment.  The Indictment charges the Defendant with

21  transportation a minor for the purpose of engaging in illegal

22  sexual activity on or about February 7, 2020.

23          The relevant statute for Count Three is Title 18,

24  United States Code,  2423(a), which provides that a person who

25  "knowingly transports an individual who has not attained the

age of 18 years in interstate...commerce...with intent that the individual engage... in any sexual activity for which any person can be charged with a criminal offense," is guilty of a federal crime.

In order to prove the Defendant guilty of transporting a minor for the purpose of engaging in illegal sexual activity, the Government must prove each of the following elements beyond a reasonable doubt: first, that the Defendant knowingly transported Alyssa in interstate commerce as alleged in Count Three of the Indictment; second, that the Defendant transported Alyssa with the intent that Alyssa would engage in illegal sexual activity; and third, that Alyssa was less than 18 years old at of the acts alleged in Count Three of the Indictment.

So now turning back to the first element that the Government must prove beyond a reasonable doubt, which is that the Defendant knowingly transported Alyssa in interstate commerce as alleged in Count Three of the Indictment, to transport an individual in interstate commerce means to move or carry or cause someone to be moved or carried, from one state to another.

"Interstate commerce" simply means movement between one state and another. The Government does not have to prove that the Defendant personally transported Alyssa across a state line. It is sufficient to satisfy this element that the

1   Defendant was actively engaged in the making of travel

2   arrangements such as by purchasing the tickets necessary for

3   Alyssa to travel as planned.

4           The Defendant must have knowingly transported Alyssa

5   in interstate commerce.  This means that the Government must

6   prove that the Defendant knew both that he was transporting

7   Alyssa as I have just defined that term and that he was

8   transporting Alyssa in interstate commerce.  I have already

9   instructed you as to what it means to act knowingly.  Please

10  apply the instructions previously provided to you.

11          Whether or not the minor consented to being

12  transported or to traveling in interstate commerce for the

13  purpose of engaging in criminal  sexual activity or otherwise

14  voluntarily participated is irrelevant.  Likewise, the minor's

15  consent to the sexual activity is irrelevant.  The consent or

16  voluntary participation of a minor is not a defense.  Put

17  simply, the minor's consent or lack of consent is irrelevant

18  with regard to this  element.

19          The second element that the Government must prove

20  beyond a reasonable doubt is that the Defendant transported

21  Alyssa with the intent that Alyssa would engage in illegal

22  sexual activity for which any person can be charged with a

23  criminal offense in violation of New York law.

24          Direct proof of a person's intent is almost never

25  available.  It would be a rare case where it could be shown

that a person wrote or stated that as of a given time, he
committed an act with a particular intent.  Such direct proof
is not required.  The ultimate fact of intent, though
subjective, may be established by circumstantial evidence based
upon the Defendant's outward manifestations, his words, his
conduct, his acts, and all the surrounding circumstances
disclosed by the evidence and the rational or logical
inferences that may be drawn from them.

In order to establish this element, it is not
necessary for the Government to prove that engaging in illegal
sexual activity was the sole purpose for crossing the state
line.  A person may have different purposes or motives for such
travel and each may prompt in varying degrees the act of making
the journey.  The Government must prove beyond a reasonable
doubt, however, that a significant or motivating purpose of the
travel across a state line was that Alyssa would engage in
illegal sexual activity.  In other words, the illegal activity
must not have been merely incidental to the trip.

Count Three of the Indictment charges that the
Defendant transported Alyssa with the intent that Alyssa would
engage in sexual activity in violation of three sections of New
York Penal Law: (i)  130.30, Rape  in the Second Degree; (ii),
 130.45, Criminal Sexual Act in the Second Degree; and (iii)
 130.60, Sexual Abuse in the Second Degree.  For this count,
you need only find that the sexual activity, if completed,

1   would violate one of these crimes under New York law.  However,

2   you must be unanimous, that is, all 12 jurors must agree, that

3   the Government has proven beyond a reasonable doubt that the

4   sexual activity, if completed, would violate at least one of

5   the three New York State crimes.  To clarify, a finding that

6   the Defendant intended to violate a particular section of New

7   York Penal Law must be unanimous as to that particular section

8   of New York Penal Law.

9           Now, I have already instructed you as to each of

10  these New York Penal Law crimes with respect to the elements of

11  Count One.  Please apply the instructions previously provided

12  to you.

13          The third element that the Government must prove

14  beyond a reasonable doubt is that Alyssa was less than 18 years

15  old at the time of the acts alleged in Count Three.  The

16  Government must also prove that the Defendant knew that Alyssa

17  was less than 18 years old at the time of the acts alleged in

18  Count Three.

19          Now, in addition to all the elements I have described

20  for each count, you must decide whether any act in furtherance

21  of the crime charged in each count occurred within the Southern

22  District of New York, which includes New York County, in other

23  words, Manhattan; Bronx, Westchester, Rockland, Putnam,

24  Dutchess, Orange, and Sullivan Counties.

25          On the issue of venue, and on this issue alone, the

1     Government need not offer proof beyond a reasonable doubt.  It

2     is sufficient if the Government proves venue by a mere

3     preponderance of the evidence.  Thus, the Government has proved

4     venue if you conclude that it is more likely than not that any

5     act in furtherance of the crime you are considering occurred

6     within the Southern District of New York.

7              Venue must be examined separately for each count in

8     the indictment.  Venue on one count does not establish venue on

9     another count, though if applicable, you may rely on the same

10    evidence to establish venue on multiple counts.

11             Now, as we have proceeded through the indictment, you

12    may have noticed that it refers to various dates.  I instruct

13    you that it does not matter if a specific event is alleged to

14    have occurred on or about a certain date or month, but the

15    testimony indicates that, in fact, it was a different date or

16    month.  The law requires only a substantial similarity between

17    the dates and months alleged in the Indictment and the dates

18    and months established by the evidence.

19             Next, we're going to discuss how you should evaluate

20    the evidence you have been presented in this case.

21             The evidence in this case consists of the sworn

22    testimony of the witnesses, the exhibits that have been

23    received into evidence, and the stipulations agreed upon by the

24    parties.  As I have mentioned many times, the arguments,

25    questions, and objections made by the lawyers are not evidence.

1    It is entirely for you alone to decide what weight, if any, to

2    give the testimony and the stipulations you have heard and the

3    exhibits you have seen.

4            I will now give you some specific instructions about

5    how you should evaluate certain types of evidence you may have

6    seen or heard during the trial.

7            There are two types of evidence that you may properly

8    use in reaching your verdict: direct evidence and

9    circumstantial evidence.  Direct evidence is evidence that

10   proves a fact directly.  One kind of direct evidence is a

11   witness's testimony about something the witness knows by virtue

12   of the witness's own senses, something the witness has seen,

13   felt, or heard.  Direct evidence may also be in the form of an

14   exhibit.

15           Circumstantial evidence is evidence that tends to

16   prove one fact by proof of other facts.  Here is a simple

17   example:

18           Suppose that when you came to the courthouse this

19   morning, the sun was shining and it was a nice day.  Assume we

20   drew the blinds in the courtroom and you couldn't see outside.

21   Then, later on, as you are sitting here, someone enters the

22   room with an umbrella that is dripping wet.  Someone else walks

23   in wearing a raincoat that is dripping wet.

24           You cannot look outside the courtroom and therefore

25   you cannot see directly whether or not it is raining.  You have

1  no direct evidence of that fact, but on the combination of the

2  other facts about the umbrella and the raincoat, it would be

3  reasonable and logical for you to conclude that between the

4  time you arrived at the courthouse and the time these people

5  walked in, it had started to rain.  That is all there is to

6  circumstantial evidence.  You infer the existence or

7  nonexistence of a fact from other facts using your reason,

8  experience, and common sense.

9       The law makes no distinction between direct and

10 circumstantial evidence.  Circumstantial evidence is of no less

11 value than direct evidence.  Your job, again, is to decide the

12 facts of the case based on all the evidence, direct and

13 circumstantial.

14      Now, I've told you that circumstantial evidence will

15 require you to "infer" facts from other facts.  The lawyers may

16 also have used the term 'infer' or 'inference' and they may

17 have asked you to infer on the basis of your reason,

18 experience, and common sense the existence of some fact from

19 one or more established facts.

20      An inference is not a suspicion or a guess.  It is a

21 reasoned, logical decision to conclude that a disputed fact

22 exists or does not exist based on other facts.  It is a

23 deduction or conclusion that you, the jury, are permitted, but

24 not required, to draw from the facts established either by

25 direct or circumstantial evidence.  In drawing inferences, you

1    should exercise your own common sense, reason, and experience.

2           There may be times when different inferences can be

3    drawn from facts, whether proved by direct or circumstantial

4    evidence.  The Government will ask you to draw one set of

5    inferences while the Defendant will ask you to draw other

6    inferences.  It is for you and you alone to decide what

7    inferences you should draw.

8           Let me remind you again, whether based on direct or

9    circumstantial evidence or reasonable and logical inferences

10   based on that evidence, the Defendant is presumed innocent and

11   you must be satisfied that the Government has met its burden to

12   prove the Defendant guilty beyond a reasonable doubt before you

13   may convict the Defendant.

14          Now, with regard to stipulations, let me repeat the

15   instructions I gave you when you first heard a stipulation in

16   this case.

17          A stipulation is an agreement between the parties as

18   to what certain facts are or what the testimony would be if a

19   certain person was called to testify.  You should accept a

20   stipulated fact to be true.  You should also accept as true the

21   fact that the witness would have given the testimony the

22   parties agree he or she would have given.  It is for you to

23   determine the effect to be given that testimony.  You should

24   consider the weight to be given to stipulated evidence just as

25   you would any other evidence.

1        Now, you've heard testimony about evidence seized in

2   various searches.  Evidence obtained from these searches was

3   lawfully obtained and properly admitted in this case and you

4   may properly consider it.  Whether you approve or disapprove of

5   how the evidence was obtained should not enter into your

6   deliberations because I instruct you that the Government's use

7   of this evidence is entirely lawful.  You must, therefore,

8   regardless of your personal opinions, give this evidence as

9   much consideration as you give every other piece of evidence in

10  this case in determining whether the Government has proved the

11  Defendant's guilt beyond a reasonable doubt.

12       Now, you may have heard references to the fact that

13  the Government did not use certain investigative techniques.  I

14  instruct you that there is no legal requirement that the

15  Government prove its case through any particular means.  There

16  is also no legal requirement that the Government use any

17  specific technique to investigate.  Law enforcement techniques

18  are not your concern.  Your concern, as I have said before, is

19  to determine whether or not, based on all the evidence

20  presented to you, the Government has proved the Defendant's

21  guilt beyond a reasonable doubt.

22       Now, in this case, I have permitted Dr. Dawn Hughes,

23  Brittany Antonucci, Andrew Petersohn, Allyson Goble, Dr.

24  Miralle Yaakov-Blechman, and Richard Brunt to express their

25  opinions on matters that are in issue.  Under the rules of

evidence, a witness may be permitted to testify to an opinion

on those matters about which he or she has special knowledge,

skill, experience, and training.  This testimony is presented

to you on the theory that someone who is experienced and

knowledgeable in the field can assist you in understanding the

evidence or in reaching an independent decision on the facts.

Now, in weighing this opinion testimony, you may

consider the witness's qualifications , his or her opinions and

the reasons given for them, the witness's reasons for

testifying, as well as all of the other considerations that

ordinarily apply when you are deciding whether or not to

believe a witness's testimony.  I will discuss those

considerations further in a moment.  You may give the opinion

testimony whatever weight, if any, you find it deserves in

light of all of the other evidence in the case.  You should

not, however, accept opinion testimony merely because I allowed

the witness to testify as an "expert," nor should you

substitute such testimony for your own reason, judgment, and

common sense.  Again, the determination of the facts in this

case is entirely your job.

Now, some of the exhibits were charts, tables, or

other forms of summary exhibits.  These exhibits are not

themselves direct evidence.  They are graphic representations

or other ways of summarizing more voluminous information that

was either described in the testimony of a witness or reflected

in documents admitted into evidence.  It is often easier and

more convenient to utilize charts, tables, and summaries as

opposed placing all of the underlying documents in front of

you, but it is up to you to decide whether the summary exhibits

fairly and correctly reflect the underlying testimony and

documents they purport to summarize.  To the extent that

summary exhibits conform to your understanding of the

underlying evidence, you may accept them.  To the extent they

do not, you should set them aside and rely on the underlying

evidence instead.  But one way or the other, realize that

summary exhibits are not in and of themselves direct evidence.

They are merely intended to serve as aids in a party's

presentation of the evidence.

Now, some of the exhibits admitted into evidence

include redactions of certain information.  'Redacted' means

that part of the document or recording was taken out.  There is

nothing unusual or improper about such redactions.  You are to

concern yourself only with the part of the item that has been

admitted into evidence and you should not consider any possible

reason why the other part of it was not admitted into evidence.

The Government has been permitted to show you a typed

document that it prepared containing the Government's

interpretation of what appears on an English-language tape

recording which has been received as evidence.  It was given to

you as an aid or guide to assist you in listening to the tape.

1    However, it is in and of itself not evidence. Therefore, when

2    the tape was played, I advised you to listen carefully to the

3    tape itself. You alone should make your own interpretation of

4    what appears on the tape based on what you heard. If you think

5    you heard something different than appeared on the transcript,

6    then what you heard is controlling.

7         Let me again say, you, the jury, are the sole judges

8    of the facts in this case.

9         Under our Constitution, a defendant has no obligation

10   to testify or to present any evidence because it is always the

11   Government's burden to prove a defendant guilty beyond a

12   reasonable doubt. The burden remains with the Government

13   throughout the entire trial and never shifts to a defendant. A

14   defendant is never required to prove that he or she is innocent

15   or present any evidence or call any witnesses.

16        Therefore, you must not attach any significance to

17   the fact that the Defendant did not testify. There may be many

18   reasons why a defendant does not testify. No adverse inference

19   against the Defendant may be drawn by you because he did not

20   take the witness stand, and you may not consider it in any way

21   in your deliberations in the jury room.

22        You heard testimony that the Defendant traveled to

23   Florida and that at the time of the arrest, he gave a name

24   other than his given name. The Government contends that such

25   conduct demonstrates consciousness of guilt.

1          You must decide first whether you believe that such

2     conduct took place, and second, if it did take place, whether

3     it demonstrates consciousness of guilt on the part of the

4     Defendant.

5          In determining whether or not conduct demonstrates

6     consciousness of guilt, you may consider whether that conduct

7     has an innocent explanation.  If you determine that the

8     evidence establishes that the Defendant engaged in the conduct

9     and that the conduct demonstrates consciousness of guilt, it is

10    still for you to decide the weight and importance you give that

11    evidence.  However, I instruct you that, standing alone, such

12    evidence may never be the basis for a finding of guilt.

13         Now for the important subject of evaluating the

14    testimony you have heard; how do you evaluate the credibility

15    or believability of witnesses.

16         Well, as a general matter, you evaluate the

17    credibility of a witness by using your plain common sense.  In

18    short, you should ask yourselves the same types of questions

19    you would use in your everyday life to decide whether a person

20    is truthful, straightforward, and accurate in his or her

21    statements and recollections.  You should ask yourselves: did

22    the witness strike you as honest, open, and candid?  How

23    responsive was the witness to the questions asked on direct

24    examination and on cross-examination?  Was the witness

25    consistent or contradictory?  Did the witness appear to know

1   what he or she was talking about?  Did the witness strike you

2   as someone who was trying to report his or her knowledge

3   accurately?  These are examples of the types of questions you

4   should ask yourselves in deciding whether and to what extent

5   you believe a witness is or is not credible.

6          If you find that a witness is intentionally telling a

7   falsehood, then that is always a matter of importance that you

8   should weigh carefully.  Few people recall every detail of

9   every event precisely the same way.  However, a witness, like

10  any other person, may be inaccurate, contradictory, or even

11  untruthful in some respects and yet entirely believable and

12  truthful in others.  It is for you to determine whether such

13  inconsistencies, if any, are significant or inconsequential.

14         In a similar vein, you may have heard testimony that

15  a witness made a statement on an earlier occasion that a lawyer

16  has argued is inconsistent with the witness's trial testimony.

17  It is for you to determine whether a witness's prior statements

18  are inconsistent with his or her live testimony and, if so, how

19  much, if any, weight you should give to an inconsistent

20  statement or a discrepancy in testimony in determining how much

21  of a witness's trial testimony, if any, to believe.  Let me

22  instruct you, however, that you should only consider evidence

23  of a witness's prior inconsistent statements insofar as it

24  relates to that witness's credibility.

25         If you find that any witness has willfully testified

1  falsely as to any important matter, the law permits you to

2  disregard that witness's entire testimony on the theory that

3  one who testifies falsely about one important fact is likely to

4  testify falsely about everything.  But you also do not have to

5  do so.  You may, but are not required, to consider such a

6  witness completely "unbelievable."  Again, a witness might lie

7  about some things, but testify truthfully about others.

8         How much you choose to believe a witness may also be

9  influenced by the witness's bias, if you think he or she has

10  any.  Does the witness have a relationship with the Government

11  or the Defendant that may affect how the witness testified?

12  Does the witness have some incentive or motive to shade the

13  truth?  Does the witness have some bias, prejudice, or

14  hostility that may cause the witness to give you something

15  other than a completely accurate account of the facts he or she

16  testified to?

17         You should also consider the witness's accuracy: did

18  the witness have an opportunity to observe the facts he or she

19  testified about?  Does the witness's recollection of the facts

20  stand up in light of the other evidence in the case?

21         In evaluating credibility, you may accept so much of

22  a witness's testimony as you deem true and accurate and

23  disregard what you feel is false.  In other words, credibility

24  is not an all-or-nothing proposition.  By this process, as the

25  sole judges of the facts, you will decide which of the

witnesses you will believe, what portion of their testimony you will accept, and what weight you will give it.

Now, you've heard evidence that a witness made a statement on an earlier occasion that counsel argues is inconsistent with the witness's trial testimony.  Evidence of a prior inconsistent statement is not to be considered by you as affirmative evidence bearing on the Defendant's guilt. Evidence of the prior inconsistent statement was placed before you for the more limited purpose of helping you decide whether to believe the trial testimony of the witness who contradicted himself or herself.  If you find that the witness made an earlier statement that conflicts with the trial testimony, you may consider that fact in deciding how much of the trial testimony, if any, to believe.

In making this determination, you may consider whether the witness purposely made a false statement or whether it was an innocent mistake, whether the inconsistency concerns an important fact or whether it had to do with a small detail, whether the witness had an explanation for the inconsistency, and whether that explanation appealed to your common sense.

It is exclusively your duty, based upon all the evidence and your own good judgment, to determine whether the prior statement was inconsistent and, if so, how much, if any, weight to be given to the inconsistent statement in determining whether to believe all or part of the witness's testimony.

1          Now, you have heard evidence during the trial that

2     witnesses have discussed the facts of the case and their

3     testimony with the lawyers before the witnesses appeared in

4     court.

5          Although you may consider that fact when you are

6     evaluating a witness's credibility, I should tell you that

7     there is nothing either unusual or improper about a witness

8     meeting with lawyers before testifying so that the witness can

9     be aware of the subjects he or she will be questioned about,

10    focus on those subjects, and have the opportunity to review

11    relevant exhibits and other materials before being questioned

12    about them.  Such consultation helps conserve your time.  In

13    fact, it would be unusual for a lawyer to call a witness

14    without such consultation.  The weight you give to the fact or

15    the nature of the witness's preparation for his or her

16    testimony and what inferences you draw from such preparations

17    are matters completely within your discretion.

18         You've also heard testimony of several law

19    enforcement officers in this case.  The fact that a witness is

20    employed as a law enforcement official does not mean his or her

21    testimony is necessarily deserving of more or less

22    consideration or greater or lesser weight than that of an

23    ordinary witness.  It is your decision, after reviewing all the

24    evidence, whether to accept or reject the testimony of the

25    witness, in whole or in part, and to give that testimony

whatever weight you find it deserves.

There's also been evidence that the Defendant made certain statements to law enforcement officials. In deciding what weight to give the Defendant's statements, you should first examine with great care whether each statement was made and, if so, whether it was voluntarily and understandingly made. I instruct you that you are to give the statements such weight as you feel they deserve in light of all of the evidence.

Now, the fact that one party may have called more witnesses and introduced more exhibits than another does not mean that you should find the facts in favor of that side. Your job is to evaluate all the evidence presented to determine which witnesses to believe and which facts are true. Again, you should keep in mind that the burden of proof is always on the Government and the Defendant is not required to call any witness or offer any evidence, because the Defendant is presumed innocent.

Now, there may be persons, some of whose names you have heard during the course of the trial, who have some knowledge regarding the case, but who did not appear here to testify and as to whom there will be no stipulation as to what they would testify to if they appeared. In a similar vein, there may be evidence relating to this case that was not introduced here and as to which there was no stipulation about

1    what it would show if it was introduced.  I instruct you that

2    each party had an equal opportunity, or lack of opportunity, to

3    call individuals as witnesses and to present evidence.

4    Therefore, you should not draw any inferences or reach any

5    conclusions as to what any other witnesses would have testified

6    to had they been called or what any other evidence would have

7    shown if it had been presented.  Their absence should not

8    affect your judgment in any way.

9            Now, a lawyer has a duty to object when another party

10   offers evidence that the lawyer believes is inadmissible.  In

11   this trial, the lawyers had the right, and the duty, to object

12   and to ask the Court to make rulings of law.  You should not

13   hold a lawyer's decision to object to a question, to ask me for

14   a ruling, or to ask to speak to me at the sidebar against

15   either that lawyer or his client.

16           Additionally, let me remind you here that nothing I

17   have said during this trial is evidence and you should not draw

18   any inference about my own views of the facts in this case from

19   any rulings I have made during the trial.  You are the sole

20   judges of the credibility of all witnesses and of the weight

21   and significance of all evidence.

22           Now, you may not draw any inference, favorable or

23   unfavorable, toward the Government or the Defendant from the

24   fact that any person was not named as a defendant in this case

25   and you may not speculate as to the reasons why other people

1    are not on trial before you now.  Those matters are wholly

2    outside your concern and have no bearing on your function as

3    jurors in deciding the case before you.

4         Now, the Government has offered evidence tending to

5    show that on a different occasion, the Defendant engaged in

6    conduct similar to the charges in the Indictment.  Let me

7    remind you, the Defendant is not on trial for committing any

8    acts not alleged in the Indictment.  Accordingly, you may not

9    consider this evidence of other acts as a substitute for proof

10   that the Defendant committed the crimes charged.

11        There are two forms of so-called "similar act"

12   evidence offered by the Government as follows:

13        The first form of similar act evidence offered by the

14   Government is evidence that the Defendant committed other

15   "sexual assaults" similar to the acts set forth in the

16   Indictment.  The phrase 'sexual assault' includes unlawful and

17   nonconsensual contact between any part of the Defendant's body

18   and another person's genitals or anus.  It is for you to decide

19   whether the Defendant engaged in other sexual assaults.

20        In a criminal case like this one in which the

21   Defendant is accused of sexual assault, evidence of the

22   Defendant's commission of other sexual assaults is admissible

23   and may be considered by the jury for its bearing on whether

24   the Defendant committed the offenses for which he's charged in

25   the Indictment.  However, evidence of another similar offense

1    on its own is not sufficient to prove that the Defendant is

2    guilty of the crimes charged in the Indictment.

3              Now, the second form of similar act evidence that the

4    Government offers is intended to show that, on different

5    occasions, the Defendant engaged in conduct that is arguably

6    related to the charges in the Indictment, but that conduct did

7    not involve sexual assaults.  It involved search terms and

8    browsing history from the Defendant's cell  phone.  You may

9    consider this second form of similar act evidence, but for a

10   more limited purpose than the first form of similar act

11   evidence.

12             You may consider both types of "similar act" evidence

13   if you determine that the Defendant committed the acts charged

14   in the indictment and the similar acts, and then you may, but

15   you need not, draw an inference that in committing the acts

16   charged in the Indictment, that Defendant acted knowingly and

17   intentionally and not because of some mistake, accident, or

18   other innocent reasons.  You may also consider this evidence in

19   determining whether the Defendant utilized a common scheme or

20   plan in committing both the crimes charged in the Indictment

21   and the similar acts introduced by the Government.

22             As I mentioned, there are more limitations on the use

23   of the second form of similar act evidence, that is, evidence

24   of similar acts but not involving sexual assault.  You may not

25   consider this second type of evidence for any other purpose.

1  These limitations apply only to the second type of similar act

2  evidence and do not apply to your consideration of evidence of

3  similar acts that do involve sexual assaults.

4       I remind you again that the Defendant is only on

5  trial for committing acts alleged in the Indictment.

6  Accordingly, you may not consider this evidence of similar acts

7  as a substitute for proof that the Defendant committed the

8  crimes charged.

9       Now, some of the evidence in this case has consisted

10  of electronic evidence seized from phones or electronic

11  accounts.  The Government's use of such electronic evidence in

12  this case is entirely legal and proper and you may consider it

13  along with all the other evidence in the case.  Whether you

14  approve or disapprove of the seizure of this evidence may not

15  enter into your deliberations.

16       You may, therefore, regardless of any personal

17  opinions, consider this evidence along with all the other

18  evidence in the case in determining whether the Government has

19  proven the Defendant's guilt beyond a reasonable doubt.

20  However, as with the other evidence, it is for you to determine

21  what weight, if any, to give to such evidence.

22       Now, you know, ladies and gentlemen, that the

23  Defendant was not present in the courtroom for portions of the

24  trial.  As I already instructed you, please do not speculate as

25  to why he was absent.  Under the law, in these circumstances,

1  we were allowed to proceed in his absence.  I instruct you that

2  you are not to draw any inference as to the Defendant's guilt

3  or innocence based on his absence or draw any adverse inference

4  against him on that basis.

5      Also, the fact that some witnesses in this trial did

6  not provide their last names is not a fact from which any

7  inference unfavorable to the Defendant may be drawn.  You may

8  not consider this as evidence of guilt of the Defendant or for

9  any other purpose.

10      You will now retire to decide this case.  It is your

11  duty as jurors to consult with one another and to deliberate

12  with a view to reaching an agreement.  Each of you must decide

13  for yourself the answers to the questions I have posed, but you

14  should do so only after consideration of the case with your

15  fellow jurors.

16      You should not hesitate to change an opinion when you

17  are convinced that it is wrong.  Your answers to each question

18  must be unanimous, but you are not bound to surrender your

19  honest convictions concerning the effect or weight of the

20  evidence for the mere purpose of returning a verdict or solely

21  because of the opinions of other jurors.  Discuss and weigh

22  your respective opinions dispassionately and without regard to

23  sympathy, prejudice, or favor for any party, and adopt the

24  conclusion that in your good conscience appears to be in

25  accordance with the truth.

1        You are not to discuss the case until all jurors are

2   present.  Four or five jurors together is only a gathering of

3   individuals.  Only when all jurors are present do you

4   constitute a jury and only then may you deliberate.

5        The exhibits will be sent to you in the jury room.

6   As I mentioned, it's going to be done via a thumb drive.  If

7   you want any transcripts of testimony during your

8   deliberations, that can be arranged.  You also may request to

9   re-see or hear any recording that you may have seen or heard or

10  to see any transcript that has been entered  into evidence,

11  except for the transcript that was just an aid.  Please

12  appreciate that it is not always easy to locate any testimony

13  you might want, so be as specific as you possibly can.

14       Any communication with the Court should be made in

15  writing, signed by your foreperson, and given to the Court

16  Security Officer.  I will respond to any questions or requests

17  you have as promptly as possible, either in writing or by

18  having you return to the courtroom so I can speak with you in

19  person.  Whenever you communicate with the Court, do not tell

20  me or anyone else how the jury stands until after a unanimous

21  verdict is reached.

22       Let me say that to you again because sometimes that

23  gets forgotten.  Whenever you communicate with the Court,

24  please do not tell me or anyone else how the jury stands until

25  after a unanimous verdict is reached.

1          And by the way, when you've reached a verdict, don't

2    put the verdict sheet in the envelope, just send us a note

3    saying "we've reached a verdict," and then what happens is the

4    foreperson brings the verdict sheet and then reads from the

5    verdict sheet, all right?

6          Now, I know that some of you took notes during the

7    trial.  You should not show your notes or discuss your notes

8    with anybody else during your deliberations.  Any notes you

9    have taken are not evidence and they are to be used solely to

10   assist you.  The fact that a particular juror has taken notes

11   entitles that juror's views to no greater weight than those of

12   any other juror.  Finally, your notes are not to substitute for

13   your recollection of the evidence in this case.  If you have

14   any doubt as to any testimony, as I said, you may request the

15   official transcript that has been made of these proceedings be

16   read or otherwise provided to you.

17         Your verdict must be based solely on the evidence

18   developed at trial or the lack of evidence.  It would be

19   improper for you to consider in reaching your decision as to

20   whether the Government has sustained its burden of proof any

21   personal feelings you may have about the Defendant's race,

22   religion, national origin, sex, or age.  The same is true of

23   the race, religion, national origin, sex, or age of the

24   victims.  Everyone is entitled to the presumption of innocence.

25   It would be equally improper for you to allow any feelings you

might have about the nature of the crime charged to interfere

with your decision-making process.  Likewise, you should not

consider any feelings you might have about the attorneys in

this case.  Your verdict must be based exclusively on the

evidence or lack of evidence in this case.

Now, the question of possible punishment, if there is

to be any punishment at all, is of no concern to the jury and

should not in any sense enter into or influence your

deliberations.  The duty of imposing sentences rests

exclusively upon the Court.  Your function is to weigh the

evidence in the case and to determine whether or not the

Defendant has been proved guilty beyond a reasonable doubt

solely upon the basis of such evidence.

Now, under your oath as jurors, you are not to be

swayed by sympathy.  You are to be guided solely by the

evidence, or lack of evidence, in this case, and the crucial

question you must ask yourselves as you sift through the

evidence is: has the Government proved the Defendant's guilt

beyond a reasonable doubt.

It is for you alone to decide whether the Government

has proved the Defendant guilty of the crimes charged solely on

the basis of the evidence and subject to the law as I have

charged you.  It must be clear to you that once you let fear,

prejudice, bias, or sympathy interfere with your thinking,

there is a risk that you will not arrive at a true and just

1  verdict.

2      Now, as I mentioned, I'm going to send a copy of the

3  indictment into the jury room.  You are reminded, however, that

4  the Indictment is not evidence.  It is merely an accusation and

5  it is not to be used by you as any proof of the conduct

6  charged.

7      The foreperson will also receive a form on which to

8  record your verdict.  As I said, all of you have it, but there

9  will be one form that will be completed by the foreperson.

10  When the foreperson has completed the official verdict form,

11  the foreperson must sign his or her name and the form will be

12  marked as a Court exhibit, so you will bring it in with you

13  when you are brought in to record your verdict.

14      The most important part of this case, members of the

15  jury, is the part that you as jurors are now about to play as

16  you deliberate on the issues of fact.  It is for you, and you

17  alone, to decide whether the Government has proved beyond a

18  reasonable doubt each of the essential elements of the crimes

19  with which the Defendant has been charged.  If the Government

20  has succeeded as to its charges against the Defendant, your

21  verdict should be "Guilty" as to that charge; if it has failed,

22  it must be "Not Guilty."

23      I know you will try the issues that have been

24  presented to you according to the oath that you have taken as

25  jurors.  In that oath, you promised that you would well and

truly try the issues joined in this case and render a true

verdict. Your function is to weigh the evidence in the case

and to determine whether or not the Defendant has been proven

guilty solely upon the basis of such evidence.

As you deliberate, please listen to the opinions of

your fellow jurors and ask for an opportunity to express your

own views. Every juror should be heard. No one juror should

hold center stage in the jury room and no one juror should

control or monopolize the deliberations. If, after listening

to your fellow jurors and if after stating your own view, you

become convinced that your view is wrong, please do not

hesitate because of stubbornness or pride to change your view.

On the other hand, do not surrender your honest convictions and

beliefs solely because of the opinions of your fellow jurors or

because you are outnumbered. Your final vote must reflect your

conscientious belief as to how the issues should be decided.

Your verdict must be unanimous. If at any time you

are not in agreement, you are instructed that you are not to

reveal the standing of the jurors, that is, the split of the

vote, to anyone, including the Court, at any time during your

deliberations.

Finally, and I say this not because I think it's

necessary, but because it is the custom in this courthouse to

say this, you should treat each other with courtesy and respect

during your deliberations.

1      Now, your first task as a jury will be to choose your

2  foreperson.  The foreperson has no greater voice or authority

3  than any other juror but is the person who will simply

4  communicate with the Court when questions arise.

5      All litigants stand equal in this room.  All

6  litigants stand equal before the bar of justice.  All litigants

7  stand equal before you.  Your duty is to decide the issues

8  before you fairly and impartially and to see that justice is

9  done.

10      Now, ladies and gentlemen, I'm going to ask for your

11  patience one last time.  I'm just going to speak to the lawyers

12  at the sidebar to see if there's anything else I need to

13  instruct you on before you begin your deliberations.

14      (Discussion at sidebar:

15      THE COURT:  Anybody got anything?

16      MS. KEENAN:  No, your Honor.  I worried at the end of

17  the charge that I hadn't heard Ted's proposed instructions, but

18  Ms. Spivack remind me that I was looking at yesterday's charge

19  and Ted and Mr. Ly both confirmed that they did hear Mr.

20  Green's proposal.

21      MR. GREEN:  Unless I was dreaming, I did hear it.

22      MR. LY:  I did hear it.

23      THE COURT:  Hear what?

24      MS. KEENAN:   Ted's proposed language on flight.

25      MR. GREEN:  You're talking about the flight

1   instruction or the consciousness of guilt instruction and the

2   use of first names instruction that I had requested.  I heard

3   that the Court delivered both of those.

4              THE COURT:  Okay.

5              MS. SASSOON:  No issue.

6              THE COURT:  Okay, so you're good in other words.

7              MR. GREEN:  (Nods in the affirmative).

8              THE COURT:  Okay.

9              Just a couple things.

10             So we have to excuse the alternates.  We're going to

11  swear the Court Security Officer, and do we know if their lunch

12  is here?

13             MS. SPIVACK:  It is.

14             THE COURT:  So we'll tell them that their lunch is

15  here, but we'll tell them they can work through lunch.  What

16  I'm inclined to do is, you all need to eat, so they can keep

17  deliberating, but they shouldn't assume you're going to be here

18  for a half an hour, so go get something to eat and then, you

19  know, either come back here or at least make sure that Daphna

20  has a phone number for each side.

21             So she's gotta have your number, Ted --

22             MR. GREEN:  Okay.

23             THE COURT:   -- and for somebody from the Government.

24             And I'm going to tell them that we stay late if they

25  want to stay, okay?  So the two-thirty  thing is now up to

1　them.

2　　　　　Anybody got anything else?

3　　　　　MS. KEENAN:  No.

4　　　　　MR. GREEN:  No.

5　　　　　THE COURT:  Also, I'm going to be going over the

6　verdict  form and they have to be unanimous with each one of

7　the state law predicate acts, they can't just be, yeah, one of

8　these three, so that's crystal clear to them.

9　　　　　All right, thanks.)

10　　　　　(In open court; jury present)

11　　　　　THE COURT:  All right, on the verdict sheet, if you

12　want to just take a look at that real quickly, so for Counts

13　One and Three, there's a -- as I mentioned, there's these New

14　York State law provisions that are elements of Counts One and

15　Three, and the important thing here is that you need to be

16　unanimous on each of the questions 1a, b, and c and on 4a, b,

17　and c.

18　　　　　So you can't say -- you can't just ask whether one of

19　the three has been proven beyond a reasonable doubt, you

20　actually have to answer each one, okay?  And if you're not

21　unanimous, you say no, okay?  If you are unanimous, you say

22　"yes," and then the verdict sheet gives you sort of a decision

23　tree, so if you answered "yes" to any one of the first 1a, b,

24　or c or all of them or some combination of them, then you

25　proceed to question 2.  If you answer "no" on all three, then

1  you go to Count Two, okay?  And if you have any questions, you

2  can send us a note.

3          Your lunch is here.  It's back in the jury room?

4  Okay, your lunch is back in the jury room.  You can begin your

5  deliberations once you go back there so you can have a working

6  lunch if you like.  These folks do need to eat, so you can

7  start working, and the only reason I want to let you know that

8  they need to eat is because if you have any notes, we'll try to

9  get everybody back here, but they 're not going to be here

10  waiting for the note, but as I said, we'll try to get them back

11  here.  We've got their cell phone numbers and what not.  So I'm

12  going to give them a half an hour to try and get some

13  nourishment, and then they're going to be, you know, around so

14  we can be able to quickly respond to your notes.

15          Our trial day has been nine-thirty to two-thirty.

16  That's now over, because now it's your trial day, so we will

17  stay as early or as late as you want.  We've taken verdicts

18  deep into the evening.  Whatever it is, what you want to do,

19  you -- it's now your call as to our schedule, all right?  And

20  everybody knows that.

21          And a couple other last things.

22          So Jurors 13 and 14, so Ms. Faddah and Ms. Turner,

23  you are our alternate jurors and we go to a verdict with 12.  I

24  know that that can be frustrating; you've sat through the whole

25  week.  Please know that without your presence here, we can't be

1  confident that we have a jury that will see the case through to

2  the end.

3          As I'm sure you can appreciate, especially, you know,

4  during the COVID era, the alternates became the two most

5  important people on the planet, because people were really --

6  you know, it was very likely that somebody was going to get

7  sick, so I thank you very much on behalf of the Court and the

8  parties for your service here.  Ms. Spivack will take all of

9  you back and you can gather your things and be on your way.

10         The lawyers may ask to talk to you.  It's entirely up

11  to you if you want to talk to them or not, you can, but you

12  don't have to, but I will, again, say thank you for your

13  service and have a wonderful weekend, and next up, we can have

14  our Court Security Officer take the oath.

15         (Court Security Officer sworn)

16         THE COURT:  So we have envelopes and we have a legal

17  pad for you to send any notes to us and just put the note in

18  the envelope, so now after hearing me say to you all week long

19  "please don't discuss the case," I'm now saying the opposite,

20  so your deliberations may begin.

21         We're also going to make sure that the thumb drive is

22  compatible with whatever the tech is back there, so Ms.

23  Spivack's going to go and then she's going to leave, so the

24  idea is, obviously, no one goes back there except the Court

25  Security Officer, and that's the only one, or one of his

1    colleagues, that you should be handing any notes to or that

2    should be coming into the room.  Okay, if anybody else comes

3    in, make sure you reach out to one of the Court Security

4    Officers.  Maybe somebody will come in by accident.  I'm not

5    saying anything nefarious with that, but...

6             So, ladies and gentlemen, now you may begin your

7    deliberations.

8             All rise.

9             (In open court; jury not present)

10            THE COURT:  All right, please be seated.

11            For the record, I have marked the hard copy of the

12   jury charge as Court Exhibit A with today's date, I've marked

13   the verdict sheet as Court Exhibit B with today's date.

14            So it's 1:40.  Can we say that you can be available,

15   slash, back here in about a half an hour?  Let's say 2:15?  Can

16   we do that?

17            Mr. Green, does that work for you?

18            MR. GREEN:  Yes.

19            THE COURT:  Does that work for the Government?

20            MS. KEENAN:  Yes.

21            MS. SASSOON:  Just out of an abundance of caution,

22   the Government is not going to speak to any alternates given

23   that no verdict's been reached and who knows what could happen

24   if an alternate gets thrown in, so we just want to confirm that

25   Mr. Green likewise is --

1          THE COURT:  Mr. Green, do you agree to do that, too?

2          MR. GREEN:  Yes, I will refrain from that.

3          THE COURT:  Good answer, okay.

4          MS. SASSOON:   We also have the physical exhibits

5    here.  What would you like us to do with those?

6          THE COURT:  If you want to give those to the Court

7    Security Officer, he can bring those in.

8          MS. SASSOON:  The one thing to note is the envelopes

9    have some language like "rape" on them and so if Mr. Green

10   prefers, we can keep them here.  They're listed on the exhibit

11   list.  If the jurors want to see it, we can provide it to them

12   in some form.  It's up to Mr. Green.

13         MR. GREEN:   Yeah, I think I would prefer that.

14         THE COURT:  Okay.

15         MR. GREEN:  I mean, I have hard copies in my exhibits

16   as well, so I'll hold on to mine.

17         THE COURT:  That's fair, okay.

18         All right, so let me just say before we get any

19   notes, you know, I very much appreciate the efforts of counsel

20   in this case.  This case has certainly had its challenges.

21         Mr. Green, again, just a tremendous amount of respect

22   for your professionalism in this case.  I'm not the least bit

23   surprised, but I very much want you to know how much it's

24   appreciated.

25         And, you know, frankly, all the parties in this case,

1    this was an extremely well-done trial in terms of people being

2    professional, courteous, giving 110 percent, and I wish all

3    trials could have lawyers of such caliber and dedication, so I

4    just want to thank everybody for their work in this case.

5              All right, so we'll wait and then -- off the record.

6              (Discussion off the record)

7              (Luncheon recess)

8              THE COURT:  Okay, so the jury has sent a note.  I've

9    marked it as Court Exhibit C and dated it today's date, 1:40

10   p.m., and the note reads "jury has reached a verdict."

11             Mr. Green, in light of Mr. Copeland's conduct, even

12   this morning, I'm not persuaded it's advisable to bring him in

13   here just to have another outburst in front of the jury as they

14   return their verdict.

15             The trial's over and so I don't think that having him

16   not here presents any substantial Sixth Amendment issues, but

17   to the extent it does, I think that he's waived his right to

18   object because of his conduct, and I have no reason to think

19   that he will suddenly be respectful of the process, but I'm

20   happy to hear from you.

21             MR. GREEN:  Well, I would object to excluding him,

22   and I renew all of my previous arguments regarding the

23   exclusion of the Defendant from the --

24             THE COURT:  But what's the basis to think that he's

25   going to do anything other than be disruptive?

1          MR. GREEN:  Well, I think an attempt should be made,

2     and --

3          THE COURT:  But then we make the attempt and then the

4     minute the jury comes in, he's disruptive and we have him go

5     right back out again, and I'm trying to understand what the

6     point of that would be.

7          MR. GREEN:  Well, I'm making that application, your

8     Honor.  I'm also renewing all my previous applications

9     regarding the need for a psychiatric evaluation.

10         THE COURT:  Okay.

11         Government, your thoughts on this?

12         MS. KEENAN:  In view of the incredible command the

13    Defendant has shown over the timing of his outbursts, the

14    Government agrees with the Court that the Defendant is very

15    likely to engage in an outburst the minute the verdict is

16    attempted to be read by a jury, which would cause delay.

17         THE COURT:  Yeah, I mean, we wouldn't be able to take

18    the verdict, literally we would not be able to take the

19    verdict, because he would just be screaming so loud, and also,

20    I think it could be just disturbing to the jury.  And there's

21    no longer any, you know, concern about, for example,

22    contributing to his defense, the verdict's in, so...

23         You know, I feel like I've tried to give Mr. Copeland

24    the benefit of the doubt.  I've let him back in several times;

25    each time he has been disruptive.  He's -- it's taken different

forms. This morning, he did the, you know,
I'm-going-to-repeat-everything-you-say-back -to-you trick, and
that was before the jury was even in the courtroom, and so I
don't think there's any reason to believe at all that he's
going to do anything other than be disruptive and it's going to
waste time, and I just don't think that the -- I just think
he's waived his right to be here just by virtue of his repeat
misconduct, and I don't think this is because of psychosis or
some sort of mental health-caused problem for all the reasons
I've previously mentioned, so I would propose to bring in the
jury and take the verdict.

       Anything else, Mr. Green?

       MR. GREEN:  No, your Honor.

       THE COURT:   Anything else, Government?

       MS. KEENAN:  No, your Honor.

       THE COURT:  All right, we'll bring the jury in.

       All rise.

       (In open court; jury present)

       THE COURT:  All right, please be seated, ladies and
gentlemen.

       We have received your note.  You indicate that you
have reached a verdict.

       Ms. Spivack, if you could please take the verdict.

       THE DEPUTY CLERK:   Will the foreperson please stand.

       Has the jury reached a verdict?

1          THE FOREPERSON:  Yes.

2          THE COURT:  In regards to Count One, Enticement of a

3    Minor Victim to Engage in Illegal Sexual Activity, do you find

4    that the Defendant, Vernon E. Copeland, III, violated any of

5    the following sections of New York Penal Law with respect to

6    Alyssa from at least in or about 2016 through at least in or

7    about 2020: a. New York Penal Law  130.30, Rape in the Second

8    Degree?

9          THE FOREPERSON:  Yes.

10         THE DEPUTY CLERK:   b. New York Penal Law  130.45,

11   Criminal Sexual Conduct in the Second Degree?

12         THE FOREPERSON:  Yes.

13         THE DEPUTY CLERK:   c. New York Penal Law  130.60,

14   Sexual Abuse in the Second Degree?

15         THE FOREPERSON:  Yes.

16         THE DEPUTY CLERK:  How do you find the Defendant,

17   Vernon E. Copeland, III, with respect to Count One?

18         THE FOREPERSON:  Guilty.

19         THE DEPUTY CLERK:  Count Two, Aggravated Sexual Abuse

20   of a Minor Under the Age of 12, how do you find the Defendant,

21   Vernon E. Copeland, III, with respect to Count Two?

22         THE FOREPERSON:  Guilty.

23         THE DEPUTY CLERK:  Count Three, Transportation of a

24   Minor to Engage in Illegal Sexual Activity, do you find that

25   the Defendant, Vernon E. Copeland, III, intended to violate any

of the following sections of New York Penal Law with respect to
Alyssa on or about February 7th, 2020: a. New York Penal Law
130.30, Rape in the Second Degree?

THE FOREPERSON: Yes.

THE DEPUTY CLERK: b. New York Penal Law 130.45,
Criminal Sexual Conduct in the Second Degree?

THE FOREPERSON: Yes.

THE DEPUTY CLERK: c. New York Penal Law 130.60,
Sexual Abuse in the Second Degree?

THE FOREPERSON: Yes.

THE DEPUTY CLERK: How do you find the Defendant,
Vernon E. Copeland, III, with respect to Count Three?

THE FOREPERSON: Guilty.

THE DEPUTY CLERK: Juror 1, is that your verdict?

JUROR NO. 1: Yes.

THE DEPUTY CLERK: Juror 2, is that your verdict?

JUROR NO. 2: Yes.

THE DEPUTY CLERK: Juror 3, is that your verdict?

JUROR NO. 3: Yes.

THE DEPUTY CLERK: Juror 4, is that your verdict?

JUROR NO. 4: Yes.

THE DEPUTY CLERK: Juror 5, is that your verdict?

JUROR NO. 5: Yes.

THE DEPUTY CLERK: Juror 6, is that your verdict?

JUROR NO. 6: Yes.

THE DEPUTY CLERK: Juror 7, is that your verdict?

JUROR NO. 7: Yes.

THE DEPUTY CLERK: Juror 8, is that your verdict?

JUROR NO. 8: Yes.

THE DEPUTY CLERK: Juror 9, is that your verdict?

JUROR NO. 9: Yes.

THE DEPUTY CLERK: Juror 10, is that your verdict?

JUROR NO. 1O: Yes.

THE DEPUTY CLERK: Juror 11, is that your verdict?

JUROR NO. 11: Yes.

THE DEPUTY CLERK: Juror 12, is that your verdict?

JUROR NO. 12: Yes.

THE DEPUTY CLERK: The jury was polled. The verdict is unanimous.

THE COURT: All right, ladies and gentlemen, with the return of your verdict, that completes your service in this case.

As I said when we all met on Monday, I know how much of an imposition that jury service can be on your personal and professional lives, but it really is one of the most important civic functions and so I thank you on behalf of everybody who works in the building for your taking that commitment seriously, for being here every day, giving attention to the evidence, being on time, and I bid you a pleasant weekend, so we won't see you for a few years at a minimum.

1          All rise.

2          (In open court; jury not present)

3          THE COURT:  All right, please be seated, everybody.

4          Mr. Green, how about we deem your post-trial motions

5  to be made and then I'll give you whatever time you think you

6  need to file?

7          MR. GREEN:  That will be fine, your Honor.

8          THE COURT:  So how much time do you think you need to

9  file the papers?

10          MR. GREEN:  I guess three weeks.

11          THE COURT:  Why don't you take 30 days, Ted.

12          MR. GREEN:  That's fine.

13          THE COURT:  All right.  So August 14.

14          Government, how long to respond?

15          MS. KEENAN:  Two weeks, your Honor?

16          THE COURT:  Okay, August 28?  So you're just going to

17  make Mr. Ly do it?  Is that why you made it two weeks?

18          MS. KEENAN:  We will happily take three weeks if your

19  Honor will give it.

20          THE COURT:  I'll give you the three weeks, so, what,

21  that would be September...what?  Five?

22          MS. KEENAN:  September 4.  That's Labor Day, so --

23          THE COURT:  Because the 4th gets you around Labor Day

24  and...

25          MS. KEENAN:  We'll take the 11th.  Thank you, your

1   Honor.

2          THE COURT:  And then, Mr. Green, three weeks to

3   reply?

4          MR. GREEN:  Wait a minute, you had my --

5          THE COURT:  So you're August 14, Government is

6   September 11, and then how long to reply?

7          MR. GREEN:  Okay, two weeks.

8          THE COURT:  The 25th.

9          MR. GREEN:  Yes.

10         THE COURT:  All right.  And then Ms. Bordes isn't

11  here and we're not in my courtroom so I can't even get to my

12  Outlook because that's how the court works here, so we'll have

13  to get back to you on a sentencing date, so we'll do that on

14  Monday.

15         MS. KEENAN:  The sentencing date, I think, actually

16  was scheduled before Ms. Bordes left.  There is a --

17         THE COURT:  Did she tell you?  Because she didn't

18  tell me.

19         MS. KEENAN:  There is a sentencing date on the

20  docket.  I think it's October 14th.

21         THE COURT:  Okay, well, let's have that be for now,

22  that seems a little short in terms of giving Probation enough

23  time, so I'll have Ms. Bordes reach out to you all  next week

24  to confirm, all right?  But for now, we'll say tentatively

25  October 14th.

1          All right, Mr. Green, anything else?

2          MR. GREEN:  No.

3          THE COURT:  Anything else, Ms. Keenan?

4          MS. KEENAN:  No, your Honor.  Thank you.

5          THE COURT:  All right.

6          I just want to, again, for the record, thank the

7   Marshals Service.  This was above and beyond the call of duty,

8   and their professionalism, I just think, was so admirable and

9   so appreciated and so essential to providing Mr. Copeland a

10  fair trial and to making sure that this trial ran smoothly, so

11  I want to thank the Marshals, and please convey this to all

12  your colleagues downstairs.

13         Mr. Green, do you want to try to see Mr. Copeland

14  before you go?

15         MR. GREEN:  I think I'm going to try to do that.

16         THE COURT:  Okay, so if you just give Mr. Green a

17  chance to do that downstairs?  All right, thank you, Marshals.

18         All right, then we are adjourned.  Have a good

19  weekend, everybody.  Thank you.

20         (Proceedings concluded)

21

22

23

24

25

1                    DEFENDANT EXHIBITS

2       Exhibit No.                              Received

3

4       D . . . . . . . . . . . . . . . . . . . 576

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25